UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
(MIAMI DIVISION)
www.flsb.uscourts.gov

In re                                                        CASE NO. 08-19029-BKC-LMI
                                                             CHAPTER 7
CARDIAC MANAGEMENT SYSTEMS,                                   (Jointly Administered)
NC., et al.,

        Debtors.

_____/

KENNETH A. WELT, Chapter 7 Trustee of                         ADV. CASE NO. 10-03060-LMI
the jointly administered estates of the Debtor,
Cardiac Management Systems, Inc. and its
affiliated debtors,

        Plaintiff,

v.

BDO SEIDMAN, LLP, n/k/a BDO USA, LLP
a New York limited liability partnership,

        Defendant.

_____/

**PLAINTIFF'S NOTICE OF DESIGNATION OF THE RECORD ON APPEAL AND
STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL**

        The Plaintiff, Kenneth A. Welt (the "Trustee"), not individually but in his capacity as the

Chapter 7 trustee of the jointly administered debtors in the pending bankruptcy case of Cardiac

Management Systems, Inc., et al., by and through counsel and pursuant to Federal Rule of

Bankruptcy Procedure 8006, designates the following items to be included in the record on

appeal of: (1) the Court's November 1, 2010 *Order Granting BDO USA, LLP's Motion to

Compel Arbitration and to Stay Discovery* [C.P. 24]; and (2) the Court's January 2, 2011 *Order

Denying Motion of Plaintiff, Chapter 7 Trustee Kenneth A. Welt, for Reconsideration of Order*

*Granting Motion of Defendant BDO Seidman, LLP n/k/a BDO USA, LLP, to Compel Arbitration*

[C.P. 40], and sets forth the following issues to be presented on appeal.

## DESIGNATION OF RECORD ON APPEAL

### Items from Adv. Case No. 10-03060-LMI

| Filing Date | # | Docket Text |
|---|---|---|
| 05/24/2010 | 1 | Complaint by Kenneth A. Welt, Chapter 7 Trustee against BDO Seidman, LLP, a New York Limited liability partnership, to Avoid and Recover Fraudulent Transfers and Demand for Jury Trial. Filing Fee Paid. Filed by Plaintiff Kenneth A. Welt (Cimo, David) (Entered: 05/24/2010) |
| 08/09/2010 | 14 | Motion to Compel Arbitration and to Stay Discovery, or in the alternative Motion To Stay (Re: 1 Complaint) Filed by Defendant BDO Seidman, LLP (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit B Part II) (Newman, Ari) (Entered: 08/09/2010) |
| 08/10/2010 | 15 | Notice of Hearing (Re: 14 Motion to Compel filed by Defendant BDO Seidman, LLP) Hearing scheduled for 08/27/2010 at 10:30 AM at 51 SW First Ave Room 1409, Miami. (Sanabria, Noemi) (Entered: 08/10/2010) |
| 08/23/2010 | 17 | Amended Notice of Hearing (Re: 14 Motion to Compel filed by Defendant BDO Seidman, LLP) Hearing scheduled for 08/27/2010 at 02:30 PM at 51 SW First Ave Room 1409, Miami. (Sanabria, Noemi) (Entered: 08/23/2010) |
| 08/25/2010 | 18 | *Ex Parte* Motion to Continue Hearing On: [(14 Motion to Compel, Motion To Stay)] Filed by Plaintiff Kenneth A. Welt (Attachments: #1 Proposed Order on Motion to Continue Hearing) (Cimo, David) (Entered: 08/25/2010) |
| 08/26/2010 | 20 | Order Granting *Ex-Parte* Unopposed Motion of Trustee to Continue Hearing On: (14 Motion to Compel Arbitration and to Stay Discovery). Hearing scheduled for 10/18/2010 at 03:00 PM at 51 SW First Ave Room 1409, Miami. (Benitez, Judy) (Entered: 08/26/2010) |

| | | |
|---|---|---|
| 10/14/2010 | 23 | Opposition Response to (14 Motion to Compel Arbitration and to Stay Discovery filed by Defendant BDO Seidman, LLP, Motion To Stay (Re: 1 Complaint)) Filed by Plaintiff Kenneth A. Welt (Cimo, David) (Entered: 10/14/2010) |
| 11/01/2010 | 24 | Order Granting Motion To Compel Arbitration (Re: # 14), Granting Motion To Stay Discovery (Re: # 14 ) (Benitez, Judy) (Entered: 11/01/2010) |
| 11/11/2010 | 27 | Transcript of 10/18/2010 Hearing (Re: 14 Motion to Compel Arbitration and to Stay Discovery, or in the alternative Motion To Stay). Redaction Request Due By 11/18/2010. Statement of Personal Data Identifier Redaction Request Due by 12/2/2010. Redacted Transcript Due by 12/13/2010. Transcript access will be restricted through 02/9/2011. (Ouellette and Mauldin) (Entered: 11/11/2010) |
| 11/11/2010 | 28 | Motion to Reconsider (Re: 24 Order on Motion to Compel, Order on Motion to Stay) Filed by Plaintiff Kenneth A. Welt (Cimo, David) (Entered: 11/11/2010) |
| 11/12/2010 | 30 | Notice of Hearing (Re: 28 Motion for Reconsideration filed by Plaintiff Kenneth A. Welt) Hearing scheduled for 12/06/2010 at 09:30 AM at 51 SW First Ave Room 1409, Miami. (Sanabria, Noemi) (Entered: 11/12/2010) |
| 11/15/2010 | 33 | *Ex Parte* Motion to Continue Hearing On: [(28 Motion to Reconsider)] Filed by Defendant BDO Seidman, LLP (Hutton III, John) (Entered: 11/15/2010) |
| 11/17/2010 | 34 | Order Granting *Ex-Parte* Unopposed Motion to Continue Hearing On: (28 Motion to Reconsider (Re: 24 Order on Motion to Compel, Order on Motion to Stay)).  Hearing scheduled for 12/20/2010 at 09:30 AM at 51 SW First Ave Room 1409, Miami.   (Benitez, Judy) (Entered: 11/17/2010) |
| 12/16/2010 | 38 | Response to (28 Motion to Reconsider (Re: 24 Order on Motion to Compel, Order on Motion to Stay) filed by Plaintiff Kenneth A. Welt) Filed by Defendant BDO Seidman, LLP (Hutton III, John) (Entered: 12/16/2010) |

| 01/03/2011 | 40 | Order Denying Motion To Reconsider 28 (Benitez, Judy) (Entered: 01/04/2011) |
| 01/05/2011 | 42 | Notice of Appeal Filed by Plaintiff Kenneth A. Welt (Re: 24 Order Granting Motion To Compel Arbitration, 40 Order Denying Motion To Reconsider 28 ). Appellant Designation due 01/19/2011. (Cimo, David) (Entered: 01/05/2011) |

**Items from Case No. 08-19029-BKC-LMI**

| **Filing Date** | **#** | **Docket Text** |
| --- | --- | --- |
| 03/18/2010 | 953 | Motion to Compromise Controversy with Merrill Lynch Commercial Finance Corp. Filed by Trustee Kenneth A Welt. (Hartog, Ross) (Entered: 03/18/2010) |
| 06/14/2010 | 990 | Order Granting Motion To Compromise Controversy with Merrill Lynch Commercial Finance Corp (Re: # 953 ) (Benitez, Judy) (Entered: 06/15/2010) |

## ISSUES TO BE PRESENTED ON APPEAL

1.     Whether the Bankruptcy Court erred by failing to require BDO to meets its burden to show that there is an arbitration agreement that is enforceable against the Trustee, prior to shifting the burden to the Trustee to show that compelling arbitration would inherently conflict with the underlying purpose of the Bankruptcy Code when it was clear that the Trustee did not assume or agree to be bound by the arbitration provisions in the Engagement Agreements.

2.     Whether the Bankruptcy Court erred as a matter of law in its application of *The Whiting-Turner Contracting Co. v. Electric Machinery Enterprises, Inc. (In re Electric Machinery Enterprises, Inc.)*, 479 F.3d 791 (11th Cir. 2007) to the facts in this case by

4

determining that the fraudulent transfer claim is not a "core" claim for purposes of determining whether arbitration should be compelled.

3.      Whether the Bankruptcy Court erred by ordering that if the arbitrators decline to address any of the legal claims, the parties may thereafter proceed with the litigation of any remaining issues in the Bankruptcy Court and that any factual or legal issues determined by the arbitrators shall have preclusive effect.

4.      Whether the Bankruptcy Court erred in staying the adversary proceeding pending the conclusion of arbitration.

5.      Whether the Bankruptcy Court erred by essentially determining that fraudulent transfer claim at issue in this case does not invoke substantive rights provided by Title 11 and does not arise only by virtue of the bankruptcy case.

6.      Whether the Bankruptcy Court erred in finding that because the allegations underlying the fraudulent transfer claim derive from allegations of negligent performance of services that are subject to a contractual arbitration clause, the referral to arbitration would not interfere with the underlying purposes of the Bankruptcy Code.

7.      Whether the Bankruptcy Court erred in compelling arbitration of the Trustee's fraudulent transfer claim based on the Debtor's actual intent to hinder and delay creditors in making those payments, when the Debtor's conduct has no connection to the Engagement Agreements which contain the arbitration provisions.

Dated this  12th  day of January, 2011.

I hereby certify that I am admitted to the Bar of the United States District Court for the Southern District of FL and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

GENOVESE JOBLOVE & BATTISTA, P.A.
*Special Counsel for the Trustee*
100 S.E. Second Street, 44th Floor
Miami, Florida 33131
Telephone (305) 349-2300
Direct Facsimile (305) 428-8804

By: /s/ David C. Cimo
     David C. Cimo
     Fla. Bar. No. 775400


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served electronically with the Clerk of Court using CM/ECF and via e-mail and U.S. Mail on the below-named addressees this  12th  day of January, 2011.

John B. Hutton, Esq.
Email: huttonj@gtlaw.com
D. Porpoise Evans, Esq.
Email: evansp@gtlaw.com
Greenberg Traurig, P.A.
1221 Brickell Avenue
Miami, Florida 33131
Tel. 305-579-0500


By: /s/ David C. Cimo
     David C. Cimo

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
(MIAMI DIVISION)
www.flsb.uscourts.gov

In re

CARDIAC MANAGEMENT SYSTEMS,
INC., et al.,

     Debtors.

_____/

KENETH A. WELT, Chapter 7 Trustee
of the jointly administered estates of the
Debtor, Cardiac Management Systems,
Inc. and its affiliated debtors,

     Plaintiff,

v.

BDO SEIDMAN, LLP, a New York limited
liability partnership,

     Defendant.

_____/

CASE NO. 08-19029-BKC-LMI, et al.
CHAPTER 7
(Jointly Administered)

## ADVERSARY COMPLAINT TO AVOID AND RECOVER FRAUDULENT TRANSFERS

## AND

## DEMAND FOR JURY TRIAL

The Plaintiff, Kenneth A. Welt ("Welt" or the "Trustee"), not individually but in his capacity as the Chapter 7 trustee of the jointly administered debtors in the pending bankruptcy case of Cardiac Management Systems, Inc., et al. (sometimes collectively referred to here as the "Debtor" or "Cardiac"), files this Adversary Complaint to Avoid and Recover Fraudulent Transfers and Demand for Jury Trial (the "Complaint"), against Defendant, BDO Seidman, LLP, a New York limited liability partnership (the "Defendant" or "BDO"), and alleges:

## THE PARTIES, JURISDICTION, AND VENUE

1.      On June 30, 2008, the debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Florida, Miami Division (the "Bankruptcy Court"), Case No. 08-19029-BKC-LMI.

2.      On October 20, 2008, Cardiac sold substantially all of their assets pursuant to Bankruptcy Code Section 363 sale approved by order of the Bankruptcy Court (the "Sale Date").

3.      On November 13, 2008, the Court entered an Order converting Cardiac's Chapter 11 cases to cases under Chapter 7.

4.      On November 14, 2008, Welt, who previously had been appointed Chapter 11 trustee, was appointed by the Office of the United States Trustee as the Chapter 7 Trustee for each of Cardiac estates.

5.      As such, Welt is the duly appointed and acting Chapter 7 Trustee for the above referenced jointly administered bankruptcy debtors and their respective non-debtor affiliates.[1]

6.      Welt commences this action in his capacity as Chapter 7 Trustee for the jointly administered estates of Cardiac and as the sole and/or majority shareholder of each of Cardiac's

---

[1] Cardiac consists of: (i) DTG Management, Inc.; (ii) DTG of Sunset Square, Inc.; (iii) DTG of Sunset Square II, Inc.; (iv) Diagnostic Testing Group, Inc.; (v) DTG of Miami, Inc.; (vi) Lake Worth Diagnostic Testing Group, Inc.; (vii) Diagnostic Testing Group of Palm Beach, Inc.; (viii) Aventura Diagnostic Testing Group, Inc.; (ix) DTG of Aventura, Inc.; (x) Gables Diagnostic Testing Group, Inc.; (xi) Coral Gables Diagnostic Testing Group, LLC.; (xii) Cooper City Diagnostic Testing Group, Inc.; (xiii) DTG of Cooper City, Inc.; and (xiv) Pines Diagnostic Testing Group, Inc.  Cardiac, Cardiac Management Systems, Inc., is the 100% shareholder or member of the following non-debtor entities: (i) BAC Realty Corp.; (ii) Children's Diagnostic Testing Group of Broward, Inc.; (iii) Children's Diagnostic Testing Group of Miami, Inc.; (iv) Children's Diagnostic Group of Palm Beach, Inc.; (v) Children's Diagnostic Group of Gables, Inc.; (vi) Children's Diagnostic Testing of Aventura, Inc.; (vii) CMS of Brooklyn, Inc.; (viii) Douglas Diagnostics, Inc.; (ix) Empire Annex Limited; (x) Galloway Diagnostics, Inc.; (xi) Palm Diagnostic Imaging, Inc.; (xii) Pembroke West Diagnostic Imaging, Inc.; (xiii) Sheridan West Diagnostic Imaging, Inc.; (xiv) Waterways Imaging, Inc.; and (xv) Pembroke Pines Diagnostic Testing Group, LLC (collectively defined here as the "Non-Debtor Affiliates").

Non-Debtor Affiliates, and pursuant to 11 U.S.C. § 541(a) as successor to the interests in property of the estate, and pursuant to 11 U.S.C. § 544.

7.      At all times material hereto, BDO was and is a New York limited liability partnership practicing auditing, accounting, and other services within Miami-Dade County, Florida.

8.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334.

9.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(A), (H)  and (O) and, pursuant to Fed. R. Bankr. P. 7008(a), the Trustee does not  consent to the entry of final orders or judgment by the Bankruptcy Court

10.     All conditions precedent to the filing of this action have been waived, have been performed, or have occurred.

## FACTS COMMON TO ALL COUNTS

### A.      *The History and Business Operations of Cardiac and its Affiliates*

11.     Cardiac Management Systems, Inc. ("CMS"), a Delaware corporation, is the parent corporation of the other fourteen debtors as well as a dozen unfiled subsidiaries. Thirteen of these entities were Florida corporations. The other is a Florida limited liability company, the membership interests in which were owned 95% by CMS.

12.     DTG Management, Inc. provided administrative services to all Cardiac entities. Five debtors operated medical imaging centers in Miami-Dade, Broward, and Palm Beach counties.

13.     Five others were the lessees of the leased space for the five operating locations and two Debtors which leased the administrative office suites, and these in turn subleased the space to their sister corporations at a very small mark-up of the lease rent.

14.     The fifteenth debtor formerly operated a sixth location in Pembroke Pines.

15.     Cardiac's five operations marketed their services under a common name, DTG. The only other active subsidiaries of CMS were: (i) a corporation, BAC Realty Corp., which owned a portion of the real estate leased to the Lake Worth tenant entity; and (ii) five entities that billed for the five operations' services provided to health plan participants, but those out-of-network revenues were passed through directly to the five operating entities.

16.     Cardiac was engaged in the ownership and operation of five facilities that provided magnetic resonance imaging (MRI), computer tomography scanning (CT or CAT scan), and other nuclear cardiology testing. Cardiac did not provide services for the diagnosis or treatment of injury or disease, and consequently were not "health care businesses" as that term is used in the Bankruptcy Code, although they derived all of their income from providing scans and tests for the patients of others.

17.     Cardiac's operations were located in Miami (Galloway Road), Coral Gables, Aventura, Cooper City, and Lake Worth, and each location was leased.

18.     Prior to its demise, Cardiac experienced rapid growth.  Although Cardiac was purportedly profitable for some years, its bankruptcy filings attributed the Deficit Reduction Act of 2005 (the "DRA") for causing significant cutbacks in Medicare spending, which Cardiac claimed caused a corresponding reduction in the amounts that Medicare would pay for MRI and CT services, and a resulting cutback in the fee schedules for managed care plans that were indexed to prevailing Medicare fee schedules.

19.     Cardiac, however, was well aware of the potential impact of the DRA on its business, and management failed to undertake sufficient measures to prepare for or otherwise deal with same.

20.     Other factors Cardiac attributed in its bankruptcy filings to causing losses over the period 2006-2008 included the purported: (i) increase in physicians doing their own stress-testing; and (ii) the general malaise in the nation's economy which has effectively limited access to health care by causing more employers to shift a greater portion of health care costs to employees.

21.     In actuality, Cardiac's increased insolvency and losses are directly attributable to the various acts and omissions of Debtor's management and/or BDO.

22.     After suffering reported losses of $1.8 million and $1.1 million for the fiscal year periods ended in September, 2006 and September, 2007, respectively, Cardiac suffered losses in excess of $4.1 million during the six month period ended March 31, 2008,.

**B.      _Management's Acts, Omissions and Breaches of Fiduciary and Intent to Hinder or Delay Creditors_**

23.     Stephen Cianciulli ("Cianciulli") and Harold Gobstein ("Gobstein") were officers and/or directors of Cardiac and/or the Non-Debtor Affiliates (Cianciulli and Gobstein shall sometimes collectively be referred to herein as the Debtor's "principals" or "management").

24.     The Debtor's principals maintained the following positions with Cardiac (along with respective their salaries and benefits) during the two years prior to the petition date:

         a.      Cianciulli: President and chief executive officer until May 2008; still president of CMS and director of all companies through the Sale Date; paid compensation as part of $40,000/month in Cardiac's  management

fees to CMS; paid additional compensation from other Debtors, group health insurance coverage, and a significant auto allowance.

b. Gobstein: Secretary (and director) of Cardiac and the Non-Debtor Affiliates; paid as part of $40,000/month in Cardiac's management fees to CMS; group health insurance coverage.

25. The mismanagement of Cardiac and the Non-Debtor Affiliates leading to their insolvency and the breaches of duties owed by the Debtor's principals both prior to and after it became insolvent can be divided into two broad categories: financial mismanagement and irregularities; and the failure to engage in meaningful oversight of Cardiac's operations.

26. Cianciulli and Gobstein, as officers and/or directors of Cardiac and the Non-Debtor Affiliates, failed to understand the ramifications of Cardiac's deteriorating financial condition and to engage in any meaningful oversight of Cardiac's operations pre-petition, nor did they undertake sufficient or adequate measures to prevent the increased insolvency of the enterprise.

27. Cianciulli and Gobstein similarly were grossly negligent, reckless, and/or lacked good faith by failing to cause or otherwise implement sufficient measures such that adequate and/or competent books and records would be maintained to ensure, among other things, that Cardiac's income and financial statements and other financial data contained no material misstatements.

28. Specifically, and without limitation, the record-keeping of Cardiac was wholly inadequate by, among other deficiencies, the failure to post or reconcile numerous transactions spanning several months, including records relating to Cardiac's accounts receivable. Such

actions or inactions resulted in a significant decrease in the collectability of Cardiac's receivables to the detriment of Cardiac's creditors and shareholders.

29.     In addition, the principals of the Debtor were grossly negligent, reckless, and/or lacked good faith, and otherwise caused the Debtors to conduct business in a manner intended to hinder or delay creditors:

a.      by failing to ensure that the accounts receivable departments of Cardiac were properly staffed, trained, supervised, managed, and/or otherwise operated, especially given the high importance of such function to Cardiac's business and financial operations, along with the highly regulated, paperwork-oriented nature of the health care industry;

b.      by failing to timely shut down or make substantial cost reductions to unprofitable Debtor and Non-Debtor Affiliates during the two years prior to the petition date which caused, among other harm, severe financial hardship on and substantial operating losses to the few remaining affiliates that had been operating break-even or at a profit;

c.      by failing to undertake reasonable, necessary, appropriate, and/or sufficient measures to prepare for the potential adverse effects of the DRA on Cardiac's operations, which act went into effect commencing January 1, 2007, when they knew or should have known that such act would have a substantial adverse impact on Cardiac's business and financial operations;

d.      by engaging in a highly questionable business practice whereby insurers of patients were improperly billed for higher out-of-network charges, when no right to seek out-of-network payment existed.  Specifically, as part of

this questionable business practice, management improperly caused each location of Cardiac to maintain two separate licenses with Florida's Agency for Health Care Administration.   As the opportunities arose, management would then cause Cardiac to improperly submit bills against one license or the other such that the higher out-of-network amounts would apply, even though Cardiac was contractually and/or legally required to use or apply the lower in-network charges.   When the representatives of medical insurers, who had no knowledge that such scheme was in place, contacted Cardiac to question the higher out-of-network billings, the Debtor's principals directed and/or otherwise permitted employees of Cardiac to attribute and re-characterize such transactions as "billing errors," and would instruct Cardiac's employees to cause such transactions to be written off, while knowing that a large percentage of such improper billings would not be questioned by the insurers;

e.      by engaging in and/or otherwise permitting materially inaccurate financial information to be processed and disseminated internally and to third parties, including Cardiac's secured lenders, which information, among other deficiencies, grossly overstated the revenues and the value of Cardiac's assets, including their accounts receivable;

f.      by allowing and/or otherwise permitting certain debtor and Non-Debtor Affiliates acting out of network to engage in substantial improper billings

resulting in, among other negative consequences, denials of claims by medical insurers; and

g. by allowing and/or otherwise permitting substantial preferential and/or fraudulent transfer payments to be made to Cianciulli and/or his affiliates.

## C. *BDO's Duties as Cardiac's Auditors*

30. Between the 1990's and 2008, BDO provided independent audit and other professional services for Cardiac, and issued audit reports for fiscal years (ending September 30) 2005, 2006, and 2007 (sometimes collectively referred to herein as the "Audits"), which were accepted and acknowledged by Cardiac's management.

31. For each audit year, BDO's audit reports expressed unqualified opinions on Cardiac's financial statements

32. In regard to the services rendered for Cardiac, BDO represented that it would conduct, and was otherwise legally obligated to conduct, its services, including the Audits, in accordance with Generally Accepted Auditing Standards ("GAAS") and the applicable professional guidelines and standards, including those requirements of GAAS that required that BDO to, among other things, obtain reasonable assurance about whether the financial statements were free of material misstatement and were fairly presented, in all material respects, in conformity with Generally Accepted Accounting Principles ("GAAP").

## D. *The Improper Accounting Methods and Failure of Management to Implement Adequate Safeguards and Controls and of BDO to Identify Same*

33. BDO and Cardiac's management knew or had reason to know that Cardiac was using improper and flawed accounting methods (collectively, the "Accounting Errors and/or Material Inaccuracies"), thereby resulting in, among other damages, an unduly artificially

prolonged existence causing increased insolvency, increased liabilities, and diminution in the assets and enterprise value of Cardiac.

34.     Further, BDO and Cardiac's management knew or had reason to know that Cardiac had failed to undertake adequate measures or implement sufficient safeguards or controls to prevent the Accounting Errors and/or Material Inaccuracies from occurring at or during certain material periods of time, or otherwise failed to demand or ensure that sufficient safeguards or controls were or would be implemented by Cardiac to prevent the Accounting Errors and/or Material Inaccuracies from occurring.

35.     To the extent adequate measures or controls were in place, they were ignored or otherwise overridden by certain of Cardiac's management, or they willfully turned a blind eye. Irrespective, BDO did not consider or require modification of the financial statements for the Accounting Errors and/or Material Inaccuracies in the performance of its services, including the Audits, resulting in, among other things, the issuance of materially misstated financial statements and audit opinions thereon that did not comply with GAAS.

### E.      *BDO's Acts and Omissions in Conducting its Audits*

36.     BDO, meanwhile, failed in its duties by not recognizing or otherwise requiring modification of the financial statements for the Accounting Errors and/or Material Inaccuracies in performing its services, including the Audits, and in so doing caused Cardiac to overstate its financial position and results of operations.

37.     Specifically, BDO did not adhere to GAAS and other applicable standards by, among other acts and omissions:

            a.      breaching its duties to Cardiac by violating numerous provisions of GAAS and/or applicable professional guidelines and standards related to GAAS

in the conduct of the Audits including, but not limited to, those related to: (i) the exercise of due professional care (General Auditing Standard No. 3), (ii) the proper planning and supervision of an audit (Standards of Field Work No. 1), (iii) collecting sufficient, competent evidence (Standards of Field Work No. 3), (iv) presentation of the financial statements in accordance with GAAP (Standards of Reporting No. 1), (v) providing informative disclosures (Standards of Reporting No. 3), and (vi) AICPA Audit and Accounting Guide, Health Care Organizations.

b.  in violation of Statement on Auditing Standards ("SAS") 99 (entitled Consideration Fraud in a Financial Statement Audit), failing to assess the risk of material misstatement due to fraud by, among other things: (i) failing to conduct an adequate "brainstorming" session; (ii) failing to require the attendance of a partner at the "brainstorming" session assessing areas that the auditor believed might indicate fraud; and (iii) failing to identify any facts or circumstances attendant to its audit to assist in identifying fraud, yet preparing a "brainstorming" session memo" which expressly identified the possibility "over billing of insurance companies for services & fictitious billings for services" as a potential fraudulent activity in the client's industry;

c.  in violation of AU 150 (GAAS fieldwork standards), AU 230 (entitled Due Professional Care), AU 330 (entitled the Confirmation Process), and the AICPA Audit and Accounting Guide, Health Care Organizations failing to confirm the accounts receivable or otherwise prepare a proper

memo supporting its decision not to confirm the outstanding accounts receivable of the Debtor;

d.       in violation of AU 150 (GAAS fieldwork standards), AU 230 (entitled Due Professional Care), AU 342 (entitled Auditing Accounting Estimates), AU 329 (entitled Analytical Procedures), and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to adequately perform compliance testing by, among things: (i) encountering an excessive and material number of exceptions that were never adequately resolved; and (ii) failing to perform adequate analytical procedures regarding revenue and accounts receivable;

e.       in violation of AU 329 (entitled Analytical Procedures), AU 342 (entitled Auditing Accounting Estimates), and the AICPA Audit and Accounting Guide, Health Care Organizations failing to develop industry and client expectations regarding the relationship among the financial statement components including A/R, sales, A/R aging, revenue, contractual write-off, and allowance for bad debt;

f.       in violation of AU 150, AU 230, and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to gain sufficient knowledge of the client, the rate setting environment, and its industry;

g.       in violation of AU 230, failing to exercise professional skepticism;

h.       in violation of AU 210 (entitled Training and Proficiency of Independent Auditor), AU 230, AU 314 (entitled Understanding the Entity and its Environment and Assessing the Risks of Material Misstatements)(or SAS

55 as applicable), AU 318 (entitled Performing Audit Procedures in Response to Assessed Risks and Evaluating the Audit Evidence Obtained)(or SAS 55 as applicable, AU 329, AU 330, AU 342, and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to obtain and evaluate sufficient and appropriate audit evidence to support certain accounting estimates including accounts receivable and revenue;

i. in violation of AU 210, AU 230, AU 330, AU 329, AU 342, and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to appropriately plan, design, and implement compliance testing relating to accounts receivable and revenue; and

j. other breaches as may be determined through discovery.

38.     As a result of the foregoing acts and omissions, Cardiac and its respective Non-Debtor Affiliates did not receive reasonably equivalent value in exchange for the payments made to BDO for its services.

## THE TRANSFERS AT ISSUE

39.     During the fours years prior to the Petition Date, the Debtors made the following transfers to BDO:

| Debtor - Bank Acct | Check Date | Check Clear Date | Check No. | Payee | Check Memo | Amount |
|---|---|---|---|---|---|---|
| CMS - BA#4451 | 3/14/2005 | 3/18/2005 | 5982 | BDO Seidman LLP | Inv 797135 | 51,954.00 |
| CMS - BA#4451 | 3/12/2006 | 3/20/2006 | 6106 | BDO Seidman LLP | Inv 901061 | 54,121.00 |
| CMS - BA#4451 | 3/9/2007 | 4/16/2007 | 6222 | BDO Seidman LLP | | 59,758.00 |
| DTG Mgmt - BA#4790 | 03/21/2008 | 03/31/2008 | 4940 | BDO Seidman LLP | Payment Towards Audit | 25,000.00 |
| DTG Mgmt - BA#4790 | 06/30/2008 | 07/07/2008 | 5192 | BDO Seidman LLP | Payment Towards Audit | 25,000.00 |
| | | | | | **Total BDO Seidman LLP** | **$ 215,833.00** |

(the foregoing transfers, along with any and all other transfers or incurred obligations made or otherwise incurred during the four years prior to the Petition Date for or related to services rendered by BDO, including the execution of engagement letters with terms, conditions and/or obligations materially unfavorable to the Debtor, shall collectively be referred to herein as the "2004-2008 Transfers").

## AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS

40.     The Trustee realleges paragraphs 1 through 39 above as if fully set forth herein.

41.     This is an action to avoid and recover transfers and improperly incurred obligations made from and by the Debtor to BDO during the four years prior to the Petition Date for all audit and/or accounting services rendered as fraudulent transfers in accordance with Sections 544 and 548 of the Bankruptcy Code and Sections 726.105(1)(b) and/or 726.106(1) of the Florida Statutes and/or other applicable law.

42.     Pursuant to 11 U.S.C. §§544(b) and 548, the Trustee may avoid any transfer of an interest in property of the Debtor to BDO or any obligations incurred by the Debtor that are avoidable under applicable law (in this case, Florida law) by a creditor holding an unsecured claim.

43.     Pursuant to 11 U.S.C. §550, to the extent that a transfer is avoided under either Section 544(b) or 548 of the Bankruptcy Code, then the Trustee may recover the property transferred or the value of the property from the initial transferee or any mediate or immediate transferee.

44.     The funds that are and were the subject of the 2004-2008 Transfers constituted transfers of an interest in property of the Debtor within four (4) years prior to the Petition Date.

45.     The Debtor made the 2004-2008 Transfers with the actual intent to hinder or delay creditors.  Alternatively, as a result of the acts and omissions of BDO set forth above, the Debtor did not receive reasonably equivalent value from BDO in exchange for the 2004-2008 Transfers and the Debtor (i) were insolvent at the time of the 2004-2008 Transfers or became insolvent as a result thereof; (ii) were engaged or were about to engage in a business or transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction; or (iii) intended to incur, or believed or reasonably should have believed that its would incur, debts beyond its ability to pay as they became due.

46.     At the time of the 2004-2008 Transfers, there were actual creditors who could have avoided the 2004-2008 Transfers, as evidenced by the bankruptcy estate's proof of claim register.

47.     As a result of the above, the Trustee can avoid the 2004-2008 Transfers pursuant to sections 544 and 548 of the Bankruptcy Code, Fla. Stat. 726.105(1)(b), 726.106(1) and/or other applicable law, and recover the value of the 2004-2008 Transfers for the benefit of the estate of the Debtor, pursuant to Section 550 of the Bankruptcy Code.

48.     Pursuant to 11 U.S.C.  §§544, 548 and 550 and Chapter 726 of the Florida Statutes, the Trustee is entitled to recover from BDO the value of the 2004-2008 Transfers.

WHEREFORE, the Trustee demands judgment against BDO as follows: (i) determining that the 2004-2008 Transfers were fraudulent and avoiding the 2004-2008 Transfers for the benefit of the estate of the Debtor under 11 U.S.C. §§544(b), 548 and 550 and Chapters 726.105(1)(b) and/or 726.106(1) of the Florida Statutes and/or other applicable law; (ii) entering judgment in favor of the Trustee against BDO for the amount of the 2004-2008 Transfers pursuant to Section 550 of the Bankruptcy Code, together with pre-judgment and post-judgment interest and costs; and (iii) for any other relief the Court deems appropriate.

## DEMAND FOR JURY TRIAL

49.     The Trustee demands a trial by jury in regard to each and every count of the Complaint and in regard to any and all other claims and issues triable by such.  The Trustee does not consent to a jury trial by or before the Bankruptcy Court.

Respectfully submitted this 24th day of May, 2010.

**I hereby certify that I am admitted to the Bar of the United States District Court for the Southern District of FL  and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).**

GENOVESE JOBLOVE & BATTISTA, P.A.
*Special Counsel for the Trustee*
100 S.E. Second Street, 44th Floor
Miami, FL  33131
Tel. (305) 349-2300
Fax. (305) 349-2310

By:____/s/ David C. Cimo_____
     David C. Cimo
     Fla. Bar. No. 775400
     dcimo@gjb-law.com

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
(MIAMI DIVISION)
www.flsb.uscourts.gov

In re:                                          Chapter 7

CARDIAC MANAGEMENT SYSTEMS, INC.                Case No. 08-19029-BKC-LMI
                                                (Jointly Administered)

                Debtor.

_____/

KENNETH A. WELT, Chapter 7 Trustee
of the jointly administered estates of the
Debtor, Cardiac Management Systems,
Inc. and its affiliated debtors,

                Plaintiff,

v.                                              Adv. Pro. No. 10-03060-LMI

BDO SEIDMAN, LLP, n/k/a BDO USA, LLP,
a New York limited liability partnership,

                Defendant.

_____/

## BDO USA, LLP'S MOTION TO COMPEL ARBITRATION
## AND TO STAY DISCOVERY, OR ALTERNATIVELY, TO STAY

Defendant, BDO USA, LLP ("BDO"), respectfully moves, pursuant to Sections 3 and 4

of the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, to compel arbitration of the claim asserted by

Kenneth A. Welt ("Welt"), Chapter 7 Trustee of the jointly administered estates of the Debtor,

Cardiac Management Systems, Inc., and its affiliated debtors (collectively "CMS"), and to stay

discovery, or alternatively, to stay this adversary proceeding pending arbitration of intertwined

and overlapping predicate issues.  In support of its motion, BDO states as follows:

## INTRODUCTION

This adversary proceeding arises from written engagement agreements (the "Engagement Agreements") under which BDO audited CMS's financial statements for 2004 through 2007. As the Chapter 7 trustee for CMS, Welt contends that BDO was obligated under the Engagement Agreements to conduct audits in accordance with Generally Accepted Auditing Standards ("GAAS"), but failed to meet that obligation. Welt, accordingly, seeks a refund of the professional fees CMS paid BDO for the audits, claiming that the fees paid constitute fraudulent transfers.

BDO contests Welt's allegations that BDO failed to meet its professional and contractual obligations, and that it caused CMS damages. It is unnecessary, however, for the Court to embroil itself in resolving Welt's claims. For under the Engagement Agreements, "any" claims relating to BDO's audits are required to be resolved in arbitration. Welt is estopped from objecting to arbitration because his claims against BDO are founded upon the auditing services BDO provided pursuant to the Engagement Agreements, including whether BDO conducted audits that failed to meet professional standards, and whether CMS is entitled to a refund of the fees it paid. The Court should, therefore, order that Welt's claims against BDO be arbitrated and stay interim discovery or, at minimum, stay this action in its entirety until all issues referable to arbitration are resolved.

## STATEMENT OF FACTS

### The Engagement Agreements CMS Signed Require Arbitration

CMS and its affiliates provided medical imaging and other testing services.  [D.E. #1 (Adv. Comp. ¶ 16.)  Beginning in the 1990s and continuing from 2004 through 2007, CMS entered into Engagement Agreements under which it retained BDO to conduct annual audits of its financial statements.  (Declaration of Lisa A. Morris ["Morris Decl."],[1] Exs. "A," "B," and "C"; *see* Adv. Comp. ¶ 30.)  BDO agreed in the Engagement Agreements to conduct audits "in accordance with auditing standards generally accepted in the United States."  (Morris Decl., Exs. "A", "B", and "C"; *see* Adv. Comp. ¶¶ 32, 39.)

Each Engagement Agreement CMS signed contains a broad arbitration clause mandating that:

> If any dispute, controversy, or claim arises in connection with the performance or breach of this agreement (including disputes regarding the validity or enforceability of this agreement) and cannot be resolved by facilitated negotiations (or the parties waive that process), then such dispute, controversy, or claim shall be settled by arbitration.

(Morris Decl., Exs. "A", "B", and "C".)  Confirming its intent to arbitrate, CMS further agreed to detailed provisions under which arbitration is to be conducted.  CMS agreed that (1) the "proceeding shall be governed by the provisions of the Federal Arbitration Act (FAA) or, if a court of competent jurisdiction determines the FAA to be inapplicable, by the laws of the state in which the proceeding is to take place"; (2) the "proceedings shall proceed in accordance with the then-current Arbitration Rules for Professional Accounting and Related Disputes of the American Arbitration Association (AAA)"; and (3) the proceeding shall be conducted by a panel

---

[1] A true and correct copy of the Morris Decl. is attached hereto as Exhibit A.

consisting of "three persons, one chosen by each party and a third selected by the two party-selected arbitrators." (*Id*.)

Welt contends that due to mismanagement by certain of its officers and directors, combined with cutbacks in Medicare spending under the Deficit Reduction Act of 2005, and other problems, CMS began to sustain losses in 2006 through 2008. (Adv. Comp. ¶¶ 18-20.) CMS's bankruptcy case followed, with Welt initially appointed CMS's Chapter 11 bankruptcy trustee, followed by the bankruptcy case being converted to a Chapter 7 case, in which Welt remained as CMS's Chapter 7 bankruptcy trustee. (*Id*. ¶¶ 1-4.)

**Welt Sues BDO In State Court For Professional Negligence**

On May 13, 2010, Welt sued BDO in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, and amended his complaint on June 21, 2010. (Declaration of Nikki Simon ["Simon Decl."],[2] Exs. "1", "2") (the "State Court Action"). In the State Court Action, Welt asserts that BDO was retained to conduct financial statement audits for CMS, that BDO "represented" in the Engagement Agreements that the audits would be conducted in accordance with GAAS, and that BDO's audits failed to meet professional standards. (*Id*. Ex. "2" ¶¶ 39-41, 45-46, 56-60.) Based upon theories of professional negligence, and aiding and abetting a breach of fiduciary duty, Welt seeks in excess of $6 million in damages, which presumably includes a refund of fees CMS paid for the audits. (*Id*. ¶ 47.) Consistent with the Engagement Agreements, on June 2, 2010, BDO moved to compel arbitration of Welt's claims in the State Court Action; the motion remains pending. (Simon Decl., Ex. "3".)

In the meantime, on May 24, 2010, Welt commenced the present adversary proceeding repeating – in many instances verbatim – the allegations that are the foundation of his complaint

---

[2] A true and correct copy of the Simon Decl. is attached hereto as Exhibit B.

in the State Court Action. As in the State Court Action, Welt's Adversary Complaint alleges that BDO was retained to conduct financial statement audits for CMS, that BDO "represented" in the Engagement Letters that it would conduct its audits in accordance with GAAS, and that BDO's audits did not comply with professional standards. (Adv. Comp. ¶¶ 30-36.) The Adversary Complaint concludes that because BDO allegedly failed to conduct its audits as represented in the Engagement Agreements, CMS is entitled to a refund of the fees it paid for the audits under state and federal "fraudulent transfer" laws. (*Id*. ¶¶ 39-48.) On July 9, 2010, Welt served Plaintiff's First Request for Production to Defendant seeking documents purportedly relevant to his arbitrable claims. (Simon Decl., Ex. "4".)

## ARGUMENT

## I.    THE COURT SHOULD COMPEL ARBITRATION OF WELT'S CLAIM

### A.    The Federal Arbitration Act Requires Arbitration Under The Written Engagement Agreements CMS Signed

The Federal Arbitration Act (the "FAA") was enacted as an expression of "a strong federal policy in favor of arbitration." *Picard v. Credit Solutions, Inc.*, 564 F.3d 1249, 1253 (11th Cir. 2009). Consistent with that strong federal policy, the FAA makes an order compelling arbitration mandatory where a party refuses to arbitrate "under a written agreement for arbitration." 9 U.S.C. § 4; *see Dean Witter Reynolds v. Byrd*, 470 U.S. 213, 219 (1985) ("By its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."). Any doubts concerning the scope of arbitrable issues "should be resolved in favor of arbitration." *Moses H. Cone Hospital v. Mercury Construction*, 460 U.S. 1, 24 (1983).


CMS agreed in the Engagement Agreements under which BDO was retained and conducted audits to arbitrate "any dispute, controversy, or claim" that "arises in connection with the performance or breach of this agreement . . . .". (Morris Decl., Exs. "A," "B," and "C".) Welt's claims are founded upon BDO's audits of CMS's financial statements, the performance of which was the express subject of the Engagement Agreements that contained CMS's agreement to arbitrate. Because Welt is CMS's representative, and seeks to hold BDO liable in connection with its performance of the audits for which it was retained under the Engagement Agreements CMS signed, Welt should be required to arbitrate his fraudulent transfer claims against BDO. *See McBro Planning & Development Co. v. Triangle Electrical Construction Co.*, 741 F.2d 342, 344 (11th Cir. 1984) ("it is well-established that a party may not avoid broad language in an arbitration clause by attempting to cast its complaint in tort rather than contract" where the basis of party's claim is that the defendant breached duties under the agreement containing an arbitration clause).[3]

### B. Welt Is Required To Arbitrate His Fraudulent Transfer Claim Under The Doctrine Of Equitable Estoppel

Welt's attempt to avoid arbitration by asserting a "fraudulent transfer" claim as a purported non-signatory to the Engagement Agreements, rather than asserting claims for breach of contract or negligence as he has in the State Court Action, fails under the doctrine of equitable

---

[3] Welt is bound by CMS's arbitration agreement because, as trustee, he succeeds "only to such rights" as CMS possessed, subject to all "defenses which might have been asserted against [CMS] but for the filing of the petition." *Bank of Marin v. England*, 385 U.S. 99, 101 (1966); *see Kirschner v. Grant Thornton, LLP (In re: Refco, Inc. Securities Litigation)*, Nos. 07 MDL 1902 (GEL), 07 Civ. 11604 (GEL), 2008 WL 2185676, at *5 (S.D.N.Y. 2008) (trustee, "as successor in interest to the [debtors], is bound by the arbitration clause" in engagement agreements with accountants). It appears that Welt seeks to avoid his obligation to arbitrate by disguising what would ordinarily be a negligence or breach of contract claim under the label "fraudulent transfer," which some courts have held is a creditor-derived claim. *See, e.g.*, *In re Friedman's, Inc.*, 372 B.R. 530, 545 (S.D. Ga. 2007). In this case, the label Welt assigned to his claim is beside the point, however, because he is estopped from refusing to arbitrate.

estoppel.  In *Andersen, LLP v. Carlisle*, 129 S. Ct. 1896, 1902-03 (2009), the United States Supreme Court confirmed that arbitration agreements may be enforced against a non-signatory where "traditional principals" of contract law permit.  Contract law provides that a non-signatory to an arbitration agreement is equitably estopped from refusing to arbitrate when the "very basis" of the party's claim is that the defendant "breached the duties and responsibilities" under the agreement containing the arbitration clause.  *McBro Planning*, 741 F.2d at 344; *see Blinco v. Green Tree Servicing, LLC*, 400 F.3d 1308, 1312 (11th Cir. 2005) ("Equitable estoppel precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes."); *BDO Seidman, LLP v. Bee*, 970 So. 2d 869, 875 (Fla. 4th DCA 2007) ("A party may not rely on a contract to establish his claims while avoiding his obligation under the contract to arbitrate such claims.").

Welt is equitably estopped from not arbitrating because the "very basis" of his claim for a refund is that BDO breached its purported obligation under the Engagement Agreements to conduct audits in accordance with professional standards.  *McBro Planning*, 741 F.2d at 344 (plaintiff contractor estopped from refusing to arbitrate where "the very basis of the contractor's claim against the construction manager was that the manager breached the duties and responsibilities assigned by the owner-contractor agreement"); *Blue Springs Internal Medicine, PC v. Blue Cross & Blue Shield of Kansas City (In re: Managed Care Litigation)*, No. 05-23326-CIV, 2009 WL 855963, at *9 (S.D. Fla. March 30, 2009) (plaintiff estopped from denying arbitration by seeking "a remedy under the Agreements").  Welt's claim is for "fraudulent transfers" based upon state and federal laws.  (Adv. Comp. ¶¶ 40-48.)  Thus, Welt's claim fails

unless he establishes that BDO did not provide "reasonably equivalent value" for the fees it received pursuant to the Engagement Agreements. 11 U.S.C. § 548; Fla. Stat. § 762.105(1)(b).[4]

To satisfy his burden to establish a lack of "reasonably equivalent value," Welt invokes BDO's obligations to CMS, and the fees CMS paid to BDO, under the Engagement Agreements. Welt contends that in exchange for fees, BDO agreed to perform audits in accordance with GAAS. (Adv. Comp. ¶¶ 32, 39.) According to Welt, BDO "breached its duties to CMS by violating numerous provisions of GAAS" when conducting the audits that were the subject of the Engagement Agreements. (Adv. Comp. ¶ 37.) Welt asserts, accordingly, that because BDO conducted faulty audits, CMS "did not receive reasonably equivalent value in exchange for the payments made to BDO for its services." (*Id*. ¶ 38.)

Thus, the "very basis" of Welt's claim -- although cast as a "fraudulent transfer" -- is that BDO breached its duties and obligations under the Engagement Agreements. Having invoked the "benefit" of asserting a claim based upon BDO's duties and obligations under the Engagement Agreements, Welt is estopped from refusing to arbitrate those issues as required under the same agreements.

## C. Welt's Labeling His Claims "Core" Does Not Preclude Arbitration

The FAA mandates that arbitration agreements be enforced – even when the claims asserted are core – "unless Congress has clearly expressed an intention to preclude arbitration of a statutory claim." *Whiting-Turner Contracting Co. v. Electric Machinery Enterprises, Inc. (In re: Electric Machinery Enterprises, Inc.)*, 479 F.3d 791, 795 (11th Cir. 2007). In *Whiting-Turner*, the Eleventh Circuit confirmed that there is "no evidence within the text or in the

---

[4] New York law applies to the state-based claim Welt asserts. Because arbitration is required regardless of the applicable law, there is no "conflict" requiring the Court's intervention. BDO does not intend by this motion to compel arbitration to waive its right to assert the applicable New York law when and if a conflict materializes.

legislative history that Congress intended to create an exception to the FAA in the Bankruptcy Code." *Id*. at 796; *accord Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp. (In re National Gypsum)*, 118 F.3d 1056, 1067 (5th Cir. 1997) ("Certainly not all core bankruptcy proceedings are premised on provisions of the Code that 'inherently conflict' with the Federal Arbitration Act; nor would arbitration of such proceedings necessarily jeopardize the objectives of the Bankruptcy Code.").

Nor can Welt establish that enforcing the arbitration agreement between CMS and BDO would "inherently conflict with the underlying purposes of the Bankruptcy Code." *Whiting-Turner*, 479 F.3d, at 796-97; *see Shearson/American Express v. McMahon*, 482 U.S. 220, 227 (1987) (party opposing arbitration has burden to prove "that Congress intended to preclude a waiver of judicial remedies for [the claim] at issue"). The inherent purpose of the Bankruptcy Code, including labeling certain disputes "core," includes the "goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of a bankruptcy court to enforce its own orders." *National Gypsum*, 118 F.3d at 1069.

None of those interests would even be implicated by requiring Welt to resolve his fraudulent transfer claim in arbitration along with his other claims against BDO. To the contrary, the core issue in this case -- whether BDO conducted its audits in accordance with GAAS as required under the Engagement Agreements -- has nothing to do with bankruptcy law; that core issue is governed by the common laws of contracts and torts. Perhaps more importantly, the most central and efficient method of resolving Welt's claim is in arbitration, where the remainder of the claims he asserts against BDO, and damages he seeks, are required to be resolved under the Engagement Agreements.

In short, Welt is unable to meet his burden to establish that arbitration of his claim would "inherently conflict with the underlying purposes of the Bankruptcy Code," and therefore, the fact that Welt labeled his claim "core" is not an impediment to arbitration.

## II.    THIS ACTION SHOULD NEVERTHELESS BE STAYED PENDING AN ARBITRATION BETWEEN WELT AND BDO

Should the Court determine to retain jurisdiction of Welt's claim, the present action should be stayed pending arbitration of Welt's overlapping professional negligence claims, currently subject to a motion to compel arbitration in state court.  Under Section 3 of the FAA, a stay is mandatory where, as here, the action concerns "any issue referable to arbitration under an agreement in writing for such arbitration . . . .".  9 U.S.C. § 3.  Moreover, even if Welt could establish his claim is non-arbitrable – which he cannot – a stay is warranted because "the outcome of the nonarbitrable claims will depend on the arbitrator's decision."  *Klay v. All Defendants*, 389 F.3d 1191, 1203-04 (11th Cir. 2004); *accord Petrik v. Reliant Pharmaceuticals, Inc.*, No. 8:07-cv-1462-T-24 TBM, 2007 WL 3283170, at *2, *3 (M.D. Fla. Nov. 5. 2007) (stay warranted where resolution of arbitrable issue "would appear" to resolve plaintiff's claim); *Volkswagen of America, Inc. v. Sud's of Peoria, Inc.*, 474 F.3d 966, 972 (7th Cir. 2007) (stay warranted where arbitration may resolve, "or at least shed some light on," the nonarbitrable claims).

As explained above, Welt's fraudulent transfer claim depends upon whether BDO failed to provide "reasonably equivalent value" for the fees it received from CMS.  11 U.S.C. § 548; Fla. Stat. § 762.105(1)(b).  Welt contends that CMS "did not receive reasonably equivalent value in exchange for the payments made to BDO for it services" because, he alleges, BDO "failed in its duties" in conducting the CMS audits, and in particular, "did not adhere to GAAS and other applicable standards."  (Adv. Comp. ¶¶ 36-38.)  The identical allegations are at the heart of

Welt's professional negligence claims in the State Court Action, which is subject to a pending motion to compel arbitration. (Simon Decl., Ex. "3" ¶¶ 39-41, 45-46, 56-60.) Resolution of whether BDO breached its duties in conducting CMS audits in arbitration, accordingly, will resolve the core issue in this adversary proceeding, thus warranting a stay.

## **CONCLUSION**

For all the foregoing reasons, the Court should order Welt to arbitrate the claim against BDO asserted in the Adversary Complaint and stay all discovery, or alternatively, stay this action pending resolution of Welt's common law claims in arbitration.

Dated: August 9, 2010

Respectfully submitted,

GREENBERG TRAURIG, P.A.
*Attorneys for Defendant*
1221 Brickell Avenue
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717

_____*/s/ Ari Newman*_____
Nikki Lewis Simon
Florida Bar No. 181536
*simonn@gtlaw.com*
D. Porpoise Evans, Esq.
Florida Bar No. 0576883
*evansp@gtlaw.com*
Ari Newman, Esq.
Florida Bar No. 056575
*newmanar@gtlaw.co*m

- and -

Adam D. Cole, Esq.
GREENBERG TRAURIG, LLP
MetLife Building
200 Park Avenue
New York, NY 10166
*Colea@gtlaw.com*

11

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 9, 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the Service List below, either via transmission of Notices of Electronic Filing generated by CM/ECF or by first class U.S. mail for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.



_____/s/ Ari Newman_____
ARI NEWMAN

## Electronic Mail Notice List

The following is the list of **parties** who are currently on the list to receive e-mail notice/service for this case.

- David C. Cimo    dcimo@gjb-law.com, gjbecf@gjb-law.com
- John B. Hutton    huttonj@gtlaw.com,
  thompsonc@gtlaw.com;mialitdock@gtlaw.com;miaecfbky@gtlaw.com

## Manual Notice List

The following is the list of **parties** who are **not** on the list to receive e-mail notice/service for this case (who therefore require manual noticing/service).

- (No manual recipients)

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
(MIAMI DIVISION)
www.flsb.uscourts.gov

In re:                                          Chapter 7

CARDIAC MANAGEMENT SYSTEMS,                     Case No. 08-19029-BKC-LMI
                                                (Jointly Administered)
                        Debtor.

_____/

KENNETH A. WELT, Chapter 7 Trustee
of the jointly administered estates of the
Debtor, Cardiac Management Systems,
Inc. and its affiliated debtors,

                        Plaintiff,

v.                                              Adv. Pro. No. 10-03060-LMI

BDO SEIDMAN, LLP, n/k/a BDO USA, LLP,
a New York limited liability partnership,

                        Defendant.

_____/

## DECLARATION OF LISA A. MORRIS IN SUPPORT OF
## BDO USA, LLP'S MOTION TO COMPEL
## ARBITRATION OR, ALTERNATIVELY, TO STAY

LISA A. MORRIS hereby affirms the following under the penalty of perjury

pursuant to 28 U.S.C. § 1746:

1.      I am over the age of 18 years and have personal knowledge of the facts

contained in this Affidavit.

2.      I have been designated as the Records Custodian for BDO USA, LLP

("BDO").

3.      Attached as Exhibit "A" is a true and correct copy of the signed Engagement Agreement between BDO and Cardiac Management Systems, Inc. and Subsidiaries, dated March 18, 2008.

4.      Attached as Exhibit "B" is a true and correct copy of the signed Engagement Agreement between BDO and Cardiac Management Systems, Inc. and Subsidiaries, dated October 25, 2006.

5.      Attached as Exhibit "C" is a true and correct copy of the signed Engagement Agreement between BDO and Cardiac Management Systems, Inc. and Subsidiaries, dated December 17, 2004.

6.      No previous application has been made to this or any other Court for the relief requested herein.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on August 5, 2010

Lisa A. Morris

LISA A. MORRIS



**BDO Seidman, LLP**
Accountants and Consultants

330 Madison Avenue
New York, New York 10017
Telephone: (212) 885-8000
Fax: (212) 697-1299

March 18, 2008

Mr. Harold Gobstein
Cardiac Management Systems, Inc. and
  Subsidiaries
1836 Monte Carlo Way
Coral Springs, FL 33071

Dear Mr. Gobstein:

<u>Agreement To Provide Services</u>

This agreement is intended to describe the nature and scope of our services.

## Audit

As agreed, we will audit the consolidated balance sheet of Cardiac Management Systems, Inc. and Subsidiaries (the "Company") as of September 30, 2007 and the related statements of income and retained earnings and cash flows for the year then ending in accordance with auditing standards generally accepted in the United States of America. The financial records and financial statements are the responsibility of your Company's management. In that regard, management is responsible for establishing and maintaining effective internal control over financial reporting, establishing and maintaining proper accounting records, selecting appropriate accounting principles, safeguarding company assets, and complying with relevant laws and regulations. Management is also responsible for making all financial records and related information available to us.

Our responsibility is to express an opinion on the financial statements based on our audit. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation.

At the conclusion of our audit, we will submit to you a report containing our opinion as to whether the financial statements, taken as a whole, are fairly presented based on accounting principles generally accepted in the United States of America. If, during the course of our work, it appears for any reason that we will not be in a position to render an unqualified opinion on the financial statements, or that our report will require an explanatory paragraph, we will discuss this with you. It is possible that, because of unexpected circumstances, we may determine that we cannot render a report or otherwise complete the engagement. If, for any reason, we are unable to complete the audit or are unable to form or have not formed an opinion, we may decline to express an opinion or decline to issue a report as a result of the engagement. If, in our professional judgment, the circumstances require, we may resign from the engagement prior to completion.

 **BDO Seidman, LLP**
Accountants and Consultants

Mr. Harold Gobstein
Cardiac Management Systems
March 18, 2008
Page 2

We will design our audit to provide reasonable assurance of detecting errors or fraud that would have a material effect on the financial statements. Our work will be based primarily upon selected tests of evidence supporting the amounts and disclosures in the financial statements and, therefore, will not include a detailed check of your Company's transactions for the period. Accordingly, an audit performed in accordance with auditing standards generally accepted in the United States of America is not a guarantee of the accuracy of the financial statements, and there is a risk that material errors or fraud may exist and not be detected by us. Also, an audit is not designed to detect errors or fraud that are immaterial to the financial statements. However, we will inform you of any material errors or fraud that come to our attention. We will also inform you of illegal acts that come to our attention unless they are clearly inconsequential. In addition, during the course of our audit, financial statement misstatements may be identified, either through our audit procedures or through communication by your employees to us, and we will bring these misstatements to your attention as proposed adjustments. Management is responsible for recording such adjustments in the financial statements or otherwise concluding and confirming in a representation letter provided to us at the conclusion of our audit that the effects of the unrecorded adjustments are, both individually and in the aggregate, immaterial to the financial statements taken as a whole. At the conclusion of our audit we will communicate to the audit committee all such unrecorded adjustments.

An audit includes obtaining an understanding of internal control sufficient to plan the audit and to determine the nature, timing, and extent of audit procedures to be performed. An audit is not designed to provide assurance on internal control or to identify reportable conditions. However, we are responsible for ensuring that you are aware of any reportable conditions that come to our attention during our engagement.

## E-mail Communication

In connection with this engagement, we may communicate with you or others via e-mail transmission. As e-mails can be intercepted and read, disclosed, or otherwise used or communicated by an unintended third party, or may not be delivered to each of the parties to whom they are directed and only to such parties, we cannot guarantee or warrant that e-mails from us will be properly delivered and read only by the addressee. Therefore, we specifically disclaim and waive any liability or responsibility whatsoever for interception or unintentional disclosure or communication of e-mail transmissions, or for the unauthorized use or failed delivery of e-mails transmitted by us in connection with the performance of this engagement. In that regard, you agree that we shall have no liability for any loss or damage to any person or entity resulting from the use of e-mail transmissions, including any consequential, incidental, direct, indirect, or special damages, such as loss of sales or anticipated profits, or disclosure or communication of confidential or proprietary information.

 **BDO Seidman, LLP**
Accountants and Consultants

Mr. Harold Gobstein
Cardiac Management Systems
March 18, 2008
Page 3

## Ownership of Working Papers

The working papers prepared in conjunction with our audit are the property of our Firm, constitute confidential information, and will be retained by us in accordance with our Firm's policies and procedures.

## Reproduction of Audit Report

If the Company plans any reproduction or publication of our report, or any portion of it, copies of masters' or printers' proofs of the entire document should be submitted to us in sufficient time for our review and approval before printing. You also agree to provide us with a copy of the final reproduced material for our approval before it is distributed.

## Posting of Audit Report and Financial Statements on Your Web Site

You agree to indemnify BDO Seidman, LLP from any and all claims that may arise from any differences between the electronic version of the financial statements and audit report presented on your web site, now and in the future, and the signed version of the financial statements and audit report provided to management by BDO Seidman, LLP.

## Review of Documents for Sale of Securities

The audited financial statements and our report thereon should not be provided or otherwise made available to recipients of any document to be used in connection with the sale of securities (including securities offerings on the Internet) without first submitting copies of the document to us in sufficient time for our review and approval.

## Management Representations

As required by auditing standards generally accepted in the United States of America, we will request certain written representations from management at the close of our audit to confirm oral representations given to us and to indicate and document the continuing appropriateness of such representations and reduce the possibility of misunderstanding concerning matters that are the subject of the representations. Because of the importance of management's representations to an effective audit and provided the audited financial statements and our report thereon are not included in a registration statement under the Securities Act of 1933 or in a Private Placement Memorandum, Cardiac Management Systems agrees to release and indemnify BDO Seidman, LLP and its personnel from any liability and costs relating to our services under this agreement attributable to any misrepresentations by management.



**BDO Seidman, LLP**
Accountants and Consultants

Mr. Harold Gobstein
Cardiac Management Systems
March 18, 2008
Page 4

## Availability of Records and Personnel

You agree that all records, documentation, and information we request in connection with our audit will be made available to us (including those pertaining to related parties), that all material information will be disclosed to us, and that we will have the full cooperation of, and unrestricted access to, your personnel during the course of the engagement.

## Assistance by Your Personnel and Internet Access

We also ask that your personnel, to the extent possible, prepare various schedules and analyses for our staff. In addition, we ask that you provide high-speed Internet access to our engagement team, if practicable, while working on the Company's premises. This assistance will serve to facilitate the progress of our work and minimize costs to you.

## Other Services

We are always available to meet with you and other executives at various times throughout the year to discuss current business, operational, accounting, and auditing matters affecting your Company. Whenever you feel such meetings are desirable, please let us know. We are also prepared to provide services to assist you in any of these areas. We will also be pleased, at your request, to attend your directors' and stockholders' meetings.

## Independence

Professional and certain regulatory standards require us to be independent, in both fact and appearance, with respect to your Company in the performance of our services. Any discussions that you have with personnel of our Firm regarding employment could pose a threat to our independence. Therefore, we request that you inform us prior to any such discussions so that we can implement appropriate safeguards to maintain our independence.

## Dispute Resolution Procedure

If any dispute, controversy, or claim arises in connection with the performance or breach of this agreement (including disputes regarding the validity or enforceability of this agreement), either party may, upon written notice to the other party, request facilitated negotiations. Such negotiations shall be assisted by a neutral facilitator acceptable to both parties and shall require the best efforts of the parties to discuss with each other in good faith their respective positions and, respecting their different interests, to finally resolve such dispute.



**BDO Seidman, LLP**
Accountants and Consultants

Mr. Harold Gobstein
Cardiac Management Systems
March 18, 2008
Page 5

Each party may disclose any facts to the other party or to the facilitator that it, in good faith, considers necessary to resolve the dispute. However, all such disclosures will be deemed in furtherance of settlement efforts and will not be admissible in any subsequent litigation against the disclosing party. Except as agreed by both parties, the facilitator shall keep confidential all information disclosed during negotiations. The facilitator shall not act as a witness for either party in any subsequent arbitration between the parties.

Such facilitated negotiations shall conclude within sixty days from receipt of the written notice unless extended by mutual consent. The parties may also agree at any time to terminate or waive facilitated negotiations. The costs incurred by each party in such negotiations will be borne by it; the fees and expenses of the facilitator, if any, shall be borne equally by the parties.

If any dispute, controversy, or claim arises in connection with the performance or breach of this agreement (including disputes regarding the validity or enforceability of this agreement) and cannot be resolved by facilitated negotiations (or the parties agree to waive that process), then such dispute, controversy, or claim shall be settled by arbitration. The arbitration proceeding shall take place in the city in which the BDO Seidman office providing the relevant services exists, unless the parties agree to a different locale. The proceeding shall be governed by the provisions of the Federal Arbitration Act (FAA) or, if a court of competent jurisdiction determines the FAA inapplicable, by the laws of the state in which the proceeding is to take place. In any arbitration instituted hereunder, the proceedings shall proceed in accordance with the then current Arbitration Rules for Professional Accounting and Related Disputes of the American Arbitration Association (AAA), except that no pre-hearing discovery shall be permitted unless specifically authorized by the arbitration panel.

Such arbitration shall be conducted before a panel of three persons, one chosen by each party and the third selected by the two party-selected arbitrators. The arbitration panel shall have no authority to award non-monetary or equitable relief, and any monetary award shall not include punitive damages. The confidentiality provisions applicable to facilitated negotiation shall also apply to arbitration. The award issued by the arbitration panel may be confirmed in a judgment by any federal or state court of competent jurisdiction.

**Fees**

Our charges to your Company for the services described above for the year ending September 30, 2007, will be $57,000 plus out-of-pocket expenses. This fee is based on the following assumptions: your personnel will prepare certain schedules and analyses for us and make available to us documents for our examination as and when requested;



**BDO Seidman, LLP**
Accountants and Consultants

Mr. Harold Gobstein
Cardiac Management Systems
March 18, 2008
Page 6

there will be no significant changes in the internal controls, accounting systems, key personnel, or structure of the organization; there will be no significant acquisitions or disposals of businesses; and there will not be any unanticipated increases in current operations requiring significant additional audit time. Should we encounter any unforeseen problems that will warrant additional time or expense, you will be notified of the situation and, if possible, the added cost.

Our charges for other services will be agreed to separately. The arrangements described in this letter will be updated annually.

Bills will be rendered on a monthly or other periodic basis, and are due upon receipt. If payments are not received promptly, we reserve the right to stop work on the engagement.

Very truly yours,

Christopher J. Orella
Partner

Acknowledged:

By _Harold Gobstein Secy_
     Mr. Harold Gobstein

Date _3/20/08_

G:\Hank\Clients\CX\Cardiac\2004\Cardiac L-30 Engmt ltr 9 07.doc

EXHIBIT "B"



BDO Seidman, LLP
Accountants and Consultants

330 Madison Avenue
New York, New York 10017
Telephone: (212) 885-8000
Fax: (212) 697-1299

October 25, 2006

Mr. Harold Gobstein
Cardiac Management Systems, Inc. and
   Subsidiaries
1836 Monte Carlo Way
Coral Springs, FL 33071

Dear Mr. Gobstein:

<u>Agreement To Provide Services</u>

This agreement is intended to describe the nature and scope of our services.

## Audit

As agreed, we will audit the consolidated balance sheet of Cardiac Management Systems, Inc. and Subsidiaries (the "Company") as of September 30, 2006 and the related statements of income and retained earnings and cash flows for the year then ending in accordance with auditing standards generally accepted in the United States of America. The financial records and financial statements are the responsibility of your Company's management. In that regard, management is responsible for establishing and maintaining effective internal control over financial reporting, establishing and maintaining proper accounting records, selecting appropriate accounting principles, safeguarding company assets, and complying with relevant laws and regulations. Management is also responsible for making all financial records and related information available to us.

Our responsibility is to express an opinion on the financial statements based on our audit. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation.

At the conclusion of our audit, we will submit to you a report containing our opinion as to whether the financial statements, taken as a whole, are fairly presented based on accounting principles generally accepted in the United States of America. If, during the course of our work, it appears for any reason that we will not be in a position to render an unqualified opinion on the financial statements, or that our report will require an explanatory paragraph, we will discuss this with you. It is possible that, because of unexpected circumstances, we may determine that we cannot render a report or otherwise complete the engagement. If, for any reason, we are unable to complete the audit or are unable to form or have not formed an opinion, we may decline to express an opinion or decline to issue a report as a result of the engagement. If, in our professional judgment, the circumstances require, we may resign from the engagement prior to completion.

 **BDO**     BDO Seidman, LLP
Accountants and Consultants

Mr. Harold Gobstein
Cardiac Management Systems
October 25, 2006
Page 2

We will design our audit to provide reasonable assurance of detecting errors or fraud that would have a material effect on the financial statements. Our work will be based primarily upon selected tests of evidence supporting the amounts and disclosures in the financial statements and, therefore, will not include a detailed check of your Company's transactions for the period. Accordingly, an audit performed in accordance with auditing standards generally accepted in the United States of America is not a guarantee of the accuracy of the financial statements, and there is a risk that material errors or fraud may exist and not be detected by us. Also, an audit is not designed to detect errors or fraud that are immaterial to the financial statements. However, we will inform you of any material errors or fraud that come to our attention. We will also inform you of illegal acts that come to our attention unless they are clearly inconsequential. In addition, during the course of our audit, financial statement misstatements may be identified, either through our audit procedures or through communication by your employees to us, and we will bring these misstatements to your attention as proposed adjustments. Management is responsible for recording such adjustments in the financial statements or otherwise concluding and confirming in a representation letter provided to us at the conclusion of our audit that the effects of the unrecorded adjustments are, both individually and in the aggregate, immaterial to the financial statements taken as a whole. At the conclusion of our audit we will communicate to the audit committee all such unrecorded adjustments.

An audit includes obtaining an understanding of internal control sufficient to plan the audit and to determine the nature, timing, and extent of audit procedures to be performed. An audit is not designed to provide assurance on internal control or to identify reportable conditions. However, we are responsible for ensuring that you are aware of any reportable conditions that come to our attention during our engagement.

**E-mail Communication**

In connection with this engagement, we may communicate with you or others via e-mail transmission. As e-mails can be intercepted and read, disclosed, or otherwise used or communicated by an unintended third party, or may not be delivered to each of the parties to whom they are directed and only to such parties, we cannot guarantee or warrant that e-mails from us will be properly delivered and read only by the addressee. Therefore, we specifically disclaim and waive any liability or responsibility whatsoever for interception or unintentional disclosure or communication of e-mail transmissions, or for the unauthorized use or failed delivery of e-mails transmitted by us in connection with the performance of this engagement. In that regard, you agree that we shall have no liability for any loss or damage to any person or entity resulting from the use of e-mail transmissions, including any consequential, incidental, direct, indirect, or special damages, such as loss of sales or anticipated profits, or disclosure or communication of confidential or proprietary information.



**BDO Seidman, LLP**
Accountants and Consultants

Mr. Harold Gobstein
Cardiac Management Systems
October 25, 2006
Page 3

## Ownership of Working Papers

The working papers prepared in conjunction with our audit are the property of our Firm, constitute confidential information, and will be retained by us in accordance with our Firm's policies and procedures.

## Reproduction of Audit Report

If the Company plans any reproduction or publication of our report, or any portion of it, copies of masters' or printers' proofs of the entire document should be submitted to us in sufficient time for our review and approval before printing. You also agree to provide us with a copy of the final reproduced material for our approval before it is distributed.

## Posting of Audit Report and Financial Statements on Your Web Site

You agree to indemnify BDO Seidman, LLP from any and all claims that may arise from any differences between the electronic version of the financial statements and audit report presented on your web site, now and in the future, and the signed version of the financial statements and audit report provided to management by BDO Seidman, LLP.

## Review of Documents for Sale of Securities

The audited financial statements and our report thereon should not be provided or otherwise made available to recipients of any document to be used in connection with the sale of securities (including securities offerings on the Internet) without first submitting copies of the document to us in sufficient time for our review and approval.

## Management Representations

As required by auditing standards generally accepted in the United States of America, we will request certain written representations from management at the close of our audit to confirm oral representations given to us and to indicate and document the continuing appropriateness of such representations and reduce the possibility of misunderstanding concerning matters that are the subject of the representations. Because of the importance of management's representations to an effective audit and provided the audited financial statements and our report thereon are not included in a registration statement under the Securities Act of 1933 or in a Private Placement Memorandum, Cardiac Management Systems agrees to release and indemnify BDO Seidman, LLP and its personnel from any liability and costs relating to our services under this agreement attributable to any misrepresentations by management.



**BDO Seidman, LLP**
Accountants and Consultants

Mr. Harold Gobstein
Cardiac Management Systems
October 25, 2006
Page 4

## Availability of Records and Personnel

You agree that all records, documentation, and information we request in connection with our audit will be made available to us (including those pertaining to related parties), that all material information will be disclosed to us, and that we will have the full cooperation of, and unrestricted access to, your personnel during the course of the engagement.

## Assistance by Your Personnel and Internet Access

We also ask that your personnel, to the extent possible, prepare various schedules and analyses for our staff. In addition, we ask that you provide high-speed Internet access to our engagement team, if practicable, while working on the Company's premises. This assistance will serve to facilitate the progress of our work and minimize costs to you.

## Other Services

We are always available to meet with you and other executives at various times throughout the year to discuss current business, operational, accounting, and auditing matters affecting your Company. Whenever you feel such meetings are desirable, please let us know. We are also prepared to provide services to assist you in any of these areas. We will also be pleased, at your request, to attend your directors' and stockholders' meetings.

## Independence

Professional and certain regulatory standards require us to be independent, in both fact and appearance, with respect to your Company in the performance of our services. Any discussions that you have with personnel of our Firm regarding employment could pose a threat to our independence. Therefore, we request that you inform us prior to any such discussions so that we can implement appropriate safeguards to maintain our independence.

## Dispute Resolution Procedure

If any dispute, controversy, or claim arises in connection with the performance or breach of this agreement (including disputes regarding the validity or enforceability of this agreement), either party may, upon written notice to the other party, request facilitated negotiations. Such negotiations shall be assisted by a neutral facilitator acceptable to both parties and shall require the best efforts of the parties to discuss with each other in good faith their respective positions and, respecting their different interests, to finally resolve such dispute.



**BDO Seidman, LLP**
Accountants and Consultants

Mr. Harold Gobstein
Cardiac Management Systems
October 25, 2006
Page 5

Each party may disclose any facts to the other party or to the facilitator that it, in good faith, considers necessary to resolve the dispute. However, all such disclosures will be deemed in furtherance of settlement efforts and will not be admissible in any subsequent litigation against the disclosing party. Except as agreed by both parties, the facilitator shall keep confidential all information disclosed during negotiations. The facilitator shall not act as a witness for either party in any subsequent arbitration between the parties.

Such facilitated negotiations shall conclude within sixty days from receipt of the written notice unless extended by mutual consent. The parties may also agree at any time to terminate or waive facilitated negotiations. The costs incurred by each party in such negotiations will be borne by it; the fees and expenses of the facilitator, if any, shall be borne equally by the parties.

If any dispute, controversy, or claim arises in connection with the performance or breach of this agreement (including disputes regarding the validity or enforceability of this agreement) and cannot be resolved by facilitated negotiations (or the parties agree to waive that process), then such dispute, controversy, or claim shall be settled by arbitration. The arbitration proceeding shall take place in the city in which the BDO Seidman office providing the relevant services exists, unless the parties agree to a different locale. The proceeding shall be governed by the provisions of the Federal Arbitration Act (FAA) or, if a court of competent jurisdiction determines the FAA inapplicable, by the laws of the state in which the proceeding is to take place. In any arbitration instituted hereunder, the proceedings shall proceed in accordance with the then current Arbitration Rules for Professional Accounting and Related Disputes of the American Arbitration Association (AAA), except that no pre-hearing discovery shall be permitted unless specifically authorized by the arbitration panel.

Such arbitration shall be conducted before a panel of three persons, one chosen by each party and the third selected by the two party-selected arbitrators. The arbitration panel shall have no authority to award non-monetary or equitable relief, and any monetary award shall not include punitive damages. The confidentiality provisions applicable to facilitated negotiation shall also apply to arbitration. The award issued by the arbitration panel may be confirmed in a judgment by any federal or state court of competent jurisdiction.

**Fees**

Our charges to your Company for the services described above for the year ending September 30, 2006, will be $54,000 plus out-of-pocket expenses. This fee is based on the following assumptions: your personnel will prepare certain schedules and analyses for us and make available to us documents for our examination as and when requested;

 **BDO**   BDO Seidman, LLP
Accountants and Consultants

Mr. Harold Gobstein
Cardiac Management Systems
October 25, 2006
Page 6

there will be no significant changes in the internal controls, accounting systems, key personnel, or structure of the organization; there will be no significant acquisitions or disposals of businesses; and there will not be any unanticipated increases in current operations requiring significant additional audit time. Should we encounter any unforeseen problems that will warrant additional time or expense, you will be notified of the situation and, if possible, the added cost.

Our charges for other services will be agreed to separately. The arrangements described in this letter will be updated annually.

Bills will be rendered on a monthly or other periodic basis, and are due upon receipt. If payments are not received promptly, we reserve the right to stop work on the engagement.

Very truly yours,

*Christopher J. Orella*

Christopher J. Orella
Partner

Acknowledged:

By *Harold Gobstein, Sec'y*
　　Mr. Harold Gobstein

Date  *10/27/06*

EXHIBIT "C"



**BDO Seidman, LLP**
Accountants and Consultants

330 Madison Avenue
New York, New York 10017-5001
Telephone: (212) 885-8000
Fax: (212) 697-1299

December 17, 2004

Mr. Harold Gobstein
Cardiac Management Systems, Inc. and
 Subsidiaries
1836 Monte Carlo Way
Coral Springs, FL 33071

Dear Mr. Gobstein:

<u>**Agreement To Provide Services**</u>

This agreement is intended to describe the nature and scope of our services.

## Audit

As agreed, we will audit the consolidated balance sheet of Cardiac Management Systems, Inc. and Subsidiaries (the "Company") as of September 30, 2004 and the related statements of income and retained earnings and cash flows for the year then ending in accordance with auditing standards generally accepted in the United States of America. The financial records and financial statements are the responsibility of your Company's management. In that regard, management is responsible for establishing and maintaining effective internal control over financial reporting, establishing and maintaining proper accounting records, selecting appropriate accounting principles, safeguarding company assets, and complying with relevant laws and regulations. Management is also responsible for making all financial records and related information available to us.

Our responsibility is to express an opinion on the financial statements based on our audit. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation.

At the conclusion of our audit, we will submit to you a report containing our opinion as to whether the financial statements, taken as a whole, are fairly presented based on accounting principles generally accepted in the United States of America. If, during the course of our work, it appears for any reason that we will not be in a position to render an unqualified opinion on the financial statements, or that our report will require an explanatory paragraph, we will discuss this with you. It is possible that, because of unexpected circumstances, we may determine that we cannot render a report or otherwise complete the engagement. If, for any reason, we are unable to complete the audit or are



BDO Seidman, LLP
Accountants and Consultants

Mr. Harold Gobstein
Cardiac Management Systems
December 17, 2004
Page 2

unable to form or have not formed an opinion, we may decline to express an opinion or decline to issue a report as a result of the engagement. If, in our professional judgment, the circumstances require, we may resign from the engagement prior to completion.

We will design our audit to provide reasonable assurance of detecting errors or fraud that would have a material effect on the financial statements. Our work will be based primarily upon selected tests of evidence supporting the amounts and disclosures in the financial statements and, therefore, will not include a detailed check of your Company's transactions for the period. Accordingly, an audit performed in accordance with auditing standards generally accepted in the United States of America is not a guarantee of the accuracy of the financial statements, and there is a risk that material errors or fraud may exist and not be detected by us. Also, an audit is not designed to detect errors or fraud that are immaterial to the financial statements. However, we will inform you of any material errors or fraud that come to our attention. We will also inform you of illegal acts that come to our attention unless they are clearly inconsequential. In addition, during the course of our audit, financial statement misstatements may be identified, either through our audit procedures or through communication by your employees to us, and we will bring these misstatements to your attention as proposed adjustments. Management is responsible for recording such adjustments in the financial statements or otherwise concluding and confirming in a representation letter provided to us at the conclusion of our audit that the effects of the unrecorded adjustments are, both individually and in the aggregate, immaterial to the financial statements taken as a whole. At the conclusion of our audit we will communicate to the audit committee all such unrecorded adjustments.

An audit includes obtaining an understanding of internal control sufficient to plan the audit and to determine the nature, timing, and extent of audit procedures to be performed. An audit is not designed to provide assurance on internal control or to identify reportable conditions. However, we are responsible for ensuring that you are aware of any reportable conditions that come to our attention during our engagement.

## E-mail Communication

In connection with this engagement, we may communicate with you or others via e-mail transmission. As e-mails can be intercepted and read, disclosed, or otherwise used or communicated by an unintended third party, or may not be delivered to each of the parties to whom they are directed and only to such parties, we cannot guarantee or warrant that e-mails from us will be properly delivered and read only by the addressee. Therefore, we specifically disclaim and waive any liability or responsibility for interception or unintentional disclosure or communication of e-mail transmissions, or for the unauthorized use or failed delivery of e-mails transmitted by us in connection with the

 **BDO.**  BDO Seidman, LLP
Accountants and Consultants

Mr. Harold Gobstein
Cardiac Management Systems
December 17, 2004
Page 3

performance of this engagement. In that regard, you agree that we shall have *no* liability for any loss or damage to any person or entity resulting from the use of e-mail transmissions, including any consequential, incidental, direct, indirect, or special damages, such as loss of sales or anticipated profits, or disclosure or communication of confidential or proprietary information.

## Ownership of Working Papers

The working papers prepared in conjunction with our audit are the property of our Firm, constitute confidential information, and will be retained by us in accordance with our Firm's policies and procedures.

## Reproduction of Audit Report

If the Company plans any reproduction or publication of our report, or any portion of it, copies of masters' or printers' proofs of the entire document should be submitted to us in sufficient time for our review and approval before printing. You also agree to provide us with a copy of the final reproduced material for our approval before it is distributed.

## Posting of Audit Report and Financial Statements on Your Web Site

You agree to indemnify BDO Seidman, LLP from any and all claims that may arise from any differences between the electronic version of the financial statements and audit report presented on your web site, now and in the future, and the signed version of the financial statements and audit report provided to management by BDO Seidman, LLP.

## Review of Documents for Sale of Securities

The audited financial statements and our report thereon should not be provided or otherwise made available to recipients of any document to be used in connection with the sale of securities (including securities offerings on the Internet) without first submitting copies of the document to us in sufficient time for our review and approval.

## Management Representations

As required by auditing standards generally accepted in the United States of America, we will request certain written representations from management at the close of our audit to confirm oral representations given to us and to indicate and document the continuing appropriateness of such representations and reduce the possibility of misunderstanding concerning matters that are the subject of the representations. Because of the importance

 **BDO Seidman, LLP**
Accountants and Consultants

Mr. Harold Gobstein
Cardiac Management Systems
December 17, 2004
Page 4

of management's representations to an effective audit and provided the audited financial statements and our report thereon are not included in a registration statement under the Securities Act of 1933 or in a Private Placement Memorandum, Cardiac Management Systems agrees to release and indemnify BDO Seidman, LLP and its personnel from any liability and costs relating to our services under this agreement attributable to any misrepresentations by management.

## Availability of Records and Personnel

You agree that all records, documentation, and information we request in connection with our audit will be made available to us (including those pertaining to related parties), that all material information will be disclosed to us, and that we will have the full cooperation of, and unrestricted access to, your personnel during the course of the engagement.

## Assistance by Your Personnel and Internet Access

We also ask that your personnel, to the extent possible, prepare various schedules and analyses for our staff. In addition, we ask that you provide high-speed Internet access to our engagement team, if practicable, while working on the Company's premises. This assistance will serve to facilitate the progress of our work and minimize costs to you.

## Other Services

We are always available to meet with you and other executives at various times throughout the year to discuss current business, operational, accounting, and auditing matters affecting your Company. Whenever you feel such meetings are desirable, please let us know. We are also prepared to provide services to assist you in any of these areas. We will also be pleased, at your request, to attend your directors' and stockholders' meetings.

## Independence

Professional and certain regulatory standards require us to be independent, in both fact and appearance, with respect to your Company in the performance of our services. Any discussions that you have with personnel of our Firm regarding employment could pose a threat to our independence. Therefore, we request that you inform us prior to any such discussions so that we can implement appropriate safeguards to maintain our independence.

 **BDO Seidman, LLP**
Accountants and Consultants

Mr. Harold Gobstein
Cardiac Management Systems
December 17, 2004
Page 5

## Dispute Resolution Procedure

If any dispute, controversy, or claim arises in connection with the performance or breach of this agreement (including disputes regarding the validity or enforceability of this agreement), either party may, upon written notice to the other party, request facilitated negotiations. Such negotiations shall be assisted by a neutral facilitator acceptable to both parties and shall require the best efforts of the parties to discuss with each other in good faith their respective positions and, respecting their different interests, to finally resolve such dispute.

Each party may disclose any facts to the other party or to the facilitator that it, in good faith, considers necessary to resolve the dispute. However, all such disclosures will be deemed in furtherance of settlement efforts and will not be admissible in any subsequent litigation against the disclosing party. Except as agreed by both parties, the facilitator shall keep confidential all information disclosed during negotiations. The facilitator shall not act as a witness for either party in any subsequent arbitration between the parties.

Such facilitated negotiations shall conclude within sixty days from receipt of the written notice unless extended by mutual consent. The parties may also agree at any time to terminate or waive facilitated negotiations. The costs incurred by each party in such negotiations will be borne by it; the fees and expenses of the facilitator, if any, shall be borne equally by the parties.

If any dispute, controversy, or claim arises in connection with the performance or breach of this agreement (including disputes regarding the validity or enforceability of this agreement) and cannot be resolved by facilitated negotiations (or the parties agree to waive that process), then such dispute, controversy, or claim shall be settled by arbitration. The arbitration proceeding shall take place in the city in which the BDO Seidman office providing the relevant services exists, unless the parties agree to a different locale. The proceeding shall be governed by the provisions of the Federal Arbitration Act (FAA) or, if a court of competent jurisdiction determines the FAA inapplicable, by the laws of the state in which the proceeding is to take place. In any arbitration instituted hereunder, the proceedings shall proceed in accordance with the then current Arbitration Rules for Professional Accounting and Related Disputes of the American Arbitration Association (AAA), except that no pre-hearing discovery shall be permitted unless specifically authorized by the arbitration panel.

Such arbitration shall be conducted before a panel of three persons, one chosen by each party and the third selected by the two party-selected arbitrators. The arbitration panel shall have no authority to award non-monetary or equitable relief, and any monetary award shall not include punitive damages. The confidentiality provisions applicable to facilitated



BDO Seidman, LLP
Accountants and Consultants

Mr. Harold Gobstein
Cardiac Management Systems
December 17, 2004
Page 6

negotiation shall also apply to arbitration. The award issued by the arbitration panel may be confirmed in a judgment by any federal or state court of competent jurisdiction.

## Fees

Our charges to your Company for the services described above for the year ending September 30, 2004, will be $49,000 plus out-of-pocket expenses. This fee is based on the following assumptions: your personnel will prepare certain schedules and analyses for us and make available to us documents for our examination as and when requested; there will be no significant changes in the internal controls, accounting systems, key personnel, or structure of the organization; there will be no significant acquisitions or disposals of businesses; and there will not be any unanticipated increases in current operations requiring significant additional audit time. Should we encounter any unforeseen problems that will warrant additional time or expense, you will be notified of the situation and, if possible, the added cost.

Our charges for other services will be agreed to separately. The arrangements described in this letter will be updated annually.

Bills will be rendered on a monthly or other periodic basis, and are due upon receipt. If payments are not received promptly, we reserve the right to stop work on the engagement.

Very truly yours,

Christopher J. Orella
Partner

Acknowledged:

By ~Harold Gobstein, Treas
      Mr. Harold Gobstein - Treas

Date  12/21/04

G:\Health\Clients\C\Cardiac\2004\Cardiac L-20 Engmt ltr 9 04.doc

EXHIBIT B

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
(MIAMI DIVISION)
www.flsb.uscourts.gov

In re:                                          Chapter 7

CARDIAC MANAGEMENT SYSTEMS,                     Case No. 08-19029-BKC-LMI
                                                (Jointly Administered)
                        Debtor.

_____/

KENNETH A. WELT, Chapter 7 Trustee
of the jointly administered estates of the
Debtor, Cardiac Management Systems,
Inc. and its affiliated debtors,

                        Plaintiff,

v.                                              Adv. Pro. No. 10-03060-LMI

BDO SEIDMAN, LLP, n/k/a BDO USA, LLP,
a New York limited liability partnership,

                        Defendant.

_____/

### DECLARATION OF NIKKI L. SIMON IN SUPPORT OF
### BDO USA, LLP'S MOTION TO COMPEL
### ARBITRATION OR, ALTERNATIVELY, TO STAY

NIKKI L. SIMON hereby affirms the following under the penalty of perjury

pursuant to 28 U.S.C. § 1746:

1.      I am a Shareholder of Greenberg Traurig, P.A. and am familiar with the

facts contained in this Declaration.

2.      The Adversary Complaint in this adversary proceeding [D.E. 1].

3. Attached as Exhibit "1" is a true and correct copy of the Complaint filed in the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, *Welt v. BDO Seidman, LLP*, Case No. 2010-28002-CA-01, dated May 13, 2010.

4. Attached as Exhibit "2" is a true and correct copy of the Amended Complaint filed in the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, *Welt, et al. v. BDO Seidman, LLP*, Case No. 2010-28002-CA-01, dated June 21, 2010.

5. Attached as Exhibit "3" is a true and correct copy of the motion filed in the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, *Welt v. BDO Seidman, LLP*, Case No. 2010-28002-CA-01, to compel arbitration, dated June 2, 2010.

6. Attached as Exhibit "4" is a true and correct copy of Plaintiff's First Request for Production to Defendant served in the instant adversary proceeding on July 9, 2010.

7. No previous application has been made to this or any other Court for the relief requested herein.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed on August 9, 2010

NIKKI L. SIMON

2

# EXHIBIT 1

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO. 09 = 28002 CA 10

KENNETH A. WELT, Chapter 7 Trustee
of the jointly administered estates of the
Debtor, Cardiac Management Systems,
Inc. and its affiliated debtors,

     Plaintiff,

v.

BDO SEIDMAN, LLP, n/k/a
BDO USA, LLP, a New York
limited liability partnership,

     Defendant.

_____/

**S U M M O N S**

STATE OF FLORIDA:
To Each Sheriff of Said State:

     YOU ARE HEREBY COMMANDED to serve this summons and a copy of the Notice of
Related Case and Complaint in this action upon Defendant:

**BARBARA A. TAYLOR, GENERAL COUNSEL, REGISTERED AGENT**
**BDO Seidman, LLP, n/k/a BDO USA, LLP**
**100 Park Avenue**
**New York, NY 10017**

     Each defendant is required to serve written defenses to the complaint or petition on
Plaintiff's attorney, to wit: **David Cimo**, Esq. whose address is:

**GENOVESE JOBLOVE & BATTISTA, P.A.,**
**100 Southeast Second Street, 44TH Floor**
**Miami, Florida 33131**

**within 20 days** after service of this summons on that Defendant, exclusive of the day of service,
and to file the original of the defenses with the Clerk of this Court, either before service on
Plaintiff's attorney or immediately thereafter. · If a defendant fails to do so, a default will be
entered against that defendant for the relief demanded in the complaint or petition.

DATED ON _____MAY 1 3 2010_____, 2010

Clerk of said Court

By: _____
             as Deputy Clerk
             (Court Seal)

IN THE COURT OF THE ELEVENTH
JUDICAL CIRCUIT IN AND FOR MIAMI-
DADE-COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO - 28002 CA 10

KENNETH A. WELT, Chapter 7 Trustee
of the jointly administered estates of the
Debtor, Cardiac Management Systems,
Inc. and its affiliated debtors,

    Plaintiff,

v.

BDO SEIDMAN, LLP, n/k/a
BDO USA, LLP, a New York limited
liability partnership,

    Defendant.

_____/



ORIGINAL
FILED
MAY 13 2010
HARVEY RUVIN

NOTICE OF RELATED CASE

Plaintiff, Plaintiff, Kenneth A. Welt, not individually but in his capacity as the Chapter 7

trustee of the jointly administered debtors in the pending bankruptcy case of Cardiac

Management Systems, Inc., et al. hereby gives notice of the following related case pending in

this judicial circuit:

> Kenneth A. Welt, Chapter 7 Trustee of the jointly administered
> estates of the Debtor, Cardiac Management Systems, Inc. and its
> affiliated debtors, Plaintiff, vs. Stephen Cianciulli, an individual
> and Harold Gobstein, an individual, Defendants; 11th Circuit of
> Miami-Dade County, Florida; Case No. 10-04236-CA-06.

Dated this 13 th day of May, 2010.

    GENOVESE JOBLOVE & BATTISTA, P.A.
    Attorneys for Plaintiff
    100 S.E. Second Street, 44th Flr.
    Miami, FL 33131
    Telephone: (305) 349-2300
    Facsimile: (305) 349-2310

    David C. Cimo, Florida Bar No. 775400
    Peter W. Bellas, Florida Bar No. 611387

IN THE COURT OF THE ELEVENTH
JUDICAL CIRCUIT IN AND FOR MIAMI-
DADE-COUNTY, FLORIDA

CASE NO. 10 - 28002 CA 10

KENNETH A. WELT, Chapter 7 Trustee
of the jointly administered estates of the
Debtor, Cardiac Management Systems,
Inc. and its affiliated debtors,

     Plaintiff,

v.

BDO SEIDMAN, LLP, n/k/a
BDO USA, LLP, a New York limited
liability partnership,

     Defendant.

_____/



## COMPLAINT FOR DAMAGES
## AND DEMAND FOR JURY TRIAL

    The Plaintiff, Kenneth A. Welt ("Welt" or the "Trustee"), not individually but in his

capacity as the Chapter 7 trustee of the jointly administered debtors in the pending bankruptcy

case of Cardiac Management Systems, Inc., et al. (sometimes collectively referred to herein as

the "Debtor" or "Cardiac"), files this Complaint for Damages and Demand for Jury Trial (the

"Complaint"), against Defendant, BDO Seidman, LLP, n/k/a BDO USA, LLP, a New York

limited liability partnership (the "Defendant" or "BDO"), and alleges:

### PRELIMINARY STATEMENT

    1.    This is an action for damages in excess of $15,000, exclusive of attorneys' fees

and costs.

    2.    From and after at least the 1990's, BDO was the outside independent auditors of

the Debtor.

3.    As alleged herein, BDO breached its duty of care owed to the Debtor by failing to perform its audits in compliance with applicable rules, policies, and procedures.

4.    As alleged herein, the Debtor's principals (as defined below), lacking good faith, breached their respective duties of loyalty and/or care by among other things, negligently, grossly negligently, carelessly, and recklessly managing Cardiac and the Non-Debtor Affiliates (as defined below), and/or by entrusting the management of Cardiac and the Non-Debtor Affiliates to unqualified and/or incompetent managers.

5.    The Debtor's principals further breached their fiduciary duties by failing to ensure that Cardiac's and Non-Debtor Affiliates' billing practices would be in compliance with applicable law and otherwise consistent with reasonable, customary, and best practices in the industry.

6.    BDO aided and abetted the beaches of duty of the Debtor's principals, who were charged with responsibility for safeguarding the assets of Cardiac and its various Non-Debtor Affiliates, by having knowledge of such breaches and rendering substantial assistance in regard thereto as a result of BDO's acts and omissions as alleged herein.

7.    As the direct and proximate cause of the acts and omissions by BDO alleged herein, Cardiac and the Non-Debtor Affiliates, along with each of their respective creditors, and other constituencies suffered losses in an amount no less than the amount of allowed unsecured claims, an amount in excess of $5 million.

## THE PARTIES, JURISDICTION, AND VENUE

8.    On June 30, 2008, the debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy

Court for the Southern District of Florida, Miami Division (the "Bankruptcy Court"), Case No. 08-19029-BKC-LMI.

9.      On October 20, 2008, Cardiac sold substantially all of their assets pursuant to Bankruptcy Code Section 363 sale approved by order of the Bankruptcy Court (the "Sale Date").

10.     On November 13, 2008, the Court entered an Order converting Cardiac's Chapter 11 cases to cases under Chapter 7.

11.     On November 14, 2008, Welt, who previously had been appointed Chapter 11 trustee, was appointed by the Office of the United States Trustee as the Chapter 7 Trustee for each of Cardiac estates.

12.     As such, Welt is the duly appointed and acting Chapter 7 Trustee for the above referenced jointly administered bankruptcy debtors and their respective non-debtor affiliates.[1]

13.     Welt commences this action in his capacity as Chapter 7 Trustee for the jointly administered estates of Cardiac and as the sole and/or majority shareholder of each of Cardiac's Non-Debtor Affiliates, and pursuant to 11 U.S.C. § 541(a) as successor to the interests in property of the estate, and pursuant to 11 U.S.C. § 544.

---

[1] Cardiac consists of: (i) DTG Management, Inc.; (ii) DTG of Sunset Square, Inc.; (iii) DTG of Sunset Square II, Inc.; (iv) Diagnostic Testing Group, Inc.; (v) DTG of Miami, Inc.; (vi) Lake Worth Diagnostic Testing Group, Inc.; (vii) Diagnostic Testing Group of Palm Beach, Inc.; (viii) Aventura Diagnostic Testing Group, Inc.; (ix) DTG of Aventura, Inc.; (x) Gables Diagnostic Testing Group, Inc.; (xi) Coral Gables Diagnostic Testing Group, LLC.; (xii) Cooper City Diagnostic Testing Group, Inc.; (xiii) DTG of Cooper City, Inc.; and (xiv) Pines Diagnostic Testing Group, Inc. Cardiac, Cardiac Management Systems, Inc., is the 100% shareholder or member of the following non-debtor entities: (i) BAC Realty Corp.; (ii) Children's Diagnostic Testing Group of Broward, Inc.; (iii) Children's Diagnostic Testing Group of Miami, Inc.; (iv) Children's Diagnostic Group of Palm Beach, Inc.; (v) Children's Diagnostic Group of Gables, Inc.; (vi) Children's Diagnostic Testing of Aventura, Inc.; (vii) CMS of Brooklyn, Inc.; (viii) Douglas Diagnostics, Inc.; (ix) Empire Annex Limited; (x) Galloway Diagnostics, Inc.; (xi) Palm Diagnostic Imaging, Inc.; (xii) Pembroke West Diagnostic Imaging, Inc.; (xiii) Sheridan West Diagnostic Imaging, Inc.; (xiv) Waterways Imaging, Inc.; and (xv) Pembroke Pines Diagnostic Testing Group, LLC (collectively defined here as the "Non-Debtor Affiliates").

3

14. At all times material hereto, BDO was and is a New York limited liability partnership practicing auditing, accounting, and other services within Miami-Dade County, Florida.

15. Pursuant to Florida Statute § 48.193, BDO is subject to the long arm jurisdiction of this Court by: (a) operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state; and (b) committing a tortious act within this state.

16. Venue is proper in Miami-Dade County, Florida in that, among other things, certain of the acts and omissions alleged herein occurred or otherwise transpired in Miami-Dade County, Florida.

17. All conditions precedent to the filing of this action have been waived, have been performed, or have occurred.

## FACTS COMMON TO ALL COUNTS

A. *The History and Business Operations of Cardiac and Its Affiliates*

18. Cardiac Management Systems, Inc. ("CMS"), a Delaware corporation, is the parent corporation of the other fourteen debtors as well as a dozen unfiled subsidiaries. Thirteen of these entities were Florida corporations. The other is a Florida limited liability company, the membership interests in which were owned 95% by CMS.

19. DTG Management, Inc. provided administrative services to all Cardiac entities. Five debtors operated medical imaging centers in Miami-Dade, Broward, and Palm Beach counties.

4

20. Five others were the lessees of the leased space for the five operating locations and two Debtors which leased the administrative office suites, and these in turn subleased the space to their sister corporations at a very small mark-up of the lease rent.

21. The fifteenth debtor formerly operated a sixth location in Pembroke Pines.

22. Cardiac's five operations marketed their services under a common name, DTG. The only other active subsidiaries of CMS were: (i) a corporation, BAC Realty Corp., which owned a portion of the real estate leased to the Lake Worth tenant entity; and (ii) five entities that billed for the five operations' services provided to health plan participants, but those out-of-network revenues were passed through directly to the five operating entities.

23. Cardiac was engaged in the ownership and operation of five facilities that provided magnetic resonance imaging (MRI), computer tomography scanning (CT or CAT scan), and other nuclear cardiology testing. Cardiac did not provide services for the diagnosis or treatment of injury or disease, and consequently were not "health care businesses" as that term is used in the Bankruptcy Code, although they derived all of their income from providing scans and tests for the patients of others.

24. Cardiac's operations were located in Miami (Galloway Road), Coral Gables, Aventura, Cooper City, and Lake Worth, and each location was leased.

25. Prior to its demise, Cardiac experienced rapid growth. Although Cardiac was purportedly profitable for some years, its bankruptcy filings attributed the Deficit Reduction Act of 2005 (the "DRA") for causing significant cutbacks in Medicare spending, which Cardiac claimed caused a corresponding reduction in the amounts that Medicare would pay for MRI and CT services, and a resulting cutback in the fee schedules for managed care plans that were indexed to prevailing Medicare fee schedules.

5

26. Cardiac, however, was well aware of the potential impact of the DRA on its business, and management failed to undertake sufficient measures to prepare for or otherwise deal with same.

27. Other factors Cardiac attributed in its bankruptcy filings to causing losses over the period 2006-2008 included the purported: (i) increase in physicians doing their own stress-testing; and (ii) the general malaise in the nation's economy which has effectively limited access to health care by causing more employers to shift a greater portion of health care costs to employees.

28. In actuality, Cardiac's increased insolvency and losses are directly attributable to the various acts and omissions of Debtor's management and/or BDO described herein.

29. After suffering reported losses of $1.8 million and $1.1 million for the fiscal year periods ended in September, 2006 and September, 2007, respectively, Cardiac suffered losses in excess of $4.1 million during the six month period ended March 31, 2008,.

30. In addition, the Trustee has reason to believe that during the two years prior to the petition date certain, all of Cardiac's debtors and/or Non-Debtor Affiliates were insolvent, were in the zone of insolvency, were undercapitalized, and/or could not otherwise obtain additional credit in the marketplace.

**B.** *Management's Breaches of Fiduciary Duty*

31. Stephen Cianciulli ("Cianciulli") and Harold Gobstein ("Gobstein") were officers and/or directors of Cardiac and/or the Non-Debtor Affiliates (Cianciulli and Gobstein shall sometimes collectively be referred to herein as the Debtor's "principals" or "management").

32. The Debtor's principals maintained the following positions with Cardiac (along with respective their salaries and benefits) during the two years prior to the petition date:

6

a.   Cianciulli: President and chief executive officer until May 2008; still president of CMS and director of all companies through the Sale Date; paid compensation as part of $40,000/month in Cardiac's management fees to CMS; paid additional compensation from other Debtors, group health insurance coverage, and a significant auto allowance.

b.   Gobstein: Secretary (and director) of Cardiac and the Non-Debtor Affiliates; paid as part of $40,000/month in Cardiac's management fees to CMS; group health insurance coverage.

33.   The mismanagement of Cardiac and the Non-Debtor Affiliates leading to their insolvency and the breaches of duties owed by the Debtor's principals both prior to and after it became insolvent can be divided into two broad categories: financial mismanagement and irregularities; and the failure to engage in meaningful oversight of Cardiac's operations.

34.   Cianciulli and Gobstein, as officers and/or directors of Cardiac and the Non-Debtor Affiliates, failed to understand the ramifications of Cardiac's deteriorating financial condition and to engage in any meaningful oversight of Cardiac's operations pre-petition, nor did they undertake sufficient or adequate measures to prevent the increased insolvency of the enterprise.

35.   Cianciulli and Gobstein similarly were grossly negligent, reckless, and/or lacked good faith by failing to cause or otherwise implement sufficient measures such that adequate and/or competent books and records would be maintained to ensure, among other things, that Cardiac's income and financial statements and other financial data contained no material misstatements.

7

36. Specifically, and without limitation, the record-keeping of Cardiac was wholly inadequate by, among other deficiencies, the failure to post or reconcile numerous transactions spanning several months, including records relating to Cardiac's accounts receivable. Such actions or inactions resulted in a significant decrease in the collectability of Cardiac's receivables to the detriment of Cardiac's creditors and shareholders.

37. In addition, the principals of the Debtor were grossly negligent, reckless, and/or lacked good faith:

      a. by failing to ensure that the accounts receivable departments of Cardiac were properly staffed, trained, supervised, managed, and/or otherwise operated, especially given the high importance of such function to Cardiac's business and financial operations, along with the highly regulated, paperwork-oriented nature of the health care industry;

      b. by failing to timely shut down or make substantial cost reductions to unprofitable Debtor and Non-Debtor Affiliates during the two years prior to the petition date which caused, among other harm, severe financial hardship on and substantial operating losses to the few remaining affiliates that had been operating break-even or at a profit;

      c. by failing to undertake reasonable, necessary, appropriate, and/or sufficient measures to prepare for the potential adverse effects of the DRA on Cardiac's operations, which act went into effect commencing January 1, 2007, when they knew or should have known that such act would have a substantial adverse impact on Cardiac's business and financial operations;

8

d.    by engaging in a highly questionable business practice whereby insurers of patients were improperly billed for higher out-of-network charges, when no right to seek out-of-network payment existed. Specifically, as part of this questionable business practice, management improperly caused each location of Cardiac to maintain two separate licenses with Florida's Agency for Health Care Administration. As the opportunities arose, management would then cause Cardiac to improperly submit bills against one license or the other such that the higher out-of-network amounts would apply, even though Cardiac was contractually and/or legally required to use or apply the lower in-network charges. When the representatives of medical insurers, who had no knowledge that such scheme was in place, contacted Cardiac to question the higher out-of network billings, the Debtor's principals directed and/or otherwise permitted employees of Cardiac to attribute and re-characterize such transactions as "billing errors," and would instruct Cardiac's employees to cause such transactions to be written off, while knowing that a large percentage of such improper billings would not be questioned by the insurers;

e.    by engaging in and/or otherwise permitting materially inaccurate financial information to be processed and disseminated internally and to third parties, including Cardiac's secured lenders, which information, among other deficiencies, grossly overstated the revenues and the value of Cardiac's assets, including their accounts receivable;

9

f.   by allowing and/or otherwise permitting certain debtor and Non-Debtor Affiliates acting out of network to engage in substantial improper billings resulting in, among other negative consequences, denials of claims by medical insurers; and

g.   by allowing and/or otherwise permitting substantial preferential and/or fraudulent transfer payments to be made to Cianciulli and/or his affiliates.

## C.   _BDO's Duties as Cardiac's Auditors_

38.   Between the 1990's and 2008, BDO provided independent audit and other professional services for Cardiac, and issued audit reports for fiscal years (ending September 30) 2005, 2006, and 2007 (sometimes collectively referred to herein as the "Audits"), which were accepted and acknowledged by Cardiac's management.

39.   For each audit year, BDO's audit reports expressed unqualified opinions on Cardiac's financial statements

40.   In regard to the services rendered for Cardiac, BDO represented that it would conduct, and was otherwise legally obligated to conduct, its services, including the Audits, in accordance with Generally Accepted Auditing Standards ("GAAS") and the applicable professional guidelines and standards, including those requirements of GAAS that required that BDO to, among other things, obtain reasonable assurance about whether the financial statements were free of material misstatement and were fairly presented, in all material respects, in conformity with Generally Accepted Accounting Principles ("GAAP").

[CONTINUED ON NEXT PAGE]

10

**D.** *The Improper Accounting Methods and Failure of Management to Implement Adequate Safeguards and Controls and of BDO to Identify Same*

41. BDO and Cardiac's management knew or had reason to know that Cardiac was using improper and flawed accounting methods (collectively, the "Accounting Errors and/or Material Inaccuracies"), thereby resulting in, among other damages, an unduly artificially prolonged existence causing increased insolvency, increased liabilities, and diminution in the assets and enterprise value of Cardiac.

42. Further, BDO and Cardiac's management knew or had reason to know that Cardiac had failed to undertake adequate measures or implement sufficient safeguards or controls to prevent the Accounting Errors and/or Material Inaccuracies from occurring at or during certain material periods of time, or otherwise failed to demand or ensure that sufficient safeguards or controls were or would be implemented by Cardiac to prevent the Accounting Errors and/or Material Inaccuracies from occurring.

43. To the extent adequate measures or controls were in place, they were ignored or otherwise overridden by certain of Cardiac's management, or they willfully turned a blind eye. Irrespective, BDO did not consider or require modification of the financial statements for the Accounting Errors and/or Material Inaccuracies in the performance of its services, including the Audits, resulting in, among other things, the issuance of materially misstated financial statements and audit opinions thereon that did not comply with GAAS.

**E.** *BDO's Acts and Omissions in Conducting its Audits*

44. BDO, meanwhile, failed in its duties by not recognizing or otherwise requiring modification of the financial statements for the Accounting Errors and/or Material Inaccuracies

11

in performing its services, including the Audits, and in so doing caused Cardiac to overstate its financial position and results of operations.

45.     Specifically, BDO did not adhere to GAAS and other applicable standards by, among other acts and omissions:

a.     breaching its duties to Cardiac by violating numerous provisions of GAAS and/or applicable professional guidelines and standards related to GAAS in the conduct of the Audits including, but not limited to, those related to: (i) the exercise of due professional care (General Auditing Standard No. 3), (ii) the proper planning and supervision of an audit (Standards of Field Work No. 1), (iii) collecting sufficient, competent evidence (Standards of Field Work No. 3), (iv) presentation of the financial statements in accordance with GAAP (Standards of Reporting No. 1), (v) providing informative disclosures (Standards of Reporting No. 3), and (vi) AICPA Audit and Accounting Guide, Health Care Organizations.

b.     in violation of Statement on Auditing Standards ("SAS") 99 (entitled Consideration Fraud in a Financial Statement Audit), failing to assess the risk of material misstatement due to fraud by, among other things: (i) failing to conduct an adequate "brainstorming" session; (ii) failing to require the attendance of a partner at the "brainstorming" session assessing areas that the auditor believed might indicate fraud; and (iii) failing to identify any facts or circumstances attendant to its audit to assist in identifying fraud, yet preparing a "brainstorming" session memo" which expressly identified the possibility "over billing of insurance companies

12

for services & fictitious billings for services" as a potential fraudulent activity in the client's industry;

c.   in violation of AU 150 (GAAS fieldwork standards), AU 230 (entitled Due Professional Care), AU 330 (entitled the Confirmation Process), and the AICPA Audit and Accounting Guide, Health Care Organizations failing to confirm the accounts receivable or otherwise prepare a proper memo supporting its decision not to confirm the outstanding accounts receivable of the Debtor;

d.   in violation of AU 150 (GAAS fieldwork standards), AU 230 (entitled Due Professional Care), AU 342 (entitled Auditing Accounting Estimates), AU 329 (entitled Analytical Procedures), and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to adequately perform compliance testing by, among things: (i) encountering an excessive and material number of exceptions that were never adequately resolved; and (ii) failing to perform adequate analytical procedures regarding revenue and accounts receivable;

e.   in violation of AU 329 (entitled Analytical Procedures), AU 342 (entitled Auditing Accounting Estimates), and the AICPA Audit and Accounting Guide, Health Care Organizations failing to develop industry and client expectations regarding the relationship among the financial statement components including A/R, sales, A/R aging, revenue, contractual write-off, and allowance for bad debt;

13

    f.     in violation of AU 150, AU 230, and the AICPA Audit and Accounting

Guide, Health Care Organizations, failing to gain sufficient knowledge of

the client, the rate setting environment, and its industry;

    g.     in violation of AU 230, failing to exercise professional skepticism;

    h.     in violation of AU 210 (entitled Training and Proficiency of Independent

Auditor), AU 230, AU 314 (entitled Understanding the Entity and its

Environment and Assessing the Risks of Material Misstatements)(or SAS

55 as applicable), AU 318 (entitled Performing Audit Procedures in

Response to Assessed Risks and Evaluating the Audit Evidence

Obtained)(or SAS 55 as applicable,  AU 329, AU 330, AU 342, and the

AICPA Audit and Accounting Guide, Health Care Organizations, failing

to obtain and evaluate sufficient and appropriate audit evidence to support

certain accounting estimates including accounts receivable and revenue;

    i.     in violation of AU 210, AU 230, AU 330, AU 329, AU 342, and the

AICPA Audit and Accounting Guide, Health Care Organizations, failing

to appropriately plan, design, and implement compliance testing relating

to accounts receivable and revenue; and

    j.     other breaches as may be determined through discovery.

    46.    The foregoing acts and omissions are presently estimated by the Chapter 7 Trustee to have proximately caused the following harm to the estates: (i) damages resulting from the increased insolvency of Cardiac exceeding in value the claims of the general unsecured creditors – i.e., a sum in excess of $5 million, along with an estimated $6 million deficiency claim of secured creditor Merrill Lynch/Bank of America; (ii) damages totaling the value of all

14

fraudulent transfers and/or improper or unauthorized payments or dividends to Cianciulli and his affiliates, currently totaling in excess of $785,600; (iii) damages totaling the value of post-petition claims filed or to be filed by physicians regarding the violation of the sale finance order, currently totaling in excess of $600,000; (iv) damages totaling the value of all improper additional compensation paid to employees and officers in amounts exceeding those salaries paid to similar employees in South Florida, currently totaling in excess of $35,000; (v) damages in the form of administrative expenses incurred post petition to reconstruct and/or otherwise create Cardiac's business and financial records, currently totaling in excess of $40,000; and (vi) other damages as may be ascertained following the completion of discovery.

**F.**   *Cardiac's Deepening Insolvency Between 2006 and the Petition Date*

47.   Between 2006 and the Petition Date, Cardiac incurred substantial debt totaling in excess of $5 million owed to a multitude of unsecured creditors, along with an estimated $6 million deficiency claim of secured creditor Merrill Lynch/Bank of America, many of which are the subject of pending proofs of claim filed against the Cardiac estate.

48.   The increased debt and insolvency evidenced by the proof of claims filed against the estate are the direct result of the acts and omissions of BDO alleged herein.

**COUNT I**
**PROFESSIONAL NEGLIGENCE/**
**ACCOUNTING MALPRACTICE**

49.   The Trustee realleges paragraphs 1 through 48 above as if fully set forth herein.

50.   This is a claim against BDO seeking damages for professional negligence/accounting malpractice.

51.   BDO, as professional "independent" auditors performing audit and accounting services for Cardiac, had and owed a duty to Cardiac to exercise a reasonable degree of care and

15

competence in the performance of the Audits and other accounting services, and in the presentation of financial statements reflecting the financial condition of Cardiac, which duty required BDO to possess, among other things, the degree of learning and skill of a professional auditor/accountant practicing in the same locality and under similar circumstances, to use the care and skill as would be used by reputable professional auditors/accountants under similar circumstances, and to use reasonable diligence and best judgment in accomplishing the purpose for which they were engaged.

52.     Under applicable law, as professional auditors/accountants, BDO's express purpose here was to, among other things, conduct a GAAS compliant audit of the financial statements for Cardiac for the fiscal years ending 2004, 2005, 2006, and 2007.

53.     To achieve these purposes and satisfy their obligations under applicable law as professional auditors/accountants, BDO was required to, among other things, conduct the Audits of Cardiac's financial statements in accordance with GAAS and the applicable professional guidelines and standards, including those requirements of GAAS that require BDO to properly plan and perform the Audits so as to obtain reasonable assurance about whether the financial statements were free of material misstatement and in conformity with GAAP.

54.     BDO breached its duties to Cardiac by failing to use reasonable diligence, adequate care, skill, and best judgment in the conduct of the Audits of the Debtor. BDO's failure can be traced to its repeated and flagrant deviations from GAAS and the applicable professional guidelines and standards, including the Statements on Auditing Standards, which are recognized by the AICPA as the interpretations of GAAS.

55.     Specifically, BDO breached its duties to Cardiac by violating numerous provisions of GAAS and/or applicable professional guidelines and standards related to GAAS in

16

the conduct of the Audits including, but not limited to, those related to: (i) the exercise of due professional care (General Auditing Standard No. 3), (ii) the proper planning and supervision of an audit (Standards of Field Work No. 1), (iii) collecting sufficient, competent evidence (Standards of Field Work No. 3), (iv) presentation of the financial statements in accordance with GAAP (Standards of Reporting No. 1), (v) providing informative disclosures (Standards of Reporting No. 3), and (vi) AICPA Audit and Accounting Guide, Health Care Organizations.

56.     Specifically, in regard to the accounting and other services it performed for Cardiac, including the Audits, BDO did not adhere to GAAS, and other applicable standards by, among other acts and omissions:

a.     in violation of SAS no. 99 (entitled Consideration Fraud in a Financial Statement Audit), failing to assess the risk of material misstatement due to fraud by, among other things: (i) failing to conduct an adequate "brainstorming" session; (ii) failing to require the attendance of a partner at the "brainstorming" session assessing areas that the auditor believed might indicate fraud; and (iii) failing to identify any facts or circumstances attendant to its audit to assist in identifying fraud, yet preparing a "brainstorming" session memo" which expressly identified the possibility of "over billing of insurance companies for services & fictitious billings for services" as a potential fraudulent activity in the client's industry;

b.     in violation of in violation AU 150 (GAAS fieldwork standards), AU 230 (entitled Due Professional Care), AU 330 (entitled the Confirmation Process), and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to analyze or otherwise prepare a proper memo

17

supporting its decision not to confirm the outstanding accounts receivable of the Debtor;

c.   in violation AU 150 (GAAS fieldwork standards), AU 230 (entitled Due Professional Care), AU 342 (entitled Auditing Accounting Estimates), AU 329 (entitled Analytical Procedures), and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to adequately perform compliance testing by, among things: (i) encountering an excessive and material number of exceptions that were never adequately resolved; and (ii) failing to perform adequate analytical procedures regarding revenue and accounts receivable;

d.   in violation of AU 329 (entitled Analytical Procedures), AU 342, and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to develop industry and client expectations regarding the relationship among the financial statement components including A/R, sales, A/R aging, revenue, contractual write-off, and allowance for bad debt;

e.   in violation of AU 150, AU 230, and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to gain sufficient knowledge of the client and its industry;

f.   in violation of AU 230, failing to exercise professional skepticism;

g.   in violation of AU 210 (entitled Training and Proficiency of Independent Auditor), AU 230, AU 314 (entitled Understanding the Entity and its Environment and Assessing the Risks of Material Misstatements)(or SAS 55 as applicable), AU 318 (entitled Performing Audit Procedures in

18

Response to Assessed Risks and Evaluating the Audit Evidence Obtained)(or SAS 55 as applicable, AU 329, AU 330, AU 342, and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to obtain and evaluate sufficient and appropriate audit evidence to support certain accounting estimates including accounts receivable and revenue;

h. in violation of AU 210, AU 230, AU 330, AU 329, AU 342, and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to appropriately plan, design, and implement compliance testing relating to accounts receivable and revenue; and

i. other breaches as may be determined through discovery.

57. In addition, BDO failed to properly plan the audits of Cardiac as was required under GAAS, including under SAS No. 99 (involving the integrity of management), in particular given the numerous red flags and warning signs that existed and were known to BDO in advance of each such Audit and thereafter.

58. Further, even if BDO had properly planned the Audits, which they did not, BDO failed to gather sufficient, competent evidential matter to enable them to properly perform the Audits. In addition, even with the insufficient evidential matter that it had collected, BDOs failed to exercise due professional care and competence in critically evaluating such evidential matter and in conducting the Audits in general, including the fact that BDO failed to maintain the requisite degree of professional skepticism required in the conduct of the Audits regarding revenue and accounts receivable.

59. Finally, BDO failed to adequately detect and require disclosure of material financial matters concerning Cardiac's true financial condition in the audited financial

19

statements; despite the fact that, among other things, it had missed multiple material opportunities during 2006 and 2007 to require the recording of a material impairment of certain property and equipment.

60.. Based on the above, as well as other factors, it is clear that BDO failed and was reckless, grossly negligent, and/or negligent at every step of the audit process.

61. As a result of the above numerous and material violations of the GAAS standards and guidelines, BDO breached its obligations and duties to Cardiac, its audit client, including by failing to use reasonable diligence, adequate care and skill, and judgment to accomplish the purpose for which they were engaged. Such violations and breaches caused, among other harm, the financial statements for fiscal years ending 2004, 2005, 2006, and 2007 to be materially misstated.

62. As alleged herein, BDO's negligent, grossly negligent and/or reckless audits of Cardiac proximately caused the company to artificially prolong its existence as its insolvency deepened from 2005 forward, which harmed and adversely affected Cardiac. Specifically, at all relevant times herein, Cardiac's board of directors included independent and/or innocent directors who were not involved in any alleged wrongdoing. Such independent and/or innocent directors would have discovered the true financial condition of Cardiac and would have taken action dating back to 2004 in order to avoid insolvency and ultimately bankruptcy if BDO had properly audited the financial statements to reflect the true financial condition of Cardiac.

63. BDO's failure to, among other things, conduct its Audits or issue proper audit opinions concealed the true financial condition of Cardiac, thereby causing the company's existence to be artificially prolonged.

20

64. The foregoing acts and omissions are the direct and proximate cause of damages to Cardiac, which damages include, but are not necessarily limited to: (i) a substantial increase in Cardiac's liabilities; (ii) a substantial diminution of Cardiac's assets, asset values and enterprise value; (iii) a substantial increase in Cardiac's insolvency; (iv) the effectuation of certain Bankruptcy Code Chapter 5 avoidable transfers to third parties, including the Debtor's principals; (v) the accrual and payment of professional fees and costs involving the Accounting Errors and/or Material Inaccuracies; (vi) the incurrence of professional fees and expenses in bankruptcy; and (vii) other damages as may be established through discovery.

WHEREFORE, the Trustee demands the entry of a judgment against Defendant BDO for compensatory damages, consequential damages, and special damages including, but not limited to: (i) damages resulting from the increased insolvency of Cardiac exceeding in value the claims of the general unsecured creditors – i.e., a sum in excess of $5 million; (ii) damages totaling the value of all fraudulent transfers and/or improper or unauthorized payments or dividends to Cianciulli and his affiliates, currently totaling in excess of $785,600; (iii) damages totaling the value of all improper additional compensation paid to employees and officers in amounts exceeding those salaries paid to similar employees in South Florida, currently totaling in excess of $35,000; (iv) damages in the form of administrative expenses incurred post petition to reconstruct and/or otherwise create Cardiac's business and financial records, currently totaling in excess of $40,000; (v) pre-judgment, post-judgment interest, court costs and expenses; (vi) other damages as may be ascertained following the completion of discovery; and (vii) for any other and further relief as this Court deems appropriate.

21

### COUNT II
### AIDING AND ABETTING
### BREACH OF FIDUCIARY DUTY

65.    The Trustee realleges paragraphs 1 through 48 above as if fully set forth herein.

66.    At all material times hereto, Cianciulli and Gobstein were officers and/or directors of Cardiac.  As such, they owed Cardiac, its shareholders, and their creditors a fiduciary duty to discharge their duties in good faith, with the care of an ordinarily prudent officer or director in a like position would exercise and in a manner reasonably believed to be in Cardiac's best interests.  When Cardiac entered the zone of insolvency or became insolvent, they then owed their fiduciary obligation to Cardiac's creditors.

67.    Lacking good faith, the Debtor's management exhibited a conscious, grossly negligent, and/or reckless disregard for the best interests of Cardiac and its creditors in relation to the facts and circumstances as set forth herein.  The Debtor's management knew, or, except for conscious, grossly negligent, and/or reckless disregard of the facts, should have known, of the risk of damage that ultimately befell Cardiac and its creditors.

68.    Cardiac's management continuously and on an ongoing basis, breached their respective fiduciary duties owed to Cardiac and its creditors with breaches that include, but that may not necessarily be limited to, the following:

        a.    by failing to ensure that the accounts receivable departments of Cardiac were properly staffed and/or otherwise operated given the high importance of such function to Cardiac's business and financial operations, along with the highly regulated, paperwork-oriented nature of the health care industry;

22

b.   by failing to timely shut down or make substantial cost reductions to unprofitable Debtor and Non-Debtor Affiliates during the two years prior to the petition date which caused, among other harm, severe financial hardship on and substantial operating losses to the few remaining affiliates that had been operating break-even or at a profit;

c.   by failing to undertake reasonable, necessary, appropriate, and/or sufficient measures to prepare for the potential adverse effects of the DRA on Cardiac's operations, which act which went into effect commencing January 1, 2007, when they knew or should have known that such act would have a substantial adverse impact on Cardiac's business and financial operations;

d.   by engaging in a highly questionable business practice whereby insurers of patients were improperly billed for higher out-of-network charges, when no right to seek out-of-network payment existed. Specifically, as part of this questionable business practice, management improperly caused each location of Cardiac to maintain two separate licenses with Florida's Agency for Health Care Administration. As opportunities arose, management would then cause Cardiac to improperly submit bills against one license or the other such that the higher out-of-network amounts would apply, even though Cardiac was contractually and/or legally required to use or apply the lower in-network charges. When the representatives of medical insurers, who had no knowledge that such scheme was in place, contacted Cardiac to question the higher out-of

23

network billings, the Debtor's principals directed and/or otherwise permitted employees of Cardiac to attribute and re-characterize such transactions as "billing errors," and would instruct Cardiac's employees to cause such transactions to be written off, while knowing that a large percentage of such improper billings would not be questioned by the insurers;

e.    by engaging in and/or otherwise permitting materially inaccurate financial information to be processed and disseminated internally and to third parties, including Cardiac's secured lenders, which information, among other deficiencies, grossly overstated the value of Cardiac's assets, including their accounts receivable;

f.    by allowing and/or otherwise permitting certain debtor and Non-Debtor Affiliates acting out of network to engage in substantial improper billings resulting in, among other negative consequences, denials of claims by medical insurers; and

g.    by allowing and/or otherwise permitting substantial preferential and/or fraudulent transfer payments to be made to Cianciulli and/or his affiliates.

69.    Each of the above breaches adversely impacted and conferred no benefit to Cardiac.

70.    BDO had knowledge of and rendered substantial assistance in regard to foregoing breaches, with breaches that include, but that are not limited to, the following:

a.    breaching its duties to Cardiac by violating numerous provisions of GAAS and/or applicable professional guidelines and standards related to GAAS in the conduct

24

of the Audits including, but not limited to, those related to: (i) the exercise of due professional care (General Auditing Standard No. 3), (ii) the proper planning and supervision of an audit (Standards of Field Work No. 1), (iii) collecting sufficient, competent evidence (Standards of Field Work No. 3), (iv) presentation of the financial statements in accordance with GAAP (Standards of Reporting No. 1), (v) providing informative disclosures (Standards of Reporting No. 3), and (vi) the AICPA Audit and Accounting Guide, Health Care Organizations;

b.   in violation of SAS 99 (entitled Consideration Fraud in a Financial Statement Audit), failing to assess the risk of material misstatement due to fraud by, among other things: (i) failing to conduct an adequate "brainstorming" session; (ii) failing to require the attendance of a partner at the "brainstorming" session assessing areas that the auditor believed might indicate fraud; and (iii) failing to identify any facts or circumstances attendant to its audit to assist in identifying fraud, yet preparing a "brainstorming" session memo" which expressly identified the possibility of "over billing of insurance companies for services & fictitious billings for services" as a potential fraudulent activity in the client's industry;

c.   in violation of in violation AU 150 (GAAS fieldwork standards), AU 230 (entitled Due Professional Care), AU 330 (entitled the Confirmation Process), and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to analyze or otherwise prepare a proper memo supporting its decision not to confirm the outstanding account receivables of the Debtor;

d.   in violation AU 150 (GAAS fieldwork standards), AU 230 (entitled Due Professional Care), AU 342 (entitled Accounting and Auditing Estimates), AU

25

329 (entitled Analytical Procedures), and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to adequately perform compliance testing by, among things: (i) encountering an excessive and material number of exceptions that were never adequately resolved; and (ii) failing to perform adequate analytical procedures regarding revenue and accounts receivable;

e.      in violation of AU 329 (entitled Analytical Procedures), AU 342 (entitled Auditing Accounting Estimates), and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to develop industry and client expectations regarding the relationship among the financial statement components including A/R, sales, A/R aging, revenue, contractual write-off, and allowance for bad debt;

f.      in violation of AU 150, AU 230, and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to gain sufficient knowledge of the client and its industry;

g.      in violation of AU 230, failing to exercise professional skepticism;

h.      in violation of AU 210 (entitled Training and Proficiency of Independent Auditor), AU 230, AU 314 (entitled Understanding the Entity and its Environment and Assessing the Risks of Material Misstatements)(or SAS 55 as applicable), AU 318 (entitled Performing Audit Procedures in Response to Assessed Risks and Evaluating the Audit Evidence Obtained)(or SAS 55 as applicable, AU 329, AU 330, AU 342, and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to obtain and evaluate sufficient and appropriate audit evidence to support certain accounting estimates including accounts receivable and revenue;

26

i.   in violation of AU 210, AU 230, AU 330, AU 329, AU 342, and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to appropriately plan, design, and implement compliance testing relating to accounts receivable and revenue; and

j.   other breaches as may be determined through discovery.

71.   The foregoing acts and omissions are the direct and proximate cause of damages to Cardiac, which damages include, but are not necessarily limited to: (i) a substantial increase in Cardiac's liabilities; (ii) a substantial diminution of Cardiac's assets, asset values and enterprise value; (iii) a substantial increase in Cardiac's insolvency; (iv) the effectuation of certain Bankruptcy Code Chapter 5 avoidable transfers to third parties, including the Debtor's principals; (v) the accrual and payment of professional fees and costs involving the Accounting Errors and/or Material Inaccuracies; (vi) the incurrence of professional fees and expenses in bankruptcy; and (vii) other damages as may be established through discovery.

WHEREFORE, the Trustee demands the entry of a judgment against Defendant BDO for compensatory damages, consequential damages, and special damages including, but not limited to: (i) damages resulting from the increased insolvency of Cardiac exceeding in value the claims of the general unsecured creditors – i.e., a sum in excess of $5 million; (ii) damages totaling the value of all fraudulent transfers and/or improper or unauthorized payments or dividends to Cianciulli and his affiliates, currently totaling in excess of $785,600; (iii) damages totaling the value of all improper additional compensation paid to employees and officers in amounts exceeding those salaries paid to similar employees in South Florida, currently totaling in excess of $35,000; (iv) damages in the form of administrative expenses incurred post petition to reconstruct and/or otherwise create Cardiac's business and financial records, currently totaling in

27

excess of $40,000; (v) pre-judgment, post-judgment interest, court costs and expenses; (vi) other damages as may be ascertained following the completion of discovery; and (vii) for such other and further relief as this Court deems appropriate.

## DEMAND FOR JURY TRIAL

72.    The Trustee demands a trial by jury in regard to each and every count of the Complaint and in regard to any and all other claims and issues triable by such.

Respectfully submitted this 13th day of May, 2010.

GENOVESE JOBLOVE & BATTISTA, P.A.
*Special Counsel for the Trustee*
100 S.E. Second Street, 44th Floor
Miami, FL 33131
Tel. (305) 349-2300
Fax. (305) 349-2310

By:

David C. Cimo, Esq.
Fla. Bar. No. 775400
Peter W. Bellas, Esq.
Fla. Bar No. 611387

28

EXHIBIT 2

IN THE COURT OF THE ELEVENTH
JUDICAL CIRCUIT IN AND FOR MIAMI-
DADE-COUNTY, FLORIDA

CASE NO. 2010-28002-CA-01

KENNETH A. WELT, Chapter 7 Trustee
of the jointly administered estates of the
Debtor, Cardiac Management Systems,
Inc. and its affiliated debtors, and
MERRILL LYNCH COMMERCIAL
FINANCE CORP., as assignee of the interest
of Merrill Lynch Business Financial Services,
Inc., a Delaware corporation,

      Plaintiff,

v.

BDO SEIDMAN, LLP, n/k/a
BDO USA, LLP, a New York limited
liability partnership,

      Defendant.

_____/

## AMENDED COMPLAINT FOR DAMAGES
## AND DEMAND FOR JURY TRIAL

The Plaintiff, Kenneth A. Welt ("Welt" or the "Trustee"), not individually but in his

capacity as the Chapter 7 trustee of the jointly administered debtors in the pending bankruptcy

case of Cardiac Management Systems, Inc., et al. (sometimes collectively referred to herein as

the "Debtor" or "Cardiac"), "), and Merrill Lynch Commercial Finance Corp., as assignee of the

interests of Merrill Lynch Business Financial Services, Inc. ("Merrill"), file this Amended

Complaint for Damages and Demand for Jury Trial (the "Complaint"), against Defendant, BDO

Seidman, LLP, n/k/a BDO USA, LLP, a New York limited liability partnership (the "Defendant"

or "BDO"), and alleges:

## PRELIMINARY STATEMENT

1.     This is an action for damages in excess of $15,000, exclusive of attorneys' fees and costs.

2.     From and after at least the 1990's, BDO was the outside independent auditors of the Debtor.

3.     As alleged herein, BDO breached its duty of care owed to the Debtor by failing to perform its audits in compliance with applicable rules, policies, and procedures.

4.     As alleged herein, the Debtor's principals (as defined below), lacking good faith, breached their respective duties of loyalty and/or care by among other things, negligently, grossly negligently, carelessly, and recklessly managing Cardiac and the Non-Debtor Affiliates (as defined below), and/or by entrusting the management of Cardiac and the Non-Debtor Affiliates to unqualified and/or incompetent managers.

5.     The Debtor's principals further breached their fiduciary duties by failing to ensure that Cardiac's and Non-Debtor Affiliates' billing practices would be in compliance with applicable law and otherwise consistent with reasonable, customary, and best practices in the industry.

6.     BDO aided and abetted the beaches of duty of the Debtor's principals, who were charged with responsibility for safeguarding the assets of Cardiac and its various Non-Debtor Affiliates, by having knowledge of such breaches and rendering substantial assistance in regard thereto as a result of BDO's acts and omissions as alleged herein.

7.     As the direct and proximate cause of the acts and omissions by BDO alleged herein, Cardiac and the Non-Debtor Affiliates, along with each of their respective creditors, and

other constituencies suffered losses in an amount no less than the amount of allowed unsecured claims, an amount in excess of $5 million.

## THE PARTIES, JURISDICTION, AND VENUE

8.    On June 30, 2008, the debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Florida, Miami Division (the "Bankruptcy Court"), Case No. 08-19029-BKC-LMI.

9.    On October 20, 2008, Cardiac sold substantially all of their assets pursuant to Bankruptcy Code Section 363 sale approved by order of the Bankruptcy Court (the "Sale Date").

10.    On November 13, 2008, the Court entered an Order converting Cardiac's Chapter 11 cases to cases under Chapter 7.

11.    On November 14, 2008, Welt, who previously had been appointed Chapter 11 trustee, was appointed by the Office of the United States Trustee as the Chapter 7 Trustee for each of Cardiac estates.

12.    As such, Welt is the duly appointed and acting Chapter 7 Trustee for the above referenced jointly administered bankruptcy debtors and their respective non-debtor affiliates.[1]

---

[1]  Cardiac consists of: (i) DTG Management, Inc.; (ii) DTG of Sunset Square, Inc.; (iii) DTG of Sunset Square II, Inc.; (iv) Diagnostic Testing Group, Inc.; (v) DTG of Miami, Inc.; (vi) Lake Worth Diagnostic Testing Group, Inc.; (vii) Diagnostic Testing Group of Palm Beach, Inc.; (viii) Aventura Diagnostic Testing Group, Inc.; (ix) DTG of Aventura, Inc.; (x) Gables Diagnostic Testing Group, Inc.; (xi) Coral Gables Diagnostic Testing Group, LLC.; (xii) Cooper City Diagnostic Testing Group, Inc.; (xiii) DTG of Cooper City, Inc.; and (xiv) Pines Diagnostic Testing Group, Inc.  Cardiac, Cardiac Management Systems, Inc., is the 100% shareholder or member of the following non-debtor entities: (i) BAC Realty Corp.; (ii) Children's Diagnostic Testing Group of Broward, Inc.; (iii) Children's Diagnostic Testing Group of Miami, Inc.; (iv) Children's Diagnostic Group of Palm Beach, Inc.; (v) Children's Diagnostic Group of Gables, Inc.; (vi) Children's Diagnostic Testing of Aventura, Inc.; (vii) CMS of Brooklyn, Inc.; (viii) Douglas Diagnostics, Inc.; (ix) Empire Annex Limited; (x) Galloway Diagnostics, Inc.; (xi) Palm Diagnostic Imaging, Inc.; (xii) Pembroke West Diagnostic Imaging, Inc.; (xiii) Sheridan West

3

13.     Welt commences this action in his capacity as Chapter 7 Trustee for the jointly administered estates of Cardiac and as the sole and/or majority shareholder of each of Cardiac's Non-Debtor Affiliates, and pursuant to 11 U.S.C. § 541(a) as successor to the interests in property of the estate, and pursuant to 11 U.S.C. § 544.

14.     Merrill commences this action as to Count III as the real party in interest and assignee of Merrill Lynch Business Financial Services, Inc.  Merrill is a Delaware corporation with its principal place of business in Charlotte, North Carolina.   On June 15, 2010, the Bankruptcy Court entered an *Order Granting Trustee's Motion to Approve Compromise with Merrill Lynch Commercial Finance Corp*, which approved the proposed compromise and pooling agreement between the Trustee and Merrill.  As such, both the Trustee and Merrill have standing to pursue this action.

15.     At all times material hereto, BDO was and is a New York limited liability partnership practicing auditing, accounting, and other services within Miami-Dade County, Florida.

16.     Pursuant to Florida Statute § 48.193, BDO is subject to the long arm jurisdiction of this Court by: (a) operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state; and (b)  committing a tortious act within this state.

17.     Venue is proper in Miami-Dade County, Florida in that, among other things, certain of the acts and omissions alleged herein occurred or otherwise transpired in Miami-Dade County, Florida.

---

Diagnostic Imaging, Inc.; (xiv) Waterways Imaging, Inc.; and (xv) Pembroke Pines Diagnostic Testing Group, LLC (collectively defined here as the "Non-Debtor Affiliates").

18.     All conditions precedent to the filing of this action have been waived, have been performed, or have occurred.

### FACTS COMMON TO ALL COUNTS

A.      _The History and Business Operations of Cardiac and its Affiliates_

19.     Cardiac Management Systems, Inc. ("CMS"), a Delaware corporation, is the parent corporation of the other fourteen debtors as well as a dozen unfiled subsidiaries. Thirteen of these entities were Florida corporations. The other is a Florida limited liability company, the membership interests in which were owned 95% by CMS.

20.     DTG Management, Inc. provided administrative services to all Cardiac entities. Five debtors operated medical imaging centers in Miami-Dade, Broward, and Palm Beach counties.

21.     Five others were the lessees of the leased space for the five operating locations and two Debtors which leased the administrative office suites, and these in turn subleased the space to their sister corporations at a very small mark-up of the lease rent.

22.     The fifteenth debtor formerly operated a sixth location in Pembroke Pines.

23.     Cardiac's five operations marketed their services under a common name, DTG. The only other active subsidiaries of CMS were: (i) a corporation, BAC Realty Corp., which owned a portion of the real estate leased to the Lake Worth tenant entity; and (ii) five entities that billed for the five operations' services provided to health plan participants, but those out-of-network revenues were passed through directly to the five operating entities.

24.     Cardiac was engaged in the ownership and operation of five facilities that provided magnetic resonance imaging (MRI), computer tomography scanning (CT or CAT scan), and other nuclear cardiology testing. Cardiac did not provide services for the diagnosis or

treatment of injury or disease, and consequently were not "health care businesses" as that term is used in the Bankruptcy Code, although they derived all of their income from providing scans and tests for the patients of others.

25.     Cardiac's operations were located in Miami (Galloway Road), Coral Gables, Aventura, Cooper City, and Lake Worth, and each location was leased.

26.     Prior to its demise, Cardiac experienced rapid growth.  Although Cardiac was purportedly profitable for some years, its bankruptcy filings attributed the Deficit Reduction Act of 2005 (the "DRA") for causing significant cutbacks in Medicare spending, which Cardiac claimed caused a corresponding reduction in the amounts that Medicare would pay for MRI and CT services, and a resulting cutback in the fee schedules for managed care plans that were indexed to prevailing Medicare fee schedules.

27.     Cardiac, however, was well aware of the potential impact of the DRA on its business, and management failed to undertake sufficient measures to prepare for or otherwise deal with same.

28.     Other factors Cardiac attributed in its bankruptcy filings to causing losses over the period 2006-2008 included the purported:  (i) increase in physicians doing their own stress-testing; and (ii) the general malaise in the nation's economy which has effectively limited access to health care by causing more employers to shift a greater portion of health care costs to employees.

29.     In actuality, Cardiac's increased insolvency and losses are directly attributable to the various acts and omissions of Debtor's management and/or BDO described herein.

30.     After suffering reported losses of $1.8 million and $1.1 million for the fiscal year periods ended in September, 2006 and September, 2007, respectively, Cardiac suffered losses in excess of $4.1 million during the six month period ended March 31, 2008,.

31.     In addition, the Trustee has reason to believe that during the two years prior to the petition date certain, all of Cardiac's debtors and/or Non-Debtor Affiliates were insolvent, were in the zone of insolvency, were undercapitalized, and/or could not otherwise obtain additional credit in the marketplace.

**B.     _Management's Breaches of Fiduciary Duty_**

32.     Stephen Cianciulli ("Cianciulli") and Harold Gobstein ("Gobstein") were officers and/or directors of Cardiac and/or the Non-Debtor Affiliates (Cianciulli and Gobstein shall sometimes collectively be referred to herein as the Debtor's "principals" or "management").

33.     The Debtor's principals maintained the following positions with Cardiac (along with respective their salaries and benefits) during the two years prior to the petition date:

      a.     Cianciulli:  President and chief executive officer until May 2008; still president of CMS and director of all companies through the Sale Date; paid compensation as part of $40,000/month in Cardiac's  management fees to CMS; paid additional compensation from other Debtors, group health insurance coverage, and a significant auto allowance.

      b.     Gobstein:   Secretary (and director) of Cardiac and the Non-Debtor Affiliates; paid as part of $40,000/month in Cardiac's management fees to CMS; group health insurance coverage.

34.     The mismanagement of Cardiac and the Non-Debtor Affiliates leading to their insolvency and the breaches of duties owed by the Debtor's principals both prior to and after it

became insolvent can be divided into two broad categories: financial mismanagement and irregularities; and the failure to engage in meaningful oversight of Cardiac's operations.

35. Cianciulli and Gobstein, as officers and/or directors of Cardiac and the Non-Debtor Affiliates, failed to understand the ramifications of Cardiac's deteriorating financial condition and to engage in any meaningful oversight of Cardiac's operations pre-petition, nor did they undertake sufficient or adequate measures to prevent the increased insolvency of the enterprise.

36. Cianciulli and Gobstein similarly were grossly negligent, reckless, and/or lacked good faith by failing to cause or otherwise implement sufficient measures such that adequate and/or competent books and records would be maintained to ensure, among other things, that Cardiac's income and financial statements and other financial data contained no material misstatements.

37. Specifically, and without limitation, the record-keeping of Cardiac was wholly inadequate by, among other deficiencies, the failure to post or reconcile numerous transactions spanning several months, including records relating to Cardiac's accounts receivable. Such actions or inactions resulted in a significant decrease in the collectability of Cardiac's receivables to the detriment of Cardiac's creditors and shareholders.

38. In addition, the principals of the Debtor were grossly negligent, reckless, and/or lacked good faith:

        a.    by failing to ensure that the accounts receivable departments of Cardiac were properly staffed, trained, supervised, managed, and/or otherwise operated, especially given the high importance of such function to

8

Cardiac's business and financial operations, along with the highly regulated, paperwork-oriented nature of the health care industry;

b.   by failing to timely shut down or make substantial cost reductions to unprofitable Debtor and Non-Debtor Affiliates during the two years prior to the petition date which caused, among other harm, severe financial hardship on and substantial operating losses to the few remaining affiliates that had been operating break-even or at a profit;

c.   by failing to undertake reasonable, necessary, appropriate, and/or sufficient measures to prepare for the potential adverse effects of the DRA on Cardiac's operations, which act went into effect commencing January 1, 2007, when they knew or should have known that such act would have a substantial adverse impact on Cardiac's business and financial operations;

d.   by engaging in a highly questionable business practice whereby insurers of patients were improperly billed for higher out-of-network charges, when no right to seek out-of-network payment existed. Specifically, as part of this questionable business practice, management improperly caused each location of Cardiac to maintain two separate licenses with Florida's Agency for Health Care Administration. As the opportunities arose, management would then cause Cardiac to improperly submit bills against one license or the other such that the higher out-of-network amounts would apply, even though Cardiac was contractually and/or legally required to use or apply the lower in-network charges. When the representatives of medical insurers, who had no knowledge that such

9

scheme was in place, contacted Cardiac to question the higher out-of network billings, the Debtor's principals directed and/or otherwise permitted employees of Cardiac to attribute and re-characterize such transactions as "billing errors," and would instruct Cardiac's employees to cause such transactions to be written off, while knowing that a large percentage of such improper billings would not be questioned by the insurers;

e.    by engaging in and/or otherwise permitting materially inaccurate financial information to be processed and disseminated internally and to third parties, including Cardiac's secured lenders, which information, among other deficiencies, grossly overstated the revenues and the value of Cardiac's assets, including their accounts receivable;

f.    by allowing and/or otherwise permitting certain debtor and Non-Debtor Affiliates acting out of network to engage in substantial improper billings resulting in, among other negative consequences, denials of claims by medical insurers; and

g.    by allowing and/or otherwise permitting substantial preferential and/or fraudulent transfer payments to be made to Cianciulli and/or his affiliates.

## C.    *BDO's Duties as Cardiac's Auditors*

39.    Between the 1990's and 2008, BDO provided independent audit and other professional services for Cardiac, and issued audit reports for fiscal years (ending September 30) 2005, 2006, and 2007 (sometimes collectively referred to herein as the "Audits"), which were accepted and acknowledged by Cardiac's management.

40. For each audit year, BDO's audit reports expressed unqualified opinions on Cardiac's financial statements

41. In regard to the services rendered for Cardiac, BDO represented that it would conduct, and was otherwise legally obligated to conduct, its services, including the Audits, in accordance with Generally Accepted Auditing Standards ("GAAS") and the applicable professional guidelines and standards, including those requirements of GAAS that required that BDO to, among other things, obtain reasonable assurance about whether the financial statements were free of material misstatement and were fairly presented, in all material respects, in conformity with Generally Accepted Accounting Principles ("GAAP").

**D.** **_The Improper Accounting Methods and Failure of Management to Implement Adequate Safeguards and Controls and of BDO to Identify Same_**

42. BDO and Cardiac's management knew or had reason to know that Cardiac was using improper and flawed accounting methods (collectively, the "Accounting Errors and/or Material Inaccuracies"), thereby resulting in, among other damages, an unduly artificially prolonged existence causing increased insolvency, increased liabilities, and diminution in the assets and enterprise value of Cardiac.

43. Further, BDO and Cardiac's management knew or had reason to know that Cardiac had failed to undertake adequate measures or implement sufficient safeguards or controls to prevent the Accounting Errors and/or Material Inaccuracies from occurring at or during certain material periods of time, or otherwise failed to demand or ensure that sufficient safeguards or controls were or would be implemented by Cardiac to prevent the Accounting Errors and/or Material Inaccuracies from occurring.

44. To the extent adequate measures or controls were in place, they were ignored or otherwise overridden by certain of Cardiac's management, or they willfully turned a blind eye.

11

Irrespective, BDO did not consider or require modification of the financial statements for the Accounting Errors and/or Material Inaccuracies in the performance of its services, including the Audits, resulting in, among other things, the issuance of materially misstated financial statements and audit opinions thereon that did not comply with GAAS.

### E.     *BDO's Acts and Omissions in Conducting its Audits*

45.     BDO, meanwhile, failed in its duties by not recognizing or otherwise requiring modification of the financial statements for the Accounting Errors and/or Material Inaccuracies in performing its services, including the Audits, and in so doing caused Cardiac to overstate its financial position and results of operations.

46.     Specifically, BDO did not adhere to GAAS and other applicable standards by, among other acts and omissions:

a.     breaching its duties to Cardiac by violating numerous provisions of GAAS and/or applicable professional guidelines and standards related to GAAS in the conduct of the Audits including, but not limited to, those related to: (i) the exercise of due professional care (General Auditing Standard No. 3), (ii) the proper planning and supervision of an audit (Standards of Field Work No. 1), (iii) collecting sufficient, competent evidence (Standards of Field Work No. 3), (iv) presentation of the financial statements in accordance with GAAP (Standards of Reporting No. 1), (v) providing informative disclosures (Standards of Reporting No. 3), and (vi) AICPA Audit and Accounting Guide, Health Care Organizations.

b.     in violation of Statement on Auditing Standards ("SAS") 99 (entitled Consideration Fraud in a Financial Statement Audit), failing to assess the

risk of material misstatement due to fraud by, among other things: (i) failing to conduct an adequate "brainstorming" session; (ii) failing to require the attendance of a partner at the "brainstorming" session assessing areas that the auditor believed might indicate fraud; and (iii) failing to identify any facts or circumstances attendant to its audit to assist in identifying fraud, yet preparing a "brainstorming" session memo" which expressly identified the possibility "over billing of insurance companies for services & fictitious billings for services" as a potential fraudulent activity in the client's industry;

c.    in violation of AU 150 (GAAS fieldwork standards), AU 230 (entitled Due Professional Care), AU 330 (entitled the Confirmation Process), and the AICPA Audit and Accounting Guide, Health Care Organizations failing to confirm the accounts receivable or otherwise prepare a proper memo supporting its decision not to confirm the outstanding accounts receivable of the Debtor;

d.    in violation of AU 150 (GAAS fieldwork standards), AU 230 (entitled Due Professional Care), AU 342 (entitled Auditing Accounting Estimates), AU 329 (entitled Analytical Procedures), and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to adequately perform compliance testing by, among things: (i) encountering an excessive and material number of exceptions that were never adequately resolved; and (ii) failing to perform adequate analytical procedures regarding revenue and accounts receivable;

13

e.   in violation of AU 329 (entitled Analytical Procedures), AU 342 (entitled Auditing Accounting Estimates), and the AICPA Audit and Accounting Guide, Health Care Organizations failing to develop industry and client expectations regarding the relationship among the financial statement components including A/R, sales, A/R aging, revenue, contractual write-off, and allowance for bad debt;

f.   in violation of AU 150, AU 230, and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to gain sufficient knowledge of the client, the rate setting environment, and its industry;

g.   in violation of AU 230, failing to exercise professional skepticism;

h.   in violation of AU 210 (entitled Training and Proficiency of Independent Auditor), AU 230, AU 314 (entitled Understanding the Entity and its Environment and Assessing the Risks of Material Misstatements)(or SAS 55 as applicable), AU 318 (entitled Performing Audit Procedures in Response to Assessed Risks and Evaluating the Audit Evidence Obtained)(or SAS 55 as applicable, AU 329, AU 330, AU 342, and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to obtain and evaluate sufficient and appropriate audit evidence to support certain accounting estimates including accounts receivable and revenue;

i.   in violation of AU 210, AU 230, AU 330, AU 329, AU 342, and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to appropriately plan, design, and implement compliance testing relating to accounts receivable and revenue; and

14

     j.     other breaches as may be determined through discovery.

47.     The foregoing acts and omissions are presently estimated by the Chapter 7 Trustee to have proximately caused the following harm to the estates: (i) damages resulting from the increased insolvency of Cardiac exceeding in value the claims of the general unsecured creditors – i.e., a sum in excess of $5 million, along with an estimated $6 million deficiency claim of secured creditor Merrill Lynch/Bank of America; (ii) damages totaling the value of all fraudulent transfers and/or improper or unauthorized payments or dividends to Cianciulli and his affiliates, currently totaling in excess of $785,600; (iii) damages totaling the value of post-petition claims filed or to be filed by physicians regarding the violation of the sale finance order, currently totaling in excess of $600,000; (iv) damages totaling the value of all improper additional compensation paid to employees and officers in amounts exceeding those salaries paid to similar employees in South Florida, currently totaling in excess of $35,000; (v) damages in the form of administrative expenses incurred post petition to reconstruct and/or otherwise create Cardiac's business and financial records, currently totaling in excess of $40,000; and (vi) other damages as may be ascertained following the completion of discovery.

**F.**     ***Cardiac's Deepening Insolvency Between 2006 and the Petition Date***

48.     Between 2006 and the Petition Date, Cardiac incurred substantial debt totaling in excess of $5 million owed to a multitude of unsecured creditors, along with an estimated $6 million deficiency claim of secured creditor Merrill Lynch/Bank of America, many of which are the subject of pending proofs of claim filed against the Cardiac estate.

49.     The increased debt and insolvency evidenced by the proof of claims filed against the estate are the direct result of the acts and omissions of BDO alleged herein.

**COUNT I**
**PROFESSIONAL NEGLIGENCE/**

15

## ACCOUNTING MALPRACTICE

50.     The Trustee realleges paragraphs 1 through 48 above as if fully set forth herein.

51.     This is a claim against BDO seeking damages for professional negligence/accounting malpractice.

52.     BDO, as professional "independent" auditors performing audit and accounting services for Cardiac, had and owed a duty to Cardiac to exercise a reasonable degree of care and competence in the performance of the Audits and other accounting services, and in the presentation of financial statements reflecting the financial condition of Cardiac, which duty required BDO to possess, among other things, the degree of learning and skill of a professional auditor/accountant practicing in the same locality and under similar circumstances, to use the care and skill as would be used by reputable professional auditors/accountants under similar circumstances, and to use reasonable diligence and best judgment in accomplishing the purpose for which they were engaged.

53.     Under applicable law, as professional auditors/accountants, BDO's express purpose here was to, among other things, conduct a GAAS compliant audit of the financial statements for Cardiac for the fiscal years ending 2004, 2005, 2006, and 2007.

54.     To achieve these purposes and satisfy their obligations under applicable law as professional auditors/accountants, BDO was required to, among other things, conduct the Audits of Cardiac's financial statements in accordance with GAAS and the applicable professional guidelines and standards, including those requirements of GAAS that require BDO to properly plan and perform the Audits so as to obtain reasonable assurance about whether the financial statements were free of material misstatement and in conformity with GAAP.

16

55.     BDO breached its duties to Cardiac by failing to use reasonable diligence, adequate care, skill, and best judgment in the conduct of the Audits of the Debtor.  BDO's failure can be traced to its repeated and flagrant deviations from GAAS and the applicable professional guidelines and standards, including the Statements on Auditing Standards, which are recognized by the AICPA as the interpretations of GAAS.

56.     Specifically, BDO breached its duties to Cardiac by violating numerous provisions of GAAS and/or applicable professional guidelines and standards related to GAAS in the conduct of the Audits including, but not limited to, those related to: (i) the exercise of due professional care (General Auditing Standard No. 3), (ii) the proper planning and supervision of an audit (Standards of Field Work No. 1), (iii) collecting sufficient, competent evidence (Standards of Field Work No. 3), (iv) presentation of the financial statements in accordance with GAAP (Standards of Reporting No. 1), (v) providing informative disclosures (Standards of Reporting No. 3), and (vi) AICPA Audit and Accounting Guide, Health Care Organizations.

57.     Specifically, in regard to the accounting and other services it performed for Cardiac, including the Audits, BDO did not adhere to GAAS, and other applicable standards by, among other acts and omissions:

    a.     in violation of SAS no. 99 (entitled Consideration Fraud in a Financial Statement Audit), failing to assess the risk of material misstatement due to fraud by, among other things: (i) failing to conduct an adequate "brainstorming" session; (ii) failing to require the attendance of a partner at the "brainstorming" session assessing areas that the auditor believed might indicate fraud; and (iii) failing to identify any facts or circumstances attendant to its audit to assist in identifying fraud, yet preparing a

"brainstorming" session memo" which expressly identified the possibility of "over billing of insurance companies for services & fictitious billings for services" as a potential fraudulent activity in the client's industry;

b.  in violation of in violation AU 150 (GAAS fieldwork standards), AU 230 (entitled Due Professional Care), AU 330 (entitled the Confirmation Process), and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to analyze or otherwise prepare a proper memo supporting its decision not to confirm the outstanding accounts receivable of the Debtor;

c.  in violation AU 150 (GAAS fieldwork standards), AU 230 (entitled Due Professional Care), AU 342 (entitled Auditing Accounting Estimates), AU 329 (entitled Analytical Procedures), and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to adequately perform compliance testing by, among things: (i) encountering an excessive and material number of exceptions that were never adequately resolved; and (ii) failing to perform adequate analytical procedures regarding revenue and accounts receivable;

d.  in violation of AU 329 (entitled Analytical Procedures), AU 342, and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to develop industry and client expectations regarding the relationship among the financial statement components including  A/R, sales, A/R aging, revenue, contractual write-off, and allowance for bad debt;

18

e.    in violation of AU 150, AU 230, and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to gain sufficient knowledge of the client and its industry;

f.    in violation of AU 230, failing to exercise professional skepticism;

g.    in violation of AU 210 (entitled Training and Proficiency of Independent Auditor), AU 230, AU 314 (entitled Understanding the Entity and its Environment and Assessing the Risks of Material Misstatements)(or SAS 55 as applicable), AU 318 (entitled Performing Audit Procedures in Response to Assessed Risks and Evaluating the Audit Evidence Obtained)(or SAS 55 as applicable,   AU 329, AU 330, AU 342, and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to obtain and evaluate sufficient and appropriate audit evidence to support certain accounting estimates including accounts receivable and revenue;

h.    in violation of AU 210, AU 230, AU 330, AU 329, AU 342, and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to appropriately plan, design, and implement compliance testing relating to accounts receivable and revenue; and

i.    other breaches as may be determined through discovery.

58.    In addition, BDO failed to properly plan the audits of Cardiac as was required under GAAS, including under SAS No. 99 (involving the integrity of management), in particular given the numerous red flags and warning signs that existed and were known to BDO in advance of each such Audit and thereafter.

59.     Further, even if BDO had properly planned the Audits, which they did not, BDO failed to gather sufficient, competent evidential matter to enable them to properly perform the Audits.  In addition, even with the insufficient evidential matter that it had collected, BDOs failed to exercise due professional care and competence in critically evaluating such evidential matter and in conducting the Audits in general, including the fact that BDO failed to maintain the requisite degree of professional skepticism required in the conduct of the Audits regarding revenue and accounts receivable.

60.     Finally, BDO failed to adequately detect and require disclosure of material financial matters concerning Cardiac's true financial condition in the audited financial statements, despite the fact that, among other things, it had missed multiple material opportunities during 2006 and 2007 to require the recording of a material impairment of certain property and equipment.

61.     Based on the above, as well as other factors, it is clear that BDO failed and was reckless, grossly negligent, and/or negligent at every step of the audit process.

62.     As a result of the above numerous and material violations of the GAAS standards and guidelines, BDO breached its obligations and duties to Cardiac, its audit client, including by failing to use reasonable diligence, adequate care and skill, and judgment to accomplish the purpose for which they were engaged.  Such violations and breaches caused, among other harm, the financial statements for fiscal years ending 2004, 2005, 2006, and 2007 to be materially misstated.

63.     As alleged herein, BDO's negligent, grossly negligent and/or reckless audits of Cardiac proximately caused the company to artificially prolong its existence as its insolvency deepened from 2005 forward, which harmed and adversely affected Cardiac.  Specifically, at all

relevant times herein, Cardiac's board of directors included independent and/or innocent directors who were not involved in any alleged wrongdoing.  Such independent and/or innocent directors would have discovered the true financial condition of Cardiac and would have taken action dating back to 2004 in order to avoid insolvency and ultimately bankruptcy if BDO had properly audited the financial statements to reflect the true financial condition of Cardiac.

64.     BDO's failure to, among other things, conduct its Audits or issue proper audit opinions concealed the true financial condition of Cardiac, thereby causing the company's existence to be artificially prolonged.

65.     The foregoing acts and omissions are the direct and proximate cause of damages to Cardiac, which damages include, but are not necessarily limited to: (i) a substantial increase in Cardiac's liabilities; (ii) a substantial diminution of Cardiac's assets, asset values and enterprise value; (iii) a substantial increase in Cardiac's insolvency; (iv) the effectuation of certain Bankruptcy Code Chapter 5 avoidable transfers to third parties, including the Debtor's principals; (v) the accrual and payment of professional fees and costs involving the Accounting Errors and/or Material Inaccuracies; (vi) the incurrence of professional fees and expenses in bankruptcy; and (vii) other damages as may be established through discovery.

WHEREFORE, the Trustee demands the entry of a judgment against Defendant BDO for compensatory damages, consequential damages, and special damages including, but not limited to: (i) damages resulting from the increased insolvency of Cardiac exceeding in value the claims of the general unsecured creditors – i.e., a sum in excess of $5 million; (ii) damages totaling the value of all fraudulent transfers and/or improper or unauthorized payments or dividends to Cianciulli and his affiliates, currently totaling in excess of $785,600; (iii) damages totaling the value of all improper additional compensation paid to employees and officers in amounts

21

exceeding those salaries paid to similar employees in South Florida, currently totaling in excess of $35,000; (iv) damages in the form of administrative expenses incurred post petition to reconstruct and/or otherwise create Cardiac's business and financial records, currently totaling in excess of $40,000; (v) pre-judgment, post-judgment interest, court costs and expenses; (vi) other damages as may be ascertained following the completion of discovery; and (vii) for any other and further relief as this Court deems appropriate.

<div align="center">

**COUNT II**
**AIDING AND ABETTING**
**BREACH OF FIDUCIARY DUTY**

</div>

66. The Trustee realleges paragraphs 1 through 48 above as if fully set forth herein.

67. At all material times hereto, Cianciulli and Gobstein were officers and/or directors of Cardiac. As such, they owed Cardiac, its shareholders, and their creditors a fiduciary duty to discharge their duties in good faith, with the care of an ordinarily prudent officer or director in a like position would exercise and in a manner reasonably believed to be in Cardiac's best interests. When Cardiac entered the zone of insolvency or became insolvent, they then owed their fiduciary obligation to Cardiac's creditors.

68. Lacking good faith, the Debtor's management exhibited a conscious, grossly negligent, and/or reckless disregard for the best interests of Cardiac and its creditors in relation to the facts and circumstances as set forth herein. The Debtor's management knew, or, except for conscious, grossly negligent, and/or reckless disregard of the facts, should have known, of the risk of damage that ultimately befell Cardiac and its creditors.

69. Cardiac's management continuously and on an ongoing basis, breached their respective fiduciary duties owed to Cardiac and its creditors with breaches that include, but that may not necessarily be limited to, the following:

<div align="center">22</div>

a.   by failing to ensure that the accounts receivable departments of Cardiac were properly staffed and/or otherwise operated given the high importance of such function to Cardiac's business and financial operations, along with the highly regulated, paperwork-oriented nature of the health care industry;

b.   by failing to timely shut down or make substantial cost reductions to unprofitable Debtor and Non-Debtor Affiliates during the two years prior to the petition date which caused, among other harm, severe financial hardship on and substantial operating losses to the few remaining affiliates that had been operating break-even or at a profit;

c.   by failing to undertake reasonable, necessary, appropriate, and/or sufficient measures to prepare for the potential adverse effects of the DRA on Cardiac's operations, which act which went into effect commencing January 1, 2007, when they knew or should have known that such act would have a substantial adverse impact on Cardiac's business and financial operations;

d.   by engaging in a highly questionable business practice whereby insurers of patients were improperly billed for higher out-of-network charges, when no right to seek out-of-network payment existed.  Specifically, as part of this questionable business practice, management improperly caused each location of Cardiac to maintain two separate licenses with Florida's Agency for Health Care Administration.  As opportunities arose, management would then cause Cardiac to improperly submit bills against

23

one license or the other such that the higher out-of-network amounts would apply, even though Cardiac was contractually and/or legally required to use or apply the lower in-network charges. When the representatives of medical insurers, who had no knowledge that such scheme was in place, contacted Cardiac to question the higher out-of network billings, the Debtor's principals directed and/or otherwise permitted employees of Cardiac to attribute and re-characterize such transactions as "billing errors," and would instruct Cardiac's employees to cause such transactions to be written off, while knowing that a large percentage of such improper billings would not be questioned by the insurers;

e.  by engaging in and/or otherwise permitting materially inaccurate financial information to be processed and disseminated internally and to third parties, including Cardiac's secured lenders, which information, among other deficiencies, grossly overstated the value of Cardiac's assets, including their accounts receivable;

f.  by allowing and/or otherwise permitting certain debtor and Non-Debtor Affiliates acting out of network to engage in substantial improper billings resulting in, among other negative consequences, denials of claims by medical insurers; and

g.  by allowing and/or otherwise permitting substantial preferential and/or fraudulent transfer payments to be made to Cianciulli and/or his affiliates.

24

70.     Each of the above breaches adversely impacted and conferred no benefit to Cardiac.

71.     BDO had knowledge of and rendered substantial assistance in regard to foregoing breaches, with breaches that include, but that are not limited to, the following:

a.      breaching its duties to Cardiac by violating numerous provisions of GAAS and/or applicable professional guidelines and standards related to GAAS in the conduct of the Audits including, but not limited to, those related to: (i) the exercise of due professional care (General Auditing Standard No. 3), (ii) the proper planning and supervision of an audit (Standards of Field Work No. 1), (iii) collecting sufficient, competent evidence (Standards of Field Work No. 3), (iv) presentation of the financial statements in accordance with GAAP (Standards of Reporting No. 1), (v) providing informative disclosures (Standards of Reporting No. 3), and (vi) the AICPA Audit and Accounting Guide, Health Care Organizations;

b.      in violation of SAS 99 (entitled Consideration Fraud in a Financial Statement Audit), failing to assess the risk of material misstatement due to fraud by, among other things: (i) failing to conduct an adequate "brainstorming" session; (ii) failing to require the attendance of a partner at the "brainstorming" session assessing areas that the auditor believed might indicate fraud; and (iii) failing to identify any facts or circumstances attendant to its audit to assist in identifying fraud, yet preparing a "brainstorming" session memo" which expressly identified the possibility of "over billing of insurance companies for services & fictitious billings for services" as a potential fraudulent activity in the client's industry;

25

c.    in violation of in violation AU 150 (GAAS fieldwork standards), AU 230 (entitled Due Professional Care), AU 330 (entitled the Confirmation Process), and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to analyze or otherwise prepare a proper memo supporting its decision not to confirm the outstanding account receivables of the Debtor;

d.    in violation AU 150 (GAAS fieldwork standards), AU 230 (entitled Due Professional Care), AU 342 (entitled Accounting and Auditing Estimates), AU 329 (entitled Analytical Procedures), and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to adequately perform compliance testing by, among things: (i) encountering an excessive and material number of exceptions that were never adequately resolved; and (ii) failing to perform adequate analytical procedures regarding revenue and accounts receivable;

e.    in violation of AU 329 (entitled Analytical Procedures), AU 342 (entitled Auditing Accounting Estimates), and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to develop industry and client expectations regarding the relationship among the financial statement components including A/R, sales, A/R aging, revenue, contractual write-off, and allowance for bad debt;

f.    in violation of AU 150, AU 230, and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to gain sufficient knowledge of the client and its industry;

g.    in violation of AU 230, failing to exercise professional skepticism;

h.    in violation of AU 210 (entitled Training and Proficiency of Independent Auditor), AU 230, AU 314 (entitled Understanding the Entity and its

26

Environment and Assessing the Risks of Material Misstatements)(or SAS 55 as applicable), AU 318 (entitled Performing Audit Procedures in Response to Assessed Risks and Evaluating the Audit Evidence Obtained)(or SAS 55 as applicable, AU 329, AU 330, AU 342, and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to obtain and evaluate sufficient and appropriate audit evidence to support certain accounting estimates including accounts receivable and revenue;

i. in violation of AU 210, AU 230, AU 330, AU 329, AU 342, and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to appropriately plan, design, and implement compliance testing relating to accounts receivable and revenue; and

j. other breaches as may be determined through discovery.

72. The foregoing acts and omissions are the direct and proximate cause of damages to Cardiac, which damages include, but are not necessarily limited to: (i) a substantial increase in Cardiac's liabilities; (ii) a substantial diminution of Cardiac's assets, asset values and enterprise value; (iii) a substantial increase in Cardiac's insolvency; (iv) the effectuation of certain Bankruptcy Code Chapter 5 avoidable transfers to third parties, including the Debtor's principals; (v) the accrual and payment of professional fees and costs involving the Accounting Errors and/or Material Inaccuracies; (vi) the incurrence of professional fees and expenses in bankruptcy; and (vii) other damages as may be established through discovery.

WHEREFORE, the Trustee demands the entry of a judgment against Defendant BDO for compensatory damages, consequential damages, and special damages including, but not limited to: (i) damages resulting from the increased insolvency of Cardiac exceeding in value the claims

27

of the general unsecured creditors – i.e., a sum in excess of $5 million; (ii) damages totaling the value of all fraudulent transfers and/or improper or unauthorized payments or dividends to Cianciulli and his affiliates, currently totaling in excess of $785,600; (iii) damages totaling the value of all improper additional compensation paid to employees and officers in amounts exceeding those salaries paid to similar employees in South Florida, currently totaling in excess of $35,000; (iv) damages in the form of administrative expenses incurred post petition to reconstruct and/or otherwise create Cardiac's business and financial records, currently totaling in excess of $40,000; (v) pre-judgment, post-judgment interest, court costs and expenses; (vi) other damages as may be ascertained following the completion of discovery; and (vii) for such other and further relief as this Court deems appropriate.

<div align="center">

**COUNT III**
**PROFESSIONAL NEGLIGENCE/**
**ACCOUNTING MALPRACTICE**

</div>

73. Merrill realleges paragraphs 1-3, 7-25, and 39-49 above as if fully set forth herein.

74. This is a claim against BDO seeking damages for professional negligence/accounting malpractice.

75. BDO, as professional "independent" auditors performing audit and accounting services for Cardiac, had and owed a duty to exercise a reasonable degree of care and competence in the performance of the Audits and other accounting services, and in the presentation of financial statements reflecting the financial condition of Cardiac, which duty required BDO to possess, among other things, the degree of learning and skill of a professional auditor/accountant practicing in the same locality and under similar circumstances, to use the care and skill as would be used by reputable professional auditors/accountants under similar

circumstances, and to use reasonable diligence and best judgment in accomplishing the purpose for which they were engaged.

76. BDO's duty extended to those persons or classes of person whom BDO knew would rely on BDO's audit opinions and work. BDO knew that Merrill would rely upon BDO's Audits. Specifically, BDO knew that Cardiac intended to transmit BDO's audit opinions to Merrill and/or BDO supplied its audit opinions on the financial statements of Cardiac for repetition to Merrill.

77. Under applicable law, as professional auditors/accountants, BDO's express purpose here was to, among other things, conduct a GAAS compliant audit of the financial statements for Cardiac for the fiscal years ending 2004, 2005, 2006, and 2007.

78. To achieve these purposes and satisfy their obligations under applicable law as professional auditors/accountants, BDO was required to, among other things, conduct the Audits of Cardiac's financial statements in accordance with GAAS and the applicable professional guidelines and standards, including those requirements of GAAS that require BDO to properly plan and perform the Audits so as to obtain reasonable assurance about whether the financial statements were free of material misstatement and in conformity with GAAP.

79. BDO breached its duties by failing to use reasonable diligence, adequate care, skill, and best judgment in the conduct of the Audits of the Debtor. BDO's failure can be traced to its repeated and flagrant deviations from GAAS and the applicable professional guidelines and standards, including the Statements on Auditing Standards, which are recognized by the AICPA as the interpretations of GAAS.

80. Specifically, BDO breached its duties by violating numerous provisions of GAAS and/or applicable professional guidelines and standards related to GAAS in the conduct of the

Audits including, but not limited to, those related to: (i) the exercise of due professional care (General Auditing Standard No. 3), (ii) the proper planning and supervision of an audit (Standards of Field Work No. 1), (iii) collecting sufficient, competent evidence (Standards of Field Work No. 3), (iv) presentation of the financial statements in accordance with GAAP (Standards of Reporting No. 1), (v) providing informative disclosures (Standards of Reporting No. 3), and (vi) AICPA Audit and Accounting Guide, Health Care Organizations.

81.  Specifically, in regard to the accounting and other services it performed for Cardiac, including the Audits, BDO did not adhere to GAAS, and other applicable standards by, among other acts and omissions:

a.  in violation of SAS no. 99 (entitled Consideration Fraud in a Financial Statement Audit), failing to assess the risk of material misstatement due to fraud by, among other things: (i) failing to conduct an adequate "brainstorming" session; (ii) failing to require the attendance of a partner at the "brainstorming" session assessing areas that the auditor believed might indicate fraud; and (iii) failing to identify any facts or circumstances attendant to its audit to assist in identifying fraud, yet preparing a "brainstorming" session memo" which expressly identified the possibility of "over billing of insurance companies for services & fictitious billings for services" as a potential fraudulent activity in the client's industry;

b.  in violation of in violation AU 150 (GAAS fieldwork standards), AU 230 (entitled Due Professional Care), AU 330 (entitled the Confirmation Process), and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to analyze or otherwise prepare a proper memo

30

supporting its decision not to confirm the outstanding accounts receivable of the Debtor;

c.  in violation AU 150 (GAAS fieldwork standards), AU 230 (entitled Due Professional Care), AU 342 (entitled Auditing Accounting Estimates), AU 329 (entitled Analytical Procedures), and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to adequately perform compliance testing by, among things: (i) encountering an excessive and material number of exceptions that were never adequately resolved; and (ii) failing to perform adequate analytical procedures regarding revenue and accounts receivable;

d.  in violation of AU 329 (entitled Analytical Procedures), AU 342, and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to develop industry and client expectations regarding the relationship among the financial statement components including A/R, sales, A/R aging, revenue, contractual write-off, and allowance for bad debt;

e.  in violation of AU 150, AU 230, and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to gain sufficient knowledge of the client and its industry;

f.  in violation of AU 230, failing to exercise professional skepticism;

g.  in violation of AU 210 (entitled Training and Proficiency of Independent Auditor), AU 230, AU 314 (entitled Understanding the Entity and its Environment and Assessing the Risks of Material Misstatements)(or SAS 55 as applicable), AU 318 (entitled Performing Audit Procedures in

31

Response to Assessed Risks and Evaluating the Audit Evidence Obtained)(or SAS 55 as applicable, AU 329, AU 330, AU 342, and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to obtain and evaluate sufficient and appropriate audit evidence to support certain accounting estimates including accounts receivable and revenue;

h.   in violation of AU 210, AU 230, AU 330, AU 329, AU 342, and the AICPA Audit and Accounting Guide, Health Care Organizations, failing to appropriately plan, design, and implement compliance testing relating to accounts receivable and revenue; and

i.   other breaches as may be determined through discovery.

82.   In addition, BDO failed to properly plan the audits of Cardiac as was required under GAAS, including under SAS No. 99 (involving the integrity of management), in particular given the numerous red flags and warning signs that existed and were known to BDO in advance of each such Audit and thereafter.

83.   Further, even if BDO had properly planned the Audits, which they did not, BDO failed to gather sufficient, competent evidential matter to enable them to properly perform the Audits. In addition, even with the insufficient evidential matter that it had collected, BDOs failed to exercise due professional care and competence in critically evaluating such evidential matter and in conducting the Audits in general, including the fact that BDO failed to maintain the requisite degree of professional skepticism required in the conduct of the Audits regarding revenue and accounts receivable.

84.   Finally, BDO failed to adequately detect and require disclosure of material financial matters concerning Cardiac's true financial condition in the audited financial

statements, despite the fact that, among other things, it had missed multiple material opportunities during 2006 and 2007 to require the recording of a material impairment of certain property and equipment.

85. Based on the above, as well as other factors, it is clear that BDO breached its duty of care and was negligent, grossly negligent, and/or reckless in its conduct of the audit process.

86. As a result of the above numerous and material violations of the GAAS standards and guidelines, BDO breached its obligations and duties, including by failing to use reasonable diligence, adequate care and skill, and judgment to accomplish the purpose for which they were engaged. Such violations and breaches caused, among other harm, the financial statements for fiscal years ending 2004, 2005, 2006, and 2007 to be materially misstated.

87. As alleged herein, BDO's negligent audits of Cardiac proximately caused damage to Merrill. BDO's failure to properly conduct its Audits or issue proper audit opinions effectively concealed the true financial condition of Cardiac.

88. BDO was aware that Merrill had extended a line of credit to Cardiac, as well as a term loan. BDO was aware that a material condition of the financing by Merrill to Cardiac was the provision of annual audited financial statements. BDO was aware that the financing extended by Merrill was premised upon the financial status of Cardiac, and that decisions to extend, continue or increase credit was made by Merrill in reliance on the audit opinions of BDO on the financial statements of Cardiac.

89. The foregoing acts and omissions of BDO are the direct and proximate cause of damages to Merrill, which damages include, but are not necessarily limited to, monetary damages in excess of $7,471,000.

WHEREFORE, Merrill demands the entry of a judgment against Defendant BDO for damages in an amount to be proven at trial and for any other and further relief as this Court deems appropriate.

## DEMAND FOR JURY TRIAL

90.     The Trustee and Merrill demand a trial by jury in regard to each and every respective count of the Complaint and in regard to any and all other claims and issues triable by such.

Respectfully submitted this 21st day of June, 2010.

GENOVESE JOBLOVE & BATTISTA, P.A.
*Special Counsel for the Trustee*
100 S.E. Second Street, 44th Floor
Miami, FL 33131
Tel. (305) 349-2300
Fax. (305) 349-2310

By: _____
         David C. Cimo, Esq.
         Fla. Bar. No. 775400
         Peter W. Bellas, Esq.
         Fla. Bar No. 611387

BERGER SINGERMAN, P.A.
*Counsel for Merrill*
350 East Las Olas Blvd., Suite 1000
Fort Lauderdale, FL 33301
(954) 525-9900 Telephone
(954) 523-2872 Facsimile

By: _____
         Jordi Guso, Esq.
         Fla. Bar 863580
         René D. Harrod, Esq.
         Fla. Bar 627666

2847781-2

34

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on this the 23rd of June, 2010 via facsimile, electronic mail and U.S. Mail on Nikki Lewis Simon, Esq. and D. Porpoise Evans, Esq. of Greenberg Traurig, P.A., *Counsel for BDO USA, LLP*, 1221 Brickell Avenue, Miami, Florida 33131 and Jordi Guso, Esq., of Berger Singerman, P.A., *Counsel for Merrill Lynch Commercial Finance Corp.*, 350 East Las Olas Boulevard, Suite 1000, Fort Lauderdale, Florida 33301.

GENOVESE JOBLOVE & BATTISTA, P.A.
*Special Counsel for the Trustee*
100 S.E. Second Street, 44th Floor
Miami, Florida 33131
Telephone: (305) 349-2300
Facsimile: (305) 349-2310

By: _____

David C. Cimo, Esq.
Fla. Bar. No. 775400
Peter W. Bellas, Esq.
Fla. Bar. No. 611387

# EXHIBIT 3

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO. 10-28002-CA-10

KENNETH A. WELT, Chapter 7 Trustee of the )
jointly administered estates of the Debtor, )
Cardiac Management Systems, Inc. and its )
affiliated debtors, )
                       )
              Plaintiffs, )
                        )
v. )
                        )
BDO SEIDMAN, LLP, n/k/a BDO USA, LLP, )
a New York limited liability partnership, )
                       )
             Defendants. )
                        )

THE ORIGINAL
FILED ON:

JUN 0 3 2010

IN THE OFFICE OF
CIRCUIT COURT DADE CO., FL

## BDO USA, LLP'S MOTION TO DISMISS AND TO COMPEL ARBITRATION OR ALTERNATIVELY TO STAY

Defendant BDO USA, LLP ("BDO") respectfully moves, pursuant to Sections 3 and 4 of the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, and alternatively Fla. Stat. § 682.03(1), to compel arbitration of the claims asserted by Kenneth A. Welt ("Welt"), Chapter 7 Trustee of the jointly administered estates of the Debtor, Cardiac Management Systems, Inc., and its affiliated debtors (collectively "CMS").

## INTRODUCTION

This action arises from written engagement agreements under which BDO audited CMS's financial statements for 2004 through 2007 (the "Engagement Agreements"). As Chapter 7 trustee for CMS, Welt contends that BDO's audits were negligent. Welt seeks to recover for damages allegedly caused CMS by BDO's audits based upon theories of "Professional Negligence/Accounting Malpractice" and "Aiding and Abetting Breach of Fiduciary Duty."

BDO contests Welt's allegations that BDO conducted negligent audits, and that BDO caused CMS damages. This Court, however, should not embroil itself in determining Welt's claims. For in the Engagement Agreements under which BDO was retained to conduct audits, CMS agreed to arbitrate "any dispute, controversy, or claim" arising in connection with the audits. Arbitration of Welt's claims, accordingly, is mandatory as a matter of both federal and Florida law.

## STATEMENT OF FACTS

CMS and its affiliates were companies that provided medical imaging and other testing services. (Complaint ¶¶ 18-23.) Beginning in the 1990s and continuing from 2004 through 2007, CMS entered into Engagement Agreements under which it retained BDO to conduct annual audits of its financial statements. (Affidavit of Lisa A. Morris ["Morris Aff.," Exh. 1 hereto], Exhs. "A," "B," and "C"; Complaint ¶ 38.) BDO agreed in the Engagement Agreements CMS also

2

executed to conduct audits "in accordance with auditing standards generally accepted in the United States." (Morris Aff. Exhs. "A", "B", and "C"; Complaint ¶ 40.)

Each Engagement Agreement CMS signed contains a broad arbitration clause mandating that:

> If any dispute, controversy, or claim arises in connection with the performance or breach of this agreement (including disputes regarding the validity or enforceability of this agreement) and cannot be resolved by facilitated negotiations (or the parties waive that process), then such dispute, controversy, or claim shall be settled by arbitration.

(Morris Aff. Exhs. "A," "B," and "C.")  Confirming its intent to arbitrate, CMS further agreed to detailed provisions under which an arbitration is to be conducted. CMS agreed that (1) the "proceeding shall be governed by the provisions of the Federal Arbitration Act (FAA) or, if a court of competent jurisdiction determines the FAA inapplicable, by the laws of the state in which the proceeding is to take place"; (2) the "proceedings shall proceed in accordance with the then current Arbitration Rules for Professional Accounting and Related Disputes of the American Arbitration Association (AAA)"; and (3) to a panel consisting of "three persons, one chosen by each party and a third selected by the two party-selected arbitrators." (*Id.*)

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500  | Fax 305.579.0717 | www.gtlaw.com

Welt contends that due to the mismanagement of certain of its officers and directors, combined with cutbacks on Medicare spending under the Deficit Reduction Act of 2005, and other problems, CMS began to sustain losses in 2006 through 2008. (Complaint ¶¶ 27-29.) CMS's bankruptcy case followed, with Welt initially appointed CMS's Chapter 11 bankruptcy trustee, followed by the bankruptcy case being converted to a Chapter 7 case, in which Welt remained as CMS's Chapter 7 bankruptcy trustee. (*Id.* ¶¶ 8-12.)

On May 13, 2010, Welt commenced the present action in his capacity as CMS's Chapter 7 trustee. (*Id.* ¶ 13.) Welt asserts that BDO was retained to conduct financial statement audits for CMS, and that BDO "represented" it would conduct its audits in accordance with Generally Accepted Auditing Standards. (*Id.* ¶¶ 38-40.) Welt contends the audits CMS hired BDO to perform were negligent, which is the foundation for his "Professional Negligence/Accounting Malpractice" and "Aiding and Abetting Breach of Fiduciary Duty" claims. (*Id.* ¶¶ 51-60, 70.)

4

# ARGUMENT

## CMS, THROUGH ITS TRUSTEE, IS REQUIRED TO ARBITRATE ITS DISPUTE WITH BDO

### A.    Both Federal And State Laws Mandate Arbitration Under The Written Engagement Agreements CMS Signed

Both the FAA[1] and Florida law make an order compelling arbitration *mandatory* where, as here, contracting parties agree to arbitrate "under a written agreement for arbitration."  9 U.S.C. § 4; *accord* Fla. Stat. § 682.03(1) (if no issue exists as to the making of an arbitration agreement, the court "shall grant the application" compelling arbitration); *see Dean Witter Reynolds v. Byrd*, 470 U.S. 213, 219 (1985) ("By its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."); *O'Keefe Architects, Inc. v. CED Const. Partners, Ltd.*, 944 So. 2d 181, 184-85 (Fla. 2006) ("If a dispute arises regarding a party's refusal to comply with an agreement to arbitrate, the court is required to compel arbitration if it 'is satisfied that no substantial issue exists as to the making of the agreement or provision.'") (*quoting* Fla. Stat. § 682.03(1)).  Moreover, in determining whether

---

[1]  The FAA applies in this case because the Engagement Agreement under which BDO, a New York limited liability partnership that conducted its audits in New York, was to provide services to CMC, a Delaware corporation with subsidiaries and affiliates in Florida, is a written agreement "evidencing a transaction involving commerce." 9 U.S.C. § 2; *see id.* § 1(commerce defined as "commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia"); *compare O'Keefe Architects, Inc. v. CED Const. Partners, Ltd.*, 944 So. 2d 181 (Fla. 2006) (Florida law applied where "both parties are Florida corporations involved in Florida construction projects").

5

arbitration is required, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Hospital v. Mercury Construction*, 460 U.S. 1, 24 (1983); *accord  Hospicecare of Southeast Florida, Inc. v. Major*, 968 So. 2d 117, 119 (Fla. 4th DCA 2007) ("Doubts concerning the scope of arbitration agreements should be resolved in favor of arbitration on all issues related to the contract.").

Here, CMS agreed in the Engagement Agreements under which BDO was retained and conducted audits to arbitrate *"any dispute, controversy, or claim"* that *"arises in connection with* the performance or breach of this agreement . . . ." (Morris Aff. Exhs. "A," "B," and "C") (emphasis added).   Welt's claims are founded upon BDO's audits of CMS's financial statements, the performance of which was the express subject of the Engagement Agreements that contained CMS's agreement to arbitrate.  Accordingly, Welt's claims on behalf of CMS are required to be resolved in arbitration because they arise in connection with BDO's performance of the audits for which it was retained under the Engagement Agreements. *See Breakstone v. Breakstone Homes, Inc.*, 999 So. 2d 731, 733 (Fla. 3d DCA 2009) (arbitration required when "claims are significantly related to the rights and obligations in the Agreement").  Indeed, arbitration agreements identical to those in the Engagement Agreements CMS signed have routinely been held to compel arbitration of negligence and fiduciary duty based claims similar to those

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

Welt asserts. *See, e.g., Plyer v. BDO Seidman, L.L.P.*, No. 04 2146 B/AN, 2004 WL 5039850 (W.D. Tenn. Dec. 15, 2004) (ordering fiduciary duty, negligent misrepresentation, and professional malpractice claims arbitrated) *Denney v. Jenkens & Gilchrist*, 340 F. Supp. 2d 348 (S.D.N.Y. 2004) (broadly construing arbitration clause in BDO engagement agreement); *Miron v. BDO Seidman, LLP*, 342 F. Supp. 2d 324, 330 (E.D. Pa. 2004) ("When an arbitration clause provides for arbitration of all matters 'arising under' or 'arising out of' a particular agreement, the clause is typically construed broadly to suggest that a given dispute is arbitrable.").

**B.    Welt Is Bound To CMS's Arbitration Agreements**

Welt's status as CMS's trustee does not make arbitration any less enforceable. As trustee for CMS's bankruptcy estates (Complaint ¶ 12), Welt succeeds "only to such rights" as CMS possessed, subject to all "defenses which might have been asserted against [CMS] but for the filing of the petition." *Bank of Marin v. England*, 385 U.S. 99, 101 (1966). CMS's Engagement Agreements with BDO are unambiguous in requiring that "any dispute, controversy, or claim" arising in connection with BDO's audits "shall be settled by arbitration." (Morris Aff. Exhs. "A," "B," and "C.") Because Welt succeeded to CMS's agreements to arbitrate with BDO, and seeks to recover for claims arising from the same Engagement Agreements on behalf of CMS, he is bound to arbitrate all disputes

arising in connection with BDO's audits. *See In re Electric Machinery Enterprises, Inc.*, 479 F.3d 791 (11th Cir. 2007); *see also Kirschner v. Grant Thornton LLP (In re Refco, Inc. Securities Litigation)*, Nos. 07 MDL 1902 (GEL), 07 Civ. 11604 (GEL), 2008 WL 2185676, at *5 (S.D.N.Y. 2008) (trustee, "as successor in interest to the [debtors], is bound by the arbitration clause" in engagement agreements with accountants).

## <u>CONCLUSION</u>

For all the foregoing reasons, the Court should order Welt to arbitrate the claims against BDO asserted in the Complaint.

Dated:  June 2, 2010

> **GREENBERG TRAURIG, P.A.**
> Nikki Lewis Simon
> D. Porpoise Evans
> 1221 Brickell Avenue
> Miami, Florida  33131
> Telephone:  (305) 579-0500
> Facsimile:  (305) 579-0717
> *Counsel for BDO USA, LLP*
>
>
> By: _____
>      D. PORPOISE EVANS
>      Florida Bar No. 0576883

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was served on this 2nd day of June, 2010, via facsimile, electronic and U.S. mail on: David C. Cimon, **Genovese, Joblove, and Battista, P.A.,** 100 S.E. 2nd Street, 44th Floor, Miami, Florida, 33131, (305) 349-2310.

D. PORPOISE EVANS

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

# EXHIBIT '1'

Greenberg Traurig, P.A. | Attorneys at Law | 1221 Brickell Avenue | Miami, FL 33131 | Tel 305.579.0500 | Fax 305.579.0717 | www.gtlaw.com

IN THE CIRCUIT COURT OF
THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR
MIAMI-DADE COUNTY,
FLORIDA

GENERAL JURISDICTION
DIVISION

CASE NO. 10-28002-CA-10

KENNETH A. WELT, Chapter 7 Trustee of the )
jointly administered estates of the Debtor, )
Cardiac Management Systems, Inc. and its )
affiliated debtors, )
)
                            Plaintiffs, )
)
v. )
)
BDO SEIDMAN, LLP, n/k/a BDO USA, LLP, )
a New York limited liability partnership, )
)
                         Defendants. )
_____ )

## AFFIDAVIT OF LISA A. MORRIS IN SUPPORT OF
## BDO USA, LLP'S MOTION TO DISMISS AND TO COMPEL
## ARBITRATION OR ALTERNATIVELY TO STAY

STATE OF NEW YORK

COUNTY OF NEW YORK

      Before me, the undersigned authority, personally appeared Lisa A. Morris who after having been duly sworn, deposes and says as follows:

      1.    I am over the age of 18 years and have personal knowledge of the facts contained in this Affidavit.

2.      I have been designated as the Records Custodian for BDO USA, LLP ("BDO").

3.      Attached as Exhibit "A" is a true and correct copy of the signed Engagement Agreement between BDO and Cardiac Management Systems, Inc. and Subsidiaries, dated March 18, 2008.

4.      Attached as Exhibit "B" is a true and correct copy of the signed Engagement Agreement between BDO and Cardiac Management Systems, Inc. and Subsidiaries, dated October 25, 2006.

5.      Attached as Exhibit "C" is a true and correct copy of the signed Engagement Agreement between BDO and Cardiac Management Systems, Inc. and Subsidiaries, dated December 17, 2004.

**FURTHER AFFIANT SAYETH NAUGHT.**

_____
Lisa A. Morris

SWORN TO AND SUBSCRIBED before me this 2nd day of June, 2010 by Lisa A. Morris.  She personally appeared before me, is personally known to me or produced _NYS Driver's License_ as identification, and did take an oath.

[NOTARIAL SEAL]

Notary: _____
Print Name: STEPHANIE D. REGAN
Notary Public, State of New York
My commission expires: Sept 30, 2013

STEPHANIE D. REGAN
Notary Public, State of New York
No. 43-4704738
Qualified in Richmond County
Commission Expires Sept. 30, 2013

EXHIBIT "A"



**BDO Seidman, LLP**
Accountants and Consultants

330 Madison Avenue
New York, New York 10017
Telephone: (212) 885-8000
Fax: (212) 697-1299

March 18, 2008

Mr. Harold Gobstein
Cardiac Management Systems, Inc. and
   Subsidiaries
1836 Monte Carlo Way
Coral Springs, FL 33071

Dear Mr. Gobstein:

<u>**Agreement To Provide Services**</u>

This agreement is intended to describe the nature and scope of our services.

## Audit

As agreed, we will audit the consolidated balance sheet of Cardiac Management Systems, Inc. and Subsidiaries (the "Company") as of September 30, 2007 and the related statements of income and retained earnings and cash flows for the year then ending in accordance with auditing standards generally accepted in the United States of America. The financial records and financial statements are the responsibility of your Company's management. In that regard, management is responsible for establishing and maintaining effective internal control over financial reporting, establishing and maintaining proper accounting records, selecting appropriate accounting principles, safeguarding company assets, and complying with relevant laws and regulations. Management is also responsible for making all financial records and related information available to us.

Our responsibility is to express an opinion on the financial statements based on our audit. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation.

At the conclusion of our audit, we will submit to you a report containing our opinion as to whether the financial statements, taken as a whole, are fairly presented based on accounting principles generally accepted in the United States of America. If, during the course of our work, it appears for any reason that we will not be in a position to render an unqualified opinion on the financial statements, or that our report will require an explanatory paragraph, we will discuss this with you. It is possible that, because of unexpected circumstances, we may determine that we cannot render a report or otherwise complete the engagement. If, for any reason, we are unable to complete the audit or are unable to form or have not formed an opinion, we may decline to express an opinion or decline to issue a report as a result of the engagement. If, in our professional judgment, the circumstances require, we may resign from the engagement prior to completion.

 **BDO Seldman, LLP**
Accountants and Consultants

Mr. Harold Gobstein
Cardiac Management Systems
March 18, 2008
Page 2

We will design our audit to provide reasonable assurance of detecting errors or fraud that would have a material effect on the financial statements. Our work will be based primarily upon selected tests of evidence supporting the amounts and disclosures in the financial statements and, therefore, will not include a detailed check of your Company's transactions for the period. Accordingly, an audit performed in accordance with auditing standards generally accepted in the United States of America is not a guarantee of the accuracy of the financial statements, and there is a risk that material errors or fraud may exist and not be detected by us. Also, an audit is not designed to detect errors or fraud that are immaterial to the financial statements. However, we will inform you of any material errors or fraud that come to our attention. We will also inform you of illegal acts that come to our attention unless they are clearly inconsequential. In addition, during the course of our audit, financial statement misstatements may be identified, either through our audit procedures or through communication by your employees to us, and we will bring these misstatements to your attention as proposed adjustments. Management is responsible for recording such adjustments in the financial statements or otherwise concluding and confirming in a representation letter provided to us at the conclusion of our audit that the effects of the unrecorded adjustments are, both individually and in the aggregate, immaterial to the financial statements taken as a whole. At the conclusion of our audit we will communicate to the audit committee all such unrecorded adjustments.

An audit includes obtaining an understanding of internal control sufficient to plan the audit and to determine the nature, timing, and extent of audit procedures to be performed. An audit is not designed to provide assurance on internal control or to identify reportable conditions. However, we are responsible for ensuring that you are aware of any reportable conditions that come to our attention during our engagement.

## E-mail Communication

In connection with this engagement, we may communicate with you or others via e-mail transmission. As e-mails can be intercepted and read, disclosed, or otherwise used or communicated by an unintended third party, or may not be delivered to each of the parties to whom they are directed and only to such parties, we cannot guarantee or warrant that e-mails from us will be properly delivered and read only by the addressee. Therefore, we specifically disclaim and waive any liability or responsibility whatsoever for interception or unintentional disclosure or communication of e-mail transmissions, or for the unauthorized use or failed delivery of e-mails transmitted by us in connection with the performance of this engagement. In that regard, you agree that we shall have no liability for any loss or damage to any person or entity resulting from the use of e-mail transmissions, including any consequential, incidental, direct, indirect, or special damages, such as loss of sales or anticipated profits, or disclosure or communication of confidential or proprietary information.



**BDO Seidman, LLP**
Accountants and Consultants

Mr. Harold Gobstein
Cardiac Management Systems
March 18, 2008
Page 3

## Ownership of Working Papers

The working papers prepared in conjunction with our audit are the property of our Firm, constitute confidential information, and will be retained by us in accordance with our Firm's policies and procedures.

## Reproduction of Audit Report

If the Company plans any reproduction or publication of our report, or any portion of it, copies of masters' or printers' proofs of the entire document should be submitted to us in sufficient time for our review and approval before printing. You also agree to provide us with a copy of the final reproduced material for our approval before it is distributed.

## Posting of Audit Report and Financial Statements on Your Web Site

You agree to indemnify BDO Seidman, LLP from any and all claims that may arise from any differences between the electronic version of the financial statements and audit report presented on your web site, now and in the future, and the signed version of the financial statements and audit report provided to management by BDO Seidman, LLP.

## Review of Documents for Sale of Securities

The audited financial statements and our report thereon should not be provided or otherwise made available to recipients of any document to be used in connection with the sale of securities (including securities offerings on the Internet) without first submitting copies of the document to us in sufficient time for our review and approval.

## Management Representations

As required by auditing standards generally accepted in the United States of America, we will request certain written representations from management at the close of our audit to confirm oral representations given to us and to indicate and document the continuing appropriateness of such representations and reduce the possibility of misunderstanding concerning matters that are the subject of the representations. Because of the importance of management's representations to an effective audit and provided the audited financial statements and our report thereon are not included in a registration statement under the Securities Act of 1933 or in a Private Placement Memorandum, Cardiac Management Systems agrees to release and indemnify BDO Seidman, LLP and its personnel from any liability and costs relating to our services under this agreement attributable to any misrepresentations by management.



**BDO Seidman, LLP**
Accountants and Consultants

Mr. Harold Gobstein
Cardiac Management Systems
March 18, 2008
Page 4

## Availability of Records and Personnel

You agree that all records, documentation, and information we request in connection with our audit will be made available to us (including those pertaining to related parties), that all material information will be disclosed to us, and that we will have the full cooperation of, and unrestricted access to, your personnel during the course of the engagement.

## Assistance by Your Personnel and Internet Access

We also ask that your personnel, to the extent possible, prepare various schedules and analyses for our staff. In addition, we ask that you provide high-speed Internet access to our engagement team, if practicable, while working on the Company's premises. This assistance will serve to facilitate the progress of our work and minimize costs to you.

## Other Services

We are always available to meet with you and other executives at various times throughout the year to discuss current business, operational, accounting, and auditing matters affecting your Company. Whenever you feel such meetings are desirable, please let us know. We are also prepared to provide services to assist you in any of these areas. We will also be pleased, at your request, to attend your directors' and stockholders' meetings.

## Independence

Professional and certain regulatory standards require us to be independent, in both fact and appearance, with respect to your Company in the performance of our services. Any discussions that you have with personnel of our Firm regarding employment could pose a threat to our independence. Therefore, we request that you inform us prior to any such discussions so that we can implement appropriate safeguards to maintain our independence.

## Dispute Resolution Procedure

If any dispute, controversy, or claim arises in connection with the performance or breach of this agreement (including disputes regarding the validity or enforceability of this agreement), either party may, upon written notice to the other party, request facilitated negotiations. Such negotiations shall be assisted by a neutral facilitator acceptable to both parties and shall require the best efforts of the parties to discuss with each other in good faith their respective positions and, respecting their different interests, to finally resolve such dispute.


**BDO**

BDO Seidman, LLP
Accountants and Consultants

Mr. Harold Gobstein
Cardiac Management Systems
March 18, 2008
Page 5

Each party may disclose any facts to the other party or to the facilitator that it, in good faith, considers necessary to resolve the dispute. However, all such disclosures will be deemed in furtherance of settlement efforts and will not be admissible in any subsequent litigation against the disclosing party. Except as agreed by both parties, the facilitator shall keep confidential all information disclosed during negotiations. The facilitator shall not act as a witness for either party in any subsequent arbitration between the parties.

Such facilitated negotiations shall conclude within sixty days from receipt of the written notice unless extended by mutual consent. The parties may also agree at any time to terminate or waive facilitated negotiations. The costs incurred by each party in such negotiations will be borne by it; the fees and expenses of the facilitator, if any, shall be borne equally by the parties.

If any dispute, controversy, or claim arises in connection with the performance or breach of this agreement (including disputes regarding the validity or enforceability of this agreement) and cannot be resolved by facilitated negotiations (or the parties agree to waive that process), then such dispute, controversy, or claim shall be settled by arbitration. The arbitration proceeding shall take place in the city in which the BDO Seidman office providing the relevant services exists, unless the parties agree to a different locale. The proceeding shall be governed by the provisions of the Federal Arbitration Act (FAA) or, if a court of competent jurisdiction determines the FAA inapplicable, by the laws of the state in which the proceeding is to take place. In any arbitration instituted hereunder, the proceedings shall proceed in accordance with the then current Arbitration Rules for Professional Accounting and Related Disputes of the American Arbitration Association (AAA), except that no pre-hearing discovery shall be permitted unless specifically authorized by the arbitration panel.

Such arbitration shall be conducted before a panel of three persons, one chosen by each party and the third selected by the two party-selected arbitrators. The arbitration panel shall have no authority to award non-monetary or equitable relief, and any monetary award shall not include punitive damages. The confidentiality provisions applicable to facilitated negotiation shall also apply to arbitration. The award issued by the arbitration panel may be confirmed in a judgment by any federal or state court of competent jurisdiction.

**Fees**

Our charges to your Company for the services described above for the year ending September 30, 2007, will be $57,000 plus out-of-pocket expenses. This fee is based on the following assumptions: your personnel will prepare certain schedules and analyses for us and make available to us documents for our examination as and when requested;

 **BDO**

BDO Seidman, LLP
Accountants and Consultants

Mr. Harold Gobstein
Cardiac Management Systems
March 18, 2008
Page 6

there will be no significant changes in the internal controls, accounting systems, key personnel, or structure of the organization; there will be no significant acquisitions or disposals of businesses; and there will not be any unanticipated increases in current operations requiring significant additional audit time. Should we encounter any unforeseen problems that will warrant additional time or expense, you will be notified of the situation and, if possible, the added cost.

Our charges for other services will be agreed to separately. The arrangements described in this letter will be updated annually.

Bills will be rendered on a monthly or other periodic basis, and are due upon receipt. If payments are not received promptly, we reserve the right to stop work on the engagement.

Very truly yours,

Christopher J. Orella
Partner

Acknowledged:

By _Harold Gobstein Levy_
   Mr. Harold Gobstein

Date_ 3/20/08 _

G:\Health\Clients\C\Cardiac\2004\Cardiac L-20 Engmt ltr 9 07.doc

# EXHIBIT "B"



**BDO Seidman, LLP**
Accountants and Consultants

330 Madison Avenue
New York, New York 10017
Telephone: (212) 885-8000
Fax: (212) 697-1299

October 25, 2006

Mr. Harold Gobstein
Cardiac Management Systems, Inc. and
  Subsidiaries
1836 Monte Carlo Way
Coral Springs, FL 33071

Dear Mr. Gobstein:

## Agreement To Provide Services

This agreement is intended to describe the nature and scope of our services.

## Audit

As agreed, we will audit the consolidated balance sheet of Cardiac Management Systems, Inc. and Subsidiaries (the "Company") as of September 30, 2006 and the related statements of income and retained earnings and cash flows for the year then ending in accordance with auditing standards generally accepted in the United States of America. The financial records and financial statements are the responsibility of your Company's management. In that regard, management is responsible for establishing and maintaining effective internal control over financial reporting, establishing and maintaining proper accounting records, selecting appropriate accounting principles, safeguarding company assets, and complying with relevant laws and regulations. Management is also responsible for making all financial records and related information available to us.

Our responsibility is to express an opinion on the financial statements based on our audit. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation.

At the conclusion of our audit, we will submit to you a report containing our opinion as to whether the financial statements, taken as a whole, are fairly presented based on accounting principles generally accepted in the United States of America. If, during the course of our work, it appears for any reason that we will not be in a position to render an unqualified opinion on the financial statements, or that our report will require an explanatory paragraph, we will discuss this with you. It is possible that, because of unexpected circumstances, we may determine that we cannot render a report or otherwise complete the engagement. If, for any reason, we are unable to complete the audit or are unable to form or have not formed an opinion. we may decline to express an opinion or decline to issue a report as a result of the engagement. If, in our professional judgment, the circumstances require, we may resign from the engagement prior to completion.



**BDO Seidman, LLP**
Accountants and Consultants

Mr. Harold Gobstein
Cardiac Management Systems
October 25, 2006
Page 2

We will design our audit to provide reasonable assurance of detecting errors or fraud that would have a material effect on the financial statements. Our work will be based primarily upon selected tests of evidence supporting the amounts and disclosures in the financial statements and, therefore, will not include a detailed check of your Company's transactions for the period. Accordingly, an audit performed in accordance with auditing standards generally accepted in the United States of America is not a guarantee of the accuracy of the financial statements, and there is a risk that material errors or fraud may exist and not be detected by us. Also, an audit is not designed to detect errors or fraud that are immaterial to the financial statements. However, we will inform you of any material errors or fraud that come to our attention. We will also inform you of illegal acts that come to our attention unless they are clearly inconsequential. In addition, during the course of our audit, financial statement misstatements may be identified, either through our audit procedures or through communication by your employees to us, and we will bring these misstatements to your attention as proposed adjustments. Management is responsible for recording such adjustments in the financial statements or otherwise concluding and confirming in a representation letter provided to us at the conclusion of our audit that the effects of the unrecorded adjustments are, both individually and in the aggregate, immaterial to the financial statements taken as a whole. At the conclusion of our audit we will communicate to the audit committee all such unrecorded adjustments.

An audit includes obtaining an understanding of internal control sufficient to plan the audit and to determine the nature, timing, and extent of audit procedures to be performed. An audit is not designed to provide assurance on internal control or to identify reportable conditions. However, we are responsible for ensuring that you are aware of any reportable conditions that come to our attention during our engagement.

## E-mail Communication

In connection with this engagement, we may communicate with you or others via e-mail transmission. As e-mails can be intercepted and read, disclosed, or otherwise used or communicated by an unintended third party, or may not be delivered to each of the parties to whom they are directed and only to such parties, we cannot guarantee or warrant that e-mails from us will be properly delivered and read only by the addressee. Therefore, we specifically disclaim and waive any liability or responsibility whatsoever for interception or unintentional disclosure or communication of e-mail transmissions, or for the unauthorized use or failed delivery of e-mails transmitted by us in connection with the performance of this engagement. In that regard, you agree that we shall have no liability for any loss or damage to any person or entity resulting from the use of e-mail transmissions, including any consequential, incidental, direct, indirect, or special damages, such as loss of sales or anticipated profits, or disclosure or communication of confidential or proprietary information.



**BDO Seidman, LLP**
Accountants and Consultants

Mr. Harold Gobstein
Cardiac Management Systems
October 25, 2006
Page 3

## Ownership of Working Papers

The working papers prepared in conjunction with our audit are the property of our Firm, constitute confidential information, and will be retained by us in accordance with our Firm's policies and procedures.

## Reproduction of Audit Report

If the Company plans any reproduction or publication of our report, or any portion of it, copies of masters' or printers' proofs of the entire document should be submitted to us in sufficient time for our review and approval before printing. You also agree to provide us with a copy of the final reproduced material for our approval before it is distributed.

## Posting of Audit Report and Financial Statements on Your Web Site

You agree to indemnify BDO Seidman, LLP from any and all claims that may arise from any differences between the electronic version of the financial statements and audit report presented on your web site, now and in the future, and the signed version of the financial statements and audit report provided to management by BDO Seidman, LLP.

## Review of Documents for Sale of Securities

The audited financial statements and our report thereon should not be provided or otherwise made available to recipients of any document to be used in connection with the sale of securities (including securities offerings on the Internet) without first submitting copies of the document to us in sufficient time for our review and approval.

## Management Representations

As required by auditing standards generally accepted in the United States of America, we will request certain written representations from management at the close of our audit to confirm oral representations given to us and to indicate and document the continuing appropriateness of such representations and reduce the possibility of misunderstanding concerning matters that are the subject of the representations. Because of the importance of management's representations to an effective audit and provided the audited financial statements and our report thereon are not included in a registration statement under the Securities Act of 1933 or in a Private Placement Memorandum, Cardiac Management Systems agrees to release and indemnify BDO Seidman, LLP and its personnel from any liability and costs relating to our services under this agreement attributable to any misrepresentations by management.



**BDO Seidman, LLP**
Accountants and Consultants

Mr. Harold Gobstein
Cardiac Management Systems
October 25, 2006
Page 4

## Availability of Records and Personnel

You agree that all records, documentation, and information we request in connection with our audit will be made available to us (including those pertaining to related parties), that all material information will be disclosed to us, and that we will have the full cooperation of, and unrestricted access to, your personnel during the course of the engagement.

## Assistance by Your Personnel and Internet Access

We also ask that your personnel, to the extent possible, prepare various schedules and analyses for our staff. In addition, we ask that you provide high-speed Internet access to our engagement team, if practicable, while working on the Company's premises. This assistance will serve to facilitate the progress of our work and minimize costs to you.

## Other Services

We are always available to meet with you and other executives at various times throughout the year to discuss current business, operational, accounting, and auditing matters affecting your Company. Whenever you feel such meetings are desirable, please let us know. We are also prepared to provide services to assist you in any of these areas. We will also be pleased, at your request, to attend your directors' and stockholders' meetings.

## Independence

Professional and certain regulatory standards require us to be independent, in both fact and appearance, with respect to your Company in the performance of our services. Any discussions that you have with personnel of our Firm regarding employment could pose a threat to our independence. Therefore, we request that you inform us prior to any such discussions so that we can implement appropriate safeguards to maintain our independence.

## Dispute Resolution Procedure

If any dispute, controversy, or claim arises in connection with the performance or breach of this agreement (including disputes regarding the validity or enforceability of this agreement), either party may, upon written notice to the other party, request facilitated negotiations. Such negotiations shall be assisted by a neutral facilitator acceptable to both parties and shall require the best efforts of the parties to discuss with each other in good faith their respective positions and, respecting their different interests, to finally resolve such dispute.



**BDO Seidman, LLP**
Accountants and Consultants

Mr. Harold Gobstein
Cardiac Management Systems
October 25, 2006
Page 5

Each party may disclose any facts to the other party or to the facilitator that it, in good faith, considers necessary to resolve the dispute. However, all such disclosures will be deemed in furtherance of settlement efforts and will not be admissible in any subsequent litigation against the disclosing party. Except as agreed by both parties, the facilitator shall keep confidential all information disclosed during negotiations. The facilitator shall not act as a witness for either party in any subsequent arbitration between the parties.

Such facilitated negotiations shall conclude within sixty days from receipt of the written notice unless extended by mutual consent. The parties may also agree at any time to terminate or waive facilitated negotiations. The costs incurred by each party in such negotiations will be borne by it; the fees and expenses of the facilitator, if any, shall be borne equally by the parties.

If any dispute, controversy, or claim arises in connection with the performance or breach of this agreement (including disputes regarding the validity or enforceability of this agreement) and cannot be resolved by facilitated negotiations (or the parties agree to waive that process), then such dispute, controversy, or claim shall be settled by arbitration. The arbitration proceeding shall take place in the city in which the BDO Seidman office providing the relevant services exists, unless the parties agree to a different locale. The proceeding shall be governed by the provisions of the Federal Arbitration Act (FAA) or, if a court of competent jurisdiction determines the FAA inapplicable, by the laws of the state in which the proceeding is to take place. In any arbitration instituted hereunder, the proceedings shall proceed in accordance with the then current Arbitration Rules for Professional Accounting and Related Disputes of the American Arbitration Association (AAA), except that no pre-hearing discovery shall be permitted unless specifically authorized by the arbitration panel.

Such arbitration shall be conducted before a panel of three persons, one chosen by each party and the third selected by the two party-selected arbitrators. The arbitration panel shall have no authority to award non-monetary or equitable relief, and any monetary award shall not include punitive damages. The confidentiality provisions applicable to facilitated negotiation shall also apply to arbitration. The award issued by the arbitration panel may be confirmed in a judgment by any federal or state court of competent jurisdiction.

**Fees**

Our charges to your Company for the services described above for the year ending September 30, 2006, will be $54,000 plus out-of-pocket expenses. This fee is based on the following assumptions: your personnel will prepare certain schedules and analyses for us and make available to us documents for our examination as and when requested;



**BDO Seidman, LLP**
Accountants and Consultants

Mr. Harold Gobstein
Cardiac Management Systems
October 25, 2006
Page 6

there will be no significant changes in the internal controls, accounting systems, key personnel, or structure of the organization; there will be no significant acquisitions or disposals of businesses; and there will not be any unanticipated increases in current operations requiring significant additional audit time. Should we encounter any unforeseen problems that will warrant additional time or expense, you will be notified of the situation and, if possible, the added cost.

Our charges for other services will be agreed to separately. The arrangements described in this letter will be updated annually.

Bills will be rendered on a monthly or other periodic basis, and are due upon receipt. If payments are not received promptly, we reserve the right to stop work on the engagement.

Very truly yours,

*Christopher J. Orella*

Christopher J. Orella
Partner


Acknowledged:

By _Harold Gobstein, Secy_
    Mr. Harold Gobstein

Date _10/27/06_

EXHIBIT "C"

 **BDO**

**BDO Seidman, LLP**
Accountants and Consultants

330 Madison Avenue
New York, New York 10017-5001
Telephone: (212) 885-8000
Fax: (212) 697-1299

December 17, 2004

Mr. Harold Gobstein
Cardiac Management Systems, Inc. and
 Subsidiaries
1836 Monte Carlo Way
Coral Springs, FL 33071

Dear Mr. Gobstein:

<u>**Agreement To Provide Services**</u>

This agreement is intended to describe the nature and scope of our services.

## Audit

As agreed, we will audit the consolidated balance sheet of Cardiac Management Systems, Inc. and Subsidiaries (the "Company") as of September 30, 2004 and the related statements of income and retained earnings and cash flows for the year then ending in accordance with auditing standards generally accepted in the United States of America. The financial records and financial statements are the responsibility of your Company's management. In that regard, management is responsible for establishing and maintaining effective internal control over financial reporting, establishing and maintaining proper accounting records, selecting appropriate accounting principles, safeguarding company assets, and complying with relevant laws and regulations. Management is also responsible for making all financial records and related information available to us.

Our responsibility is to express an opinion on the financial statements based on our audit. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation.

At the conclusion of our audit, we will submit to you a report containing our opinion as to whether the financial statements, taken as a whole, are fairly presented based on accounting principles generally accepted in the United States of America. If, during the course of our work, it appears for any reason that we will not be in a position to render an unqualified opinion on the financial statements, or that our report will require an explanatory paragraph, we will discuss this with you. It is possible that, because of unexpected circumstances, we may determine that we cannot render a report or otherwise complete the engagement. If, for any reason, we are unable to complete the audit or are



**BDO Seidman, LLP**
Accountants and Consultants

Mr. Harold Gobstein
Cardiac Management Systems
December 17, 2004
Page 2

unable to form or have not formed an opinion, we may decline to express an opinion or decline to issue a report as a result of the engagement. If, in our professional judgment, the circumstances require, we may resign from the engagement prior to completion.

We will design our audit to provide reasonable assurance of detecting errors or fraud that would have a material effect on the financial statements. Our work will be based primarily upon selected tests of evidence supporting the amounts and disclosures in the financial statements and, therefore, will not include a detailed check of your Company's transactions for the period. Accordingly, an audit performed in accordance with auditing standards generally accepted in the United States of America is not a guarantee of the accuracy of the financial statements, and there is a risk that material errors or fraud may exist and not be detected by us. Also, an audit is not designed to detect errors or fraud that are immaterial to the financial statements. However, we will inform you of any material errors or fraud that come to our attention. We will also inform you of illegal acts that come to our attention unless they are clearly inconsequential. In addition, during the course of our audit, financial statement misstatements may be identified, either through our audit procedures or through communication by your employees to us, and we will bring these misstatements to your attention as proposed adjustments. Management is responsible for recording such adjustments in the financial statements or otherwise concluding and confirming in a representation letter provided to us at the conclusion of our audit that the effects of the unrecorded adjustments are, both individually and in the aggregate, immaterial to the financial statements taken as a whole. At the conclusion of our audit we will communicate to the audit committee all such unrecorded adjustments.

An audit includes obtaining an understanding of internal control sufficient to plan the audit and to determine the nature, timing, and extent of audit procedures to be performed. An audit is not designed to provide assurance on internal control or to identify reportable conditions. However, we are responsible for ensuring that you are aware of any reportable conditions that come to our attention during our engagement.

## E-mail Communication

In connection with this engagement, we may communicate with you or others via e-mail transmission. As e-mails can be intercepted and read, disclosed, or otherwise used or communicated by an unintended third party, or may not be delivered to each of the parties to whom they are directed and only to such parties, we cannot guarantee or warrant that e-mails from us will be properly delivered and read only by the addressee. Therefore, we specifically disclaim and waive any liability or responsibility whatsoever for interception or unintentional disclosure or communication of e-mail transmissions, or for the unauthorized use or failed delivery of e-mails transmitted by us in connection with the



**BDO Seidman, LLP**
Accountants and Consultants

Mr. Harold Gobstein
Cardiac Management Systems
December 17, 2004
Page 3

performance of this engagement. In that regard, you agree that we shall have no liability for any loss or damage to any person or entity resulting from the use of e-mail transmissions, including any consequential, incidental, direct, indirect, or special damages, such as loss of sales or anticipated profits, or disclosure or communication of confidential or proprietary information.

## Ownership of Working Papers

The working papers prepared in conjunction with our audit are the property of our Firm, constitute confidential information, and will be retained by us in accordance with our Firm's policies and procedures.

## Reproduction of Audit Report

If the Company plans any reproduction or publication of our report, or any portion of it, copies of masters' or printers' proofs of the entire document should be submitted to us in sufficient time for our review and approval before printing. You also agree to provide us with a copy of the final reproduced material for our approval before it is distributed.

## Posting of Audit Report and Financial Statements on Your Web Site

You agree to indemnify BDO Seidman, LLP from any and all claims that may arise from any differences between the electronic version of the financial statements and audit report presented on your web site, now and in the future, and the signed version of the financial statements and audit report provided to management by BDO Seidman, LLP.

## Review of Documents for Sale of Securities

The audited financial statements and our report thereon should not be provided or otherwise made available to recipients of any document to be used in connection with the sale of securities (including securities offerings on the Internet) without first submitting copies of the document to us in sufficient time for our review and approval.

## Management Representations

As required by auditing standards generally accepted in the United States of America, we will request certain written representations from management at the close of our audit to confirm oral representations given to us and to indicate and document the continuing appropriateness of such representations and reduce the possibility of misunderstanding concerning matters that are the subject of the representations. Because of the importance



**BDO Seidman, LLP**
Accountants and Consultants

Mr. Harold Gobstein
Cardiac Management Systems
December 17, 2004
Page 4

of management's representations to an effective audit and provided the audited financial statements and our report thereon are not included in a registration statement under the Securities Act of 1933 or in a Private Placement Memorandum, Cardiac Management Systems agrees to release and indemnify BDO Seidman, LLP and its personnel from any liability and costs relating to our services under this agreement attributable to any misrepresentations by management.

## Availability of Records and Personnel

You agree that all records, documentation, and information we request in connection with our audit will be made available to us (including those pertaining to related parties), that all material information will be disclosed to us, and that we will have the full cooperation of, and unrestricted access to, your personnel during the course of the engagement.

## Assistance by Your Personnel and Internet Access

We also ask that your personnel, to the extent possible, prepare various schedules and analyses for our staff. In addition, we ask that you provide high-speed Internet access to our engagement team, if practicable, while working on the Company's premises. This assistance will serve to facilitate the progress of our work and minimize costs to you.

## Other Services

We are always available to meet with you and other executives at various times throughout the year to discuss current business, operational, accounting, and auditing matters affecting your Company. Whenever you feel such meetings are desirable, please let us know. We are also prepared to provide services to assist you in any of these areas. We will also be pleased, at your request, to attend your directors' and stockholders' meetings.

## Independence

Professional and certain regulatory standards require us to be independent, in both fact and appearance, with respect to your Company in the performance of our services. Any discussions that you have with personnel of our Firm regarding employment could pose a threat to our independence. Therefore, we request that you inform us prior to any such discussions so that we can implement appropriate safeguards to maintain our independence.



**BDO Seidman, LLP**
Accountants and Consultants

Mr. Harold Gobstein
Cardiac Management Systems
December 17, 2004
Page 5

## Dispute Resolution Procedure

If any dispute, controversy, or claim arises in connection with the performance or breach of this agreement (including disputes regarding the validity or enforceability of this agreement), either party may, upon written notice to the other party, request facilitated negotiations. Such negotiations shall be assisted by a neutral facilitator acceptable to both parties and shall require the best efforts of the parties to discuss with each other in good faith their respective positions and, respecting their different interests, to finally resolve such dispute.

Each party may disclose any facts to the other party or to the facilitator that it, in good faith, considers necessary to resolve the dispute. However, all such disclosures will be deemed in furtherance of settlement efforts and will not be admissible in any subsequent litigation against the disclosing party. Except as agreed by both parties, the facilitator shall keep confidential all information disclosed during negotiations. The facilitator shall not act as a witness for either party in any subsequent arbitration between the parties.

Such facilitated negotiations shall conclude within sixty days from receipt of the written notice unless extended by mutual consent. The parties may also agree at any time to terminate or waive facilitated negotiations. The costs incurred by each party in such negotiations will be borne by it; the fees and expenses of the facilitator, if any, shall be borne equally by the parties.

If any dispute, controversy, or claim arises in connection with the performance or breach of this agreement (including disputes regarding the validity or enforceability of this agreement) and cannot be resolved by facilitated negotiations (or the parties agree to waive that process), then such dispute, controversy, or claim shall be settled by arbitration. The arbitration proceeding shall take place in the city in which the BDO Seidman office providing the relevant services exists, unless the parties agree to a different locale. The proceeding shall be governed by the provisions of the Federal Arbitration Act (FAA) or, if a court of competent jurisdiction determines the FAA inapplicable, by the laws of the state in which the proceeding is to take place. In any arbitration instituted hereunder, the proceedings shall proceed in accordance with the then current Arbitration Rules for Professional Accounting and Related Disputes of the American Arbitration Association (AAA), except that no pre-hearing discovery shall be permitted unless specifically authorized by the arbitration panel.

Such arbitration shall be conducted before a panel of three persons, one chosen by each party and the third selected by the two party-selected arbitrators. The arbitration panel shall have no authority to award non-monetary or equitable relief, and any monetary award shall not include punitive damages. The confidentiality provisions applicable to facilitated

 **BDO**

BDO Seldman, LLP
Accountants and Consultants

Mr. Harold Gobstein
Cardiac Management Systems
December 17, 2004
Page 6

negotiation shall also apply to arbitration. The award issued by the arbitration panel may be confirmed in a judgment by any federal or state court of competent jurisdiction.

**Fees**

Our charges to your Company for the services described above for the year ending September 30, 2004, will be $49,000 plus out-of-pocket expenses. This fee is based on the following assumptions: your personnel will prepare certain schedules and analyses for us and make available to us documents for our examination as and when requested; there will be no significant changes in the internal controls, accounting systems, key personnel, or structure of the organization; there will be no significant acquisitions or disposals of businesses; and there will not be any unanticipated increases in current operations requiring significant additional audit time. Should we encounter any unforeseen problems that will warrant additional time or expense, you will be notified of the situation and, if possible, the added cost.

Our charges for other services will be agreed to separately. The arrangements described in this letter will be updated annually.

Bills will be rendered on a monthly or other periodic basis, and are due upon receipt. If payments are not received promptly, we reserve the right to stop work on the engagement.

Very truly yours,

Christopher J. Orella
Partner

Acknowledged:

By _Harold Gobstein, Treas_
       Mr. Harold Gobstein - Treas

Date _12/31/04_

G:\Health\Clients\C\Cardiac\2004\Cardiac L-20 Engmt ltr 9 04.doc

EXHIBIT 4

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
(MIAMI DIVISION)
www.flsb.uscourts.gov

In re

CARDIAC MANAGEMENT SYSTEMS,
INC., et al.,

      Debtors.
_____/

CASE NO. 08-19029-BKC-LMI, et al.
CHAPTER 7
(Jointly Administered)

KENNETH A. WELT, Chapter 7 Trustee
of the jointly administered estates of the
Debtor, Cardiac Management Systems,
Inc., and its affiliated debtors,

      Plaintiff,

v.

BDO SEIDMAN, LLP, a New York limited
liability partnership,

      Defendant.
_____/

ADV. CASE NO. 10-03060-BKC-LMI-A

## **PLAINTIFF'S FIRST REQUEST FOR PRODUCTION TO DEFENDANT**

The Plaintiff, Kenneth A. Welt ("Welt" or the "Trustee"), not individually but in his capacity as the Chapter 7 trustee of the jointly administered debtors in the pending bankruptcy case of Cardiac Management Systems, Inc., et al. (sometimes collectively referred to here as the "Debtors" or "Cardiac"), pursuant to Rule 34 of the Federal Rules of Civil Procedure as made applicable to this proceeding by Rule 7034 of the Federal Rules of Bankruptcy Procedure, hereby requests that the Defendant, BDO Seidman, LLP, produce the documents requested herein for inspection and/or copying at the law offices of Genovese Joblove & Battista, P.A., 100 Southeast Second Street, 44th Floor, Miami, Florida 33131, or such other place as the parties may agree, within the time allowed by the Rules from the date of service of hereof.

## INSTRUCTION AND DEFINITIONS

Unless otherwise specified, the following words and terms as used herein shall, when utilized, mean as follows:

I. <u>Instructions</u>

A. This document request is continuing in nature. When new knowledge or information comes to your attention you shall supplement the information supplied in the answers to the document request forthwith.

B. For each and every Request herein, you shall produce documents in your possession, custody, or control which shall include, but not be limited to, documents, objects or articles described that are in your possession or for which you have the right to secure the original or a copy from another person or entity. The fact that your investigation is continuing or discovery is incomplete is not an excuse for your failure to respond to each request as fully and completely as possible. Your responses should consist of information known to you through yourself, your agents, your attorneys, your employees, or your representatives. All documents produced pursuant to this request are to be produced as they are kept in the usual course of business, and shall be organized and labeled (without permanently marking the item produced) so as to correspond with the categories of each numbered request hereof. If copies or drafts exist of a document, the production of which has been requested herein, produce and submit for inspection and copying each and every copy and draft which differs in any way from the original document or from any copy or draft.

C. If at any time you had possession, custody, or control of any document requested herein, and such document has been lost, destroyed, discarded, or is not presently in your possession, any such documents shall be identified as completely as possible by providing the following information:

    1. The name(s) of the author(s) of the document;

    2. The name(s) of the person(s) to whom the documents or copies were sent;

    3. The date of the document;

    4. The date on which the document was received by each addressee, copyee, or its recipients;

    5. A complete description of the nature and subject matter of the document;

    6. The date on which the document was lost, discarded, or destroyed; and

    7. The manner in which the document was lost, discarded, or destroyed.

D. With respect to any document that deponent withholds under claim of privilege, the deponent shall number such documents, hold them separately, and retain them intact pending a ruling by the Court on the claimed privilege. In addition, the deponent shall provide a statement, signed by an attorney representing the deponent, setting forth as to each such document:

1.     The name(s) of the sender(s) or the document;

2.     The name(s) of the author(s) of the document;

3.     The name(s) of the person(s) to whom the document or copies were sent;

4.     The job title of every person named in subparagraphs 1, 2 and 3 above;

5.     The date of the document;

6.     The date on which the document was received by each addressee, copyee, or its recipient;

7.     A brief description of the nature and subject matter of the document; and

8.     The statute, rule, or decision which is claimed to give rise to the privilege.

E.     If, after exercising due diligence to secure or produce the document(s) requested, you cannot secure responsive documents, you must identify which Request(s) for which you do not have a responsive document, and answer the request for production to the fullest extent possible, specifying your inability to produce the document(s), and providing the identity of the person who has possession, custody, or control of the requested document(s).

F.     All words, names, and terms in this request for production shall have their plain and ordinary meanings unless specifically defined in Part II herein.

G.     Copies of documents which are identical duplicates of other documents which have already been produced for inspection and copying in this action need not be produced again, except that the duplicates must be produced if handwritten or any other type of notes or similar intelligence appear thereon or are attached thereto, including markings on slips indicating the routing of the document to individuals or organizations.

H.     The singular and plural forms shall be construed interchangeably so as to bring within the scope of this document request any information which might otherwise be construed as being outside of the scope of such request.

I.     "And" and "or" shall be construed interchangeably so as to bring within the scope of this document request any information which might otherwise be construed as being outside of the scope of such request.

J.     "Any" and "all" shall be construed to bring within the scope of this request any information which might be construed to relate to the subject matter of the request.

K.     The use of the singular form of any word includes the plural and vice versa.

L.     Unless otherwise stated herein, the time period encompassed by this Request shall include **January 1, 2004** through the date of this Request.

3

## II.    **Definitions**

1.      As used herein, the term "Trustee" or "Plaintiff" shall interchangeably mean Kenneth A. Welt, the duly appointed and acting Chapter 7 trustee for the jointly administered bankruptcy estate of Cardiac Management Systems, Inc., et al.

2.      As used herein, the term "Debtors" shall mean Cardiac Management Systems, Inc., including any of its affiliates (debtor and non-debtor affiliates), subsidiaries, assigns, authorized officers and directors, employees, attorneys, agents, and others purporting to act on its behalf.

3.      As used herein, the term "BDO" shall mean BDO Seidman, LLP, including any of its affiliates, subsidiaries, assigns, authorized officers and directors, employees, attorneys, agents, and others purporting to act on its behalf.

4.      The term "Audit" or "Audits" shall individually or collectively mean any audit BDO performed for or on behalf of the Debtors, including, but not limited to the audits performed on the Debtors' financial statements for the fiscal years ending on September 30, 2005, September 30, 2006, and September 30, 2007.

5.      The term "work papers" shall mean the work papers or working papers concerning any of the audits, including, but not limited to, any documents related to the procedures applied, the tests performed, the information obtained, specific transactions tested, and conclusions reached by you in connection to any audit, any audit programs, analysis, memoranda, letters of confirmation and representation, abstracts of Debtors' documents, schedules or commentaries prepared or obtained by you in connection with any audit, all documents in a permanent file or client file, and any other documents prepared, examined, generated, reviewed, or possessed by you in connection with any audit.

6.      The words "you", and "your" shall mean BDO, the party upon whom this request is being served, including and all of its respective affiliates, subsidiaries, assigns, authorized officers and directors, employees, agents, and others purporting to act on each of its behalf.

7.      The words "and" and "or" shall be construed as both conjunctive and disjunctive, so that a series of persons or things joined by the words "and" and "or" shall refer to any, all, or any combination of them.

8.      "Possession, custody, or control" as used herein shall have the same meaning as in Rule 34(a) of the Federal Rules of Civil Procedure.

9.      The word "person" shall mean any natural person, individual, proprietorship, partnership, corporation, association, organization, joint venture, business trust, or other business enterprise, governmental body or agency, legal or business entity, or group of natural persons, or other entity, whether *sui juris* or otherwise and includes both the singular and plural.

4

10. The terms "communication" and "communications" shall interchangeably mean any oral or written statement, dialogue, colloquy, discussion or conversation or exchange of information of any type, and any transfer of thoughts or ideas between any two or more persons, including but not limited to documents, telephone or face-to-face conversations, meetings, conferences, or transfer of data from one location to another by electronic or similar means.

11. The word "documents" shall mean any kind of written, typed, recorded or graphic matter, however produced or reproduced, of any kind or description, whether sent or received, including originals, non-identical copies and drafts of both sides thereof, and including, but not limited to, papers, books, letters, emails, text messages, correspondence, telegrams, bulletins, notices, announcements, instructions, charts, manuals, brochures, schedules, memoranda, notes, notations, transcripts, minutes, agendas, reports and recordings of telephone or other conversations, interviews, conferences, or other meetings, affidavits, statements, summaries, opinions, reports, studies, analysis, evaluations, contracts, agreements, journals, diaries, lists, tabulations, drawings, sketches, photographs, film, computer print-outs, computer data, data processing input/output, microfilms and all other records kept by electronic, photographic or mechanical means, and other things similar to any of the foregoing, including items in the possession, custody, or control of any other person, including BDO's attorneys.

12. The word "correspondence" shall mean any and all letters, facsimiles, transmitted memoranda, memorialized oral communications, e-mails, or other communications or documents exchanged or transmitted with another person or entity.

13. The words "support," "evidence," "relate to," "relating to," "related to," "referred to," "concerning," "pertaining to," and "regarding" shall mean anything which directly, or indirectly, concerns, consists of, pertains to , reflects, evidences, describes, sets forth, constitutes, contains, shows, underlies, supports, refers to in any manner, is or was used in the preparation of, appended to, legally, logically or factually connected with, proves, disproves, or tends to prove or disprove.

14. The term "Petition Date" shall mean June 30, 2008, which is the date the Debtors filed voluntary bankruptcy petitions for relief under Chapter 11 of the Bankruptcy Code.

III. **DOCUMENTS REQUESTED**[1]

1. All resumes and/or curriculum vitae, listing qualifications, educational background, and/or Continuing Professional Education (C.P.E.) listings for each of BDO's employees who were assigned, at any point in time, and/or who were actually engaged in any Audit or Audits, accounting or bookkeeping work, and/or any other professional services performed by BDO for the Debtors.

2. All documents reflecting time expended by each of BDO's employees in relation to BDO providing professional services to the Debtors, including, but not limited to, time and

---

[1] To the extent any or all documents or records responsive to the Requests are in electronic format, please contact the undersigned to arrange for their production.

expense reports, internal billing summaries, time sheets, invoices, and billing statements from January 1, 2004 to the Petition Date.

3.    All documents relating to any of the Audits performed by BDO for the Debtors, including, but not limited to, correspondence, e-mails, facsimiles, memos, individual personnel work files, firm work files, work papers, reports, report drafts, and computer records.

4.    All documents relating to any other professional services performed by BDO for the Debtors, including, but not limited to, any correspondence, e-mails, facsimiles, memos, individual personnel work files, firm work files, work papers, reports, report drafts, and computer records.

5.    All internal policy and procedural manuals relied upon by BDO's employees who were assigned, at any point in time, and/or who were actually engaged in any Audit, accounting or bookkeeping work, and/or any other professional services performed by BDO for the Debtors, including, but not limited to any audit manuals, checklists, training materials, quality control standards, or other similar documents.

6.    All documents relating to any internal policy, procedures or standards BDO uses or follows in performing audits, including, but not limited to, those applicable to the any of the Audits in this case.

7.    The BDO work papers for the Audits and all documents relating to such work papers.

8.    All documents relating to any audit plan BDO developed in connection with any of the Audits.

9.    All documents concerning any consulting work BDO performed for or on behalf of the Debtors, including, but not limited to, any correspondence, e-mails, facsimiles, memos, individual personnel work files, firm work files, work papers, reports, report drafts, and computer records.

10.    All documents concerning your retention by the Debtors, at any time and for any services, including the Audits, from January 1, 2004 to the date of this Request.

11.    All documents concerning any insurance policy or policies that may be applicable to an award of damages in this action.

12.    All documents concerning BDO's document retention policy.

13.    All engagement letters, contract(s) and agreement(s) entered into by and between BDO and the Debtors, including, but not limited to, any drafts and executed copies of such contract(s) or agreement(s).

14.    All documents and communications relating any engagement letters, contract(s) and agreement(s) between BDO and the Debtors, including, but not limited to, any

6

correspondence, e-mails, facsimiles, memos, individual personnel work files, firm work files, work papers, reports, report drafts, and computer records.

15. All documents and communications between BDO and the Debtors relating to any of the Audits or any other professional services performed by BDO for the Debtors, including, but not limited to, any correspondence, e-mails, facsimiles, memos, individual personnel work files, firm work files, work papers, reports, report drafts, and computer records.

16. All documents and correspondence between BDO and any third party relating to the Debtors, any of the Audits, or any other professional services performed by BDO for the Debtors, including, but not limited to, any correspondence, e-mails, facsimiles, memos, individual personnel work files, firm work files, work papers, reports, report drafts, and computer records.

17. All internal documents and correspondence relating to any payments received from the Debtors to pay for services rendered by BDO to the Debtors, including, but not limited to, any correspondence, e-mails, facsimiles, memos, individual personnel work files, firm work files, work papers, reports, report drafts, and computer records.

18. All documents and communications relating to any peer review reports issued by any third party to BDO from January 1, 2004 to the date of this Request, including, but not limited to, any correspondence, e-mails, facsimiles, memos, individual personnel work files, your firm's work files, work papers, reports, report drafts, and computer records.

19. All documents BDO (or anyone on its behalf) provided at any point in time to any third party relating to the Debtors in connection with the elaboration or issuance of any peer review reports.

20. All documents in the possession, custody or control of BDO related to the Debtors.

Dated this 9th day of July, 2010.

> GENOVESE JOBLOVE & BATTISTA, P.A.
> *Special Counsel for the Trustee*
> Bank of America Tower
> 100 S.E. 2nd Street, 44th Floor
> Miami, Florida 33131
> Tel: (305) 349-2300
> Fax: (305) 349-2310
>
>
> By: /s/ David C. Cimo
> David C. Cimo, Esq.
> Fla. Bar No. 087505
> Email: dcimo@gjb-law.com

7

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via email

on the below-named addressees this 9th day of July, 2010.

John B. Hutton, Esq.
Email: huttonj@gtlaw.com
D. Porpoise Evans, Esq.
Email: evansp@gtlaw.com
Greenberg Traurig, P.A.
1221 Brickell Avenue
Miami, Florida 33131
Tel. 305-579-0500

_/s/ David C. Cimo_____
David C. Cimo

8

Form CGFCRD5A (9/19/08)

# United States Bankruptcy Court
### Southern District of Florida
**www.flsb.uscourts.gov**

Case Number: 08–19029–LMI                                    Adversary Number: 10–03060–LMI

In re:
**Name of Debtor(s):** Cardiac Management Systems, Inc.
 ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━/

**Kenneth A. Welt**
Plaintiff(s)

**VS.**

**BDO Seidman, LLP**
Defendant(s)
 ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━/

## NOTICE OF HEARING

**NOTICE IS HEREBY GIVEN** that a hearing will be held on **August 27, 2010** at **10:30 AM,** at the following location:

**Claude Pepper Federal Bldg**
**51 SW First Ave Room 1409**
**Miami FL 33130**

to consider the following:

**Motion to Compel Arbitration and to Stay Discovery, or in the alternative Motion To Stay (14)**

**THIS MATTER HAS BEEN SCHEDULED FOR A TEN MINUTE HEARING. IF YOU REQUIRE MORE TIME YOU MUST CONTACT THE COURTROOM DEPUTY IMMEDIATELY FOR A SPECIAL SETTING.** **This matter has <u>not</u> been scheduled as an evidentiary hearing.** If you require an evidentiary hearing, the currently scheduled hearing will be treated as a preliminary hearing. Contact the courtroom deputy, <u>Noemi Sanabria at (305) 714–1877</u> to schedule a final evidentiary hearing.

**THE MOVANT, (OR MOVANT'S COUNSEL if represented by an attorney) SHALL SERVE A COPY OF THIS NOTICE OF HEARING** and, unless previously served, the above–described pleading on all required parties within the time frames required by the Bankruptcy Rules, Local Rules, or orders of the Court, and shall file a certificate of service as required under Local Rules 2002–1(F) and 9073–1(B). Any party who fails to properly serve any pleadings or other paper may be denied the opportunity to be heard thereon. All moving or objecting parties shall bring to the hearing proposed orders, sustaining their respective positions. **ALL PARTIES AND THEIR COUNSEL ARE EXPECTED TO REVIEW, AND COMPLY WITH, JUDGE ISICOFF'S COURTROOM PROCEDURES, AVAILABLE ON THE COURT'S WEBSITE – www.flsb.uscourts.gov**

**PLEASE NOTE:** Photo identification is required to gain entrance to all federal courthouse facilities. Electronic devices, including but not limited to cameras, cellular phones (including those with cameras), pagers, personal data assistants (PDA), laptop computers, radios, tape–recorders, etc., **are not permitted** in the courtroom, chambers or other environs of this court. These restrictions **(except for cameras not integrated into a cell phone device)** do not apply to attorneys with a valid Florida Bar identification card, attorneys who have been authorized to appear by pro hac vice order and witnesses subpoenaed to appear in a specific case. An attorney seeking entry to the Ft. Lauderdale courthouse facilities must also be admitted to practice in the Southern District of Florida or be authorized to appear by pro hac vice order. **No one is permitted to bring a camera or other prohibited electronic device into a federal courthouse facility except with a written order signed by a judge and verified by the United States Marshal's Service. See Local Rule 5072–2.**

Dated: <u>8/10/10</u>                                    **CLERK OF COURT**
                                                         By: <u>Noemi Sanabria</u>
                                                         Deputy Clerk

Form CGFCRD6A  (9/19/08)

# United States Bankruptcy Court
### Southern District of Florida
#### www.flsb.uscourts.gov

Case Number:  08–19029–LMI                                                                 Adversary Number: 10–03060–LMI

In re:
**Name of Debtor(s):** Cardiac Management Systems, Inc.
  ——————————————————————————/

**Kenneth A. Welt**
Plaintiff(s)

**VS.**

**BDO Seidman, LLP**
Defendant(s)
  ——————————————————————————/

## AMENDED NOTICE OF HEARING
Change In Time of Hearing

**NOTICE IS HEREBY GIVEN**  that a hearing will be held on **August 27, 2010** at **02:30 PM,** at the following location:

**Claude Pepper Federal Bldg
51 SW First Ave Room 1409
Miami FL 33130**

to consider the following:

**Motion to Compel Arbitration and to Stay Discovery, or in the alternative Motion To Stay (Re: [1] Complaint) Filed by Defendant BDO Seidman, LLP(14)**

**THIS MATTER HAS BEEN SCHEDULED FOR A TEN MINUTE HEARING. IF YOU REQUIRE MORE TIME YOU MUST CONTACT THE COURTROOM DEPUTY IMMEDIATELY FOR A SPECIAL SETTING.**
**This matter has not been scheduled as an evidentiary hearing.** If you require an evidentiary hearing, the currently scheduled hearing will be treated as a preliminary hearing. Contact the courtroom deputy, Noemi Sanabria at (305) 714–1877 to schedule a final evidentiary hearing.

**THE MOVANT, (OR MOVANT'S COUNSEL if represented by an attorney) SHALL SERVE A COPY OF THIS NOTICE OF HEARING** and, unless previously served, the above–described pleading on all required parties within the time frames required by the Bankruptcy Rules, Local Rules, or orders of the Court, and shall file a certificate of service as required under Local Rules 2002–1(F) and 9073–1(B). Any party who fails to properly serve any pleadings or other paper may be denied the opportunity to be heard thereon. All moving or objecting parties shall bring to the hearing proposed orders, sustaining their respective positions. **ALL PARTIES AND THEIR COUNSEL ARE EXPECTED TO REVIEW, AND COMPLY WITH, JUDGE ISICOFF'S COURTROOM PROCEDURES, AVAILABLE ON THE COURT'S WEBSITE – www.flsb.uscourts.gov**

**PLEASE NOTE:** Photo identification is required to gain entrance to all federal courthouse facilities. Electronic devices, including but not limited to cameras, cellular phones (including those with cameras), pagers, personal data assistants (PDA), laptop computers, radios, tape–recorders, etc., **are not permitted** in the courtroom, chambers or other environs of this court. These restrictions **(except for cameras not integrated into a cell phone device)** do not apply to attorneys with a valid Florida Bar identification card, attorneys who have been authorized to appear by pro hac vice order and witnesses subpoenaed to appear in a specific case. An attorney seeking entry to the Ft. Lauderdale courthouse facilities must also be admitted to practice in the Southern District of Florida or be authorized to appear by pro hac vice order. **No one is permitted to bring a camera or other prohibited electronic device into a federal courthouse facility except with a written order signed by a judge and verified by the United States Marshal's Service. See Local Rule 5072–2.**

Dated: **8/23/10**                                                        **CLERK OF COURT**

By: <u>Noemi Sanabria</u> , Deputy Clerk

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
(MIAMI DIVISION)
www.flsb.uscourts.gov

In re

CARDIAC MANAGEMENT SYSTEMS, NC., et al.,

      Debtors.

_____/

CASE NO. 08-19029-BKC-LMI
CHAPTER 7
(Jointly Administered)

KENNETH A. WELT, Chapter 7 Trustee of the jointly administered estates of the Debtor, Cardiac Management Systems, Inc. and its affiliated debtors,

      Plaintiff,

v.

BDO SEIDMAN, LLP, a New York limited liability partnership,

      Defendant.

_____/

ADV. CASE NO. 10-03060-LMI

***EX PARTE* UNOPPOSED MOTION OF CHAPTER 7 TRUSTEE KENNETH A. WELT
TO CONTINUE THE HEARING ON DEFENDANT'S MOTION TO COMPEL
ARBITRATION AND TO STAY DISCOVERY, OR ALTERNATIVELY,
TO STAY, CURRENTLY SET FOR AUGUST 27, 2010**

The Plaintiff, Kenneth A. Welt (the "Trustee"), not individually but in his capacity as the

Chapter 7 trustee of the jointly administered debtors in the pending bankruptcy case of Cardiac

Management Systems, Inc., et al., hereby files this *ex parte* unopposed motion to continue the

hearing on Defendant BDO Seidman, LLP's Motion to Compel Arbitration and to Stay

Discovery, or Alternatively, to Stay [D.E. #14], which is currently set for Friday, August 27,

2010, and says:

      1.      On May 24, 2010, the Trustee filed an Adversary Complaint for Damages and

Demand for Jury Trial against the Defendant, BDO Seidman, LLP ("BDO"), the former outside auditors for the Debtors [D.E. #1]. The Complaint alleges various acts and omissions committed by BDO, which the Trustee asserts have proximately caused damage to the Debtors.

2.     On August 9, 2010, the Defendant filed *BDO USA, LLP's Motion to Compel Arbitration and to Stay Discovery, or Alternatively, to Stay* (hereinafter, the "Motion").

3.     On August 10, 2010, the Motion was set for hearing on August 27, 2010 at 10:30 a.m. [D.E. #15] and thereafter, on August 23, 2010, was re-set for hearing on August 27, 2010 at 2:30 p.m. [D.E. #17] (hereinafter, the "Hearing").

4.     Lead special counsel for the Trustee, David C. Cimo, Esq., will be out of the State of Florida on an unrelated matter at the time of the Hearing. Understandably, because the issues to be addressed at the Hearing may potentially impact the future course of this case, Mr. Cimo wants to be present at the hearing and have the ability to meaningfully address the relief sought by BDO.

5.     Undersigned counsel has conferred with counsel for BDO and confirmed that BDO has no objection to the instant motion or the relief sought herein. Undersigned counsel also confirmed that BDO's counsel is available for hearing on the matter during the second week of October 2010. (The Trustee also filed a state court action against BDO to which BDO filed a similar motion to compel arbitration. It is anticipated that the hearing on that motion to compel arbitration will occur during the second week of October 2010).

6.     Accordingly, the Trustee respectfully requests a continuance of the Hearing to a date during the second week of October 2010 (preferably, October 12, 2010 or October 14, 2010).

7.     A continuance of this Hearing has not yet been requested.

2

8.     This motion is made in good faith and is not being interposed for the purpose of delay.

WHERFORE, the Trustee respectfully moves this Court for an order granting this *ex parte*, unopposed motion for a continuance of the Hearing on the Defendant's Motion to Compel Arbitration and to Stay Discovery, or Alternatively, to Stay, currently set for August 27, 2010 at 2:30 p.m., to a date preferably during the second week of October 2010.

Respectfully submitted this 25th day August, 2010.

**I hereby certify that I am admitted to the Bar of the United States District Court for the Southern District of FL  and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).**

GENOVESE JOBLOVE & BATTISTA, P.A.
*Special Counsel for the Trustee*
100 S.E. Second Street, 44th Floor
Miami, FL  33131
Tel. (305) 349-2300
Fax. (305) 349-2310

By: s/David C. Cimo
        David C. Cimo
        Fla. Bar. No. 775400

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via e-mail

and U.S. Mail on the below-named addressees this 25th day of August, 2010.

> John B. Hutton, Esq.
> Email: huttonj@gtlaw.com
> D. Porpoise Evans, Esq.
> Email: evansp@gtlaw.com
> Greenberg Traurig, P.A.
> 1221 Brickell Avenue
> Miami, Florida 33131
> Tel. 305-579-0500

>    /s/ David C. Cimo
>       David C. Cimo

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
(MIAMI DIVISION)
www.flsb.uscourts.gov

In re

CARDIAC MANAGEMENT SYSTEMS,
NC., et al.,

     Debtors.

_____/

KENNETH A. WELT, Chapter 7 Trustee
of the jointly administered estates of the
Debtor, Cardiac Management Systems,
Inc. and its affiliated debtors,

     Plaintiff,

v.

BDO SEIDMAN, LLP, a New York limited
liability partnership,

     Defendant.

_____/

CASE NO. 08-19029-BKC-LMI
CHAPTER 7
(Jointly Administered)

ADV. CASE NO. 10-03060-LMI

**ORDER GRANTING *EX PARTE* UNOPPOSED MOTION OF CHAPTER 7 TRUSTEE KENNETH A. WELT TO CONTINUE THE HEARING ON DEFENDANT'S MOTION TO COMPEL ARBITRATION AND TO STAY DISCOVERY, OR ALTERNATIVELY, TO STAY, CURRENTLY SET FOR AUGUST 27, 2010**

THIS MATTER came before the Court on the *Ex Parte Unopposed Motion of Chapter 7 Trustee Kenneth A. Welt to Continue the Hearing on Defendant's Motion to Compel Arbitration and to Stay Discovery, or Alternatively, to Stay, Currently Set for August 27, 2010* [D.E. #__] (the "Motion"). The Court, having considered the Motion, the position of the parties, and being otherwise duly advised in the premises, finds and concludes that it is appropriate to grant the Motion. Accordingly, it is:

**ORDERED** as follows:

1.      The Motion is **GRANTED**.

2.      The hearing on *BDO USA, LLP's Motion to Compel Arbitration and to Stay Discovery, or Alternatively, to Stay* [D.E. #14] is rescheduled for _____, 2010 at _____. The hearing will be conducted at the United States Courthouse, Claude Pepper Federal Bldg., 51 SW First Ave Room 1409, Miami, Florida 33130.

Submitted by:

David C. Cimo, Esq.
GENOVESE JOBLOVE & BATTISTA, P.A.
*Special Counsel for the Trustee*
 100 S.E. Second Street, 44th Floor
 Miami, FL  33131
 Telephone: (305) 349-2300
 Facsimile: (305) 349-2310
 Email: dcimo@gjb-law.com

 *(Attorney Cimo is directed to serve a copy of this Order on all parties entitled to service and to file with the Court a Certificate of Service).*



ORDERED in the Southern District of Florida on *Aug. 26, 2010*

Laurel Myerson Isicoff, Judge
United States Bankruptcy Court

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
(MIAMI DIVISION)
www.flsb.uscourts.gov

In re

CARDIAC MANAGEMENT SYSTEMS,
NC., et al.,

     Debtors.

_____/

KENNETH A. WELT, Chapter 7 Trustee
of the jointly administered estates of the
Debtor, Cardiac Management Systems,
Inc. and its affiliated debtors,

     Plaintiff,
v.

BDO SEIDMAN, LLP, a New York limited
liability partnership,

     Defendant.

_____/

CASE NO. 08-19029-BKC-LMI
CHAPTER 7
(Jointly Administered)

ADV. CASE NO. 10-03060-LMI

**ORDER GRANTING *EX PARTE* UNOPPOSED MOTION OF CHAPTER 7 TRUSTEE KENNETH A. WELT TO CONTINUE THE HEARING ON DEFENDANT'S MOTION TO COMPEL ARBITRATION AND TO STAY DISCOVERY, OR ALTERNATIVELY, TO STAY, CURRENTLY SET FOR AUGUST 27, 2010**

THIS MATTER came before the Court on the *Ex Parte Unopposed Motion of Chapter 7 Trustee Kenneth A. Welt to Continue the Hearing on Defendant's Motion to Compel Arbitration and to Stay Discovery, or Alternatively, to Stay, Currently Set for August 27, 2010* [D.E. #__] (the "Motion"). The Court, having considered the Motion, the position of the parties, and being otherwise duly advised in the premises, finds and concludes that it is appropriate to grant the Motion. Accordingly, it is:

ORDERED as follows:

1.    The Motion is **GRANTED**.

2.    The hearing on *BDO USA, LLP's Motion to Compel Arbitration and to Stay Discovery, or Alternatively, to Stay* [D.E. #14] is rescheduled for ___*Oct. 18*___, 2010 at ___*3:00 p.m.*___ The hearing will be conducted at the United States Courthouse, Claude Pepper Federal Bldg., 51 SW First Ave Room 1409, Miami, Florida 33130.

Submitted by:

David C. Cimo, Esq.
GENOVESE JOBLOVE & BATTISTA, P.A.
*Special Counsel for the Trustee*
100 S.E. Second Street, 44th Floor
Miami, FL 33131
Telephone: (305) 349-2300
Facsimile: (305) 349-2310
Email: dcimo@gjb-law.com

*(Attorney Cimo is directed to serve a copy of this Order on all parties entitled to service and to file with the Court a Certificate of Service).*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
(MIAMI DIVISION)
www.flsb.uscourts.gov

In re

CARDIAC MANAGEMENT SYSTEMS,
NC., et al.,

      Debtors.

_____/

KENNETH A. WELT, Chapter 7 Trustee of
the jointly administered estates of the Debtor,
Cardiac Management Systems, Inc. and its
affiliated debtors,

      Plaintiff,

v.

BDO SEIDMAN, LLP, n/k/a BDO USA, LLP
a New York limited liability partnership,

      Defendant.

_____/

CASE NO. 08-19029-BKC-LMI
CHAPTER 7
(Jointly Administered)

ADV. CASE NO. 10-03060-LMI

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO
COMPEL ARBITRATION AND TO STAY DISCOVERY,
OR ALTERNATIVELY, TO STAY [D.E. #14]**

The Plaintiff, Kenneth A. Welt (the "Trustee"), not individually but in his capacity as the

Chapter 7 trustee of the jointly administered debtors in the pending bankruptcy case of Cardiac

Management Systems, Inc., et al., and through undersigned counsel, respectfully submits this

response in opposition to *BDO USA, LLP's Motion to Compel Arbitration and to Stay Discovery,

or Alternatively, to Stay* [D.E. #14] (the "Motion").  For the reasons set forth below, the Motion

should be denied in its entirety.

# I.      Preliminary Statement

This is an action in which the Trustee seeks to avoid and recover transfers and improperly incurred obligations made from and by the Debtor to the Defendant, BDO Seidman, LLP, n/k/a BDO USA, LLP (hereinafter, "BDO") in the four years prior to the Petition Date purportedly for audit and accounting services rendered by BDO for, or on behalf of, the Debtor.  The Trustee seeks to avoid the fraudulent transfers in accordance with Sections 544, and 548 of the Bankruptcy Code and Chapter 726 of the Florida Statutes, and to recover the same pursuant to Section 550 of the Bankruptcy Code.

Pursuant to its authority to oversee the orderly and efficient administration of the Debtor's bankruptcy estate and preserve potential assets for the benefit of the estate's creditors, this Court has subject matter jurisdiction over the parties and the fraudulent transfer claim asserted by the Trustee.  Nonetheless, BDO has moved to compel arbitration in this case under the provisions of the Federal Arbitration Act (the "FAA") on the grounds that the Trustee is bound by the arbitration provisions contained in Engagement Agreements the Debtor entered into with BDO.

Notably, however, the Trustee's only claim in this case – avoidance and recovery of fraudulent transfers under 11 U.S.C. § 544, 548 and 550 – is a "core" claim under the Bankruptcy Code.  Although BDO argues that the fact that the claim is a "core" claim under the Bankruptcy Code is, essentially, of no moment for purposes of compelling arbitration, BDO is wrong.  To be sure, the claim in this case is not derivative from the Debtor under contract law.  Rather, the claim arises directly under specific provisions of the Bankruptcy Code and exists within the exclusive province of federal bankruptcy law.  Thus, the claim not only should not, but cannot, be arbitrated as a matter of law.

## II.    Factual and Procedural Background

In the Adversary Complaint for Damages and Demand for Jury Trial against BDO, the Trustee alleges that as a result of BDO's acts and omissions in connection with its audits of the Debtor's financial information, the Debtor's financial condition was materially and substantially misstated and misrepresented leading to, at the very least, increased insolvency of the company.

Based on BDO's conduct, the Trustee alleges that the Debtor did not receive reasonably equivalent value in exchange for the payments made to BDO and seeks the avoidance and recovery of all such payments.  Contrary to BDO's argument, the Trustee's allegations do not arise from, nor are they dependent on, BDO's contractual obligations with the Debtor.  To be sure, the Trustee makes only a passing reference in the Complaint to the Engagement Agreements entered into between BDO and the Debtor and alleges that the terms of the Agreements were materially unfavorable to the Debtor.  Rather, the claim against BDO arises, in part, from BDO's failure to comply with professional guidelines and standards, generally.  Indeed, the allegations focus on BDO's improper and flawed accounting methods and failure to conform to Generally Accepted Auditing Standards ("GAAS") – standards not even referenced in the Engagement Agreements.

Alternatively, the Trustee also seeks to avoid and recovery the transfers made to BDO based on the Debtor's actual intent to hinder and delay creditors in making those payments.  Notably, BDO wholly ignores this fact in its Motion – notwithstanding the fact that the Trustee devotes page after page to this issue in the Complaint.  The Trustee submits that there is simply no rational basis (and none has been argued by BDO) for the compelled arbitration of the actual fraudulent transfer claim in this case.

Based on the arbitration provision contained in each of the Engagement Agreements attached to its Motion, BDO now seeks to compel the Trustee to arbitrate the fraudulent transfer claim. However, the Engagement Agreements were entered into between the Debtor and BDO – the Trustee was not a party to any of those Agreements. Indeed, the Trustee has not entered into any agreement to arbitrate the core claim in this case, and contests the applicability of the arbitration provision to this proceeding. Furthermore, each Engagement Agreements is for BDO's audit of the Debtor's consolidated balance sheet and related statements for the year then ending in September. Thus, each Engagement Agreement covers a one year period ending in the month of September. BDO attached three (3) Engagement Agreements to its Motion. It did not reference or attach agreements for the years ending September 2005 and September 2008. Thus, there is no even arguably applicable arbitration provision concerning BDO's professional conduct from October 2004 – September 2005 or from October 2007 – September 2008 and BDO received transfers during these time periods..

## III.     Legal Argument and Citation to Authority

### A.     This Court has subject matter jurisdiction over the claim in this case.

By arguing that arbitration is "required" in this case, BDO is essentially challenging the subject matter jurisdiction of this Court. Undoubtedly, however, this Court has subject matter jurisdiction over the fraudulent transfer claim under 28 U.S.C. § 1334. Section 1334 provides that "Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred to under subsection (a) of this section …." 28 U.S.C. § 1334(b)(1). It is well-settled that bankruptcy courts have jurisdiction over core (and non-core related) bankruptcy proceedings. *See, e.g., Matter of Wood*, 825 F.2d 90, 92 (5th Cir. 1987); *Halper v. Halper*, 164 F.3d 830, 835 (3d Cir. 1999). Section 157 of the

Bankruptcy Code provides a non-exhaustive list of "core proceedings." 28 U.S.C. § 157. The Fifth Circuit has clarified that "[a] proceeding is core under section 157 if it invokes a substantive right provided by Title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case." *Wood*, 825 F.2d at 97.

Here, the Trustee's fraudulent transfer claim is unquestionably a core proceeding arising under the Bankruptcy Code. *See* 28 U.S.C. § 157(2)(A) ("matters concerning the administration of the estate") and 157(2)(H) ("proceedings to determine, avoid, or recover fraudulent conveyances"). The fraudulent transfer claim clearly meets the disjunctive two-prong test set forth in *Wood* as it invokes substantive rights provided by Title 11 or could arise only in the context of a bankruptcy case. Because this action arises out of a claim that is specifically available to the Trustee under the Bankruptcy Code, the claim is related to the administration of the estate and the Court has subject matter jurisdiction.

**B.      The fraudulent transfer claim is not subject to arbitration.**

Notwithstanding the Court's jurisdiction over the claim in this case, BDO asserts that the Court is required by the FAA to send this case to arbitration. BDO is wrong. Most importantly, it is undisputed that the Trustee has not entered into any arbitration agreement with BDO. Further, even assuming the purported validity of the arbitration provisions in the Engagement Agreements entered into between the Debtor and BDO, the Trustee is not required to arbitrate his core bankruptcy claim.

The arbitration provision at issue in this case essentially provides for the arbitration of "any dispute, controversy, or claim [that] arises in connection with the performance or breach of th[e] [services] agreement (including disputes regarding the validity and enforceability of this agreement)…." Although this provision is extremely encompassing, its breath is not unlimited

to necessarily include core bankruptcy claims. Furthermore, as set forth above, there is no

agreement – and accordingly no arbitration provision – even arguably covering BDO's conduct

from October 2005 – September 2005 or from October 2007 – September 2008. In sum, the

arbitration provision that is at issue does not require arbitration of the specific bankruptcy claim

asserted by the Trustee in this case.

For example, in *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d

1149 (3d Cir. 1989), a securities broker moved to compel arbitration of claims brought by a

Chapter 11 bankruptcy trustee for violations of various federal and state securities laws, as well

as for fraudulent conveyance and constructive trust under 11 U.S.C. §544(b). *Id*. at 1149. The

lower court compelled arbitration of the securities claims, but found that the two bankruptcy

claims brought under section 544(b) were not subject to arbitration because they were not

derivative of the debtor. *Id*. at 1155. In affirming, the Third Circuit specifically found that the

trustee – and the creditors that the trustee represented – were not required to arbitrate the core

claims because:

> [Such claims] are not derivative of the bankrupt. They are creditor
> claims that the [Bankruptcy] Code authorizes the Trustee to assert
> on their behalf. The Supreme Court has made it clear that it is the
> ***parties*** to an arbitration agreement who are bound by, it and whose
> intentions must be carried out. Thus there is no justification for
> binding creditors to an arbitration clause with respect to claims that
> are not derivative from one who was a party to it. It follows that
> the Trustee cannot be required to arbitrate its section 544(b) claims
> and that the district court was not obligated to stay them pending
> arbitration.

*Id*. (emphasis in original). Other courts have agreed with the *Hays* analysis and have similarly

held that core claims are generally not arbitrable. *See also, In re Hagerstown Fiber Limited*

*P'ship v. Landegger*, 277 B.R. 181, 210 (Bankr. S.D.N.Y. 2002) (holding that fraudulent transfer

claims asserted by a trustee were not arbitrable, as "the Debtor's contractual rights cannot limit

the trustee's more extensive statutory powers to perform his duties"); *In re Oakwood Homes Corp.*, No. 02-13396PJW, Adv. No. 04-56928PBL, 2005 WL 670310 at *4 (Bankr. D. Del. Mar. 18, 2005) (fraudulent conveyance claims under the Bankruptcy Code are creatures of statute, available in bankruptcy to a trustee solely for the benefit of creditors of the debtor, and, as such, are not arbitrable); *Pardo v. Pacificare of Tex., Inc. (In re APF Co.)*, 264 B.R. 344, 363 (Bankr. D. Del. 2001) (holding that preferential transfer claims brought under section 547 are not arbitrable); *In the Matter of National Gypsum Company*, 118 F.3d 1056 (5th Cir. 1997) (core declaratory judgment action by debtor against liability insurer to collect pre-confirmation debts is not arbitrable); *In re Mintze*, 288 B.R. 95 (Bankr. E.D. Pa. 2003) (core proceeding to determine validity, priority and extent of lien is not arbitrable).

This Court can and should exercise its discretion to deny BDO's Motion on the grounds that compelling arbitration in this case would conflict with the underlying purposes of the Bankruptcy Code. *See McMahon*, 482 U.S. at 225-26; *Durango Georgia Paper*, 309B.R. at 401. In *McMahon*, the United States Supreme Court recognized that despite the "federal policy favoring arbitration," that policy, at times, must be "overridden by a contrary congressional command." 482 U.S. at 226. The Court then proceeded to formulate a disjunctive three-part test to determine when a mandate to arbitrate may be overridden: "If Congress did intend to limit or prohibit waiver of a judicial forum for a particular claim, such an intent will be deducible from the statute's text, or legislative history, or from an inherent conflict between arbitration and the statute's underlying purposes." *Id.* at 227.

Here, there are inherent conflicts between the FAA and the Bankruptcy Code with respect to the claim at issue in this case. The question of whether and when a bankruptcy court may exercise its discretion to deny enforcement of an otherwise applicable arbitration clause under

the *McMahon* test has been addressed most recently in *Brown v. Mortgage Electronic Systems, Inc.*, 354 B.R. 591 (D.R.I. 2006), which noted that

> [t]he proper resolution of this question requires the Court to weigh competing statutory directives and implicates important principles regarding the relationship between the FAA, which requires enforcement of arbitration agreements, and the Bankruptcy Code, which centralizes disputes into a single forum and allows for the waiver of alternative dispute fora.

*Id.* at 594.

In *Brown*, the district court was presented with the question of whether the bankruptcy court acted properly in denying a motion to compel arbitration of a Chapter 13 debtor's adversary proceeding against the debtor's mortgagee and bank seeking rescission of the debtor's loan consolidation agreement based on violations of the federal Truth in Lending Act ("TILA"). In holding that the Bankruptcy Court did not abuse its discretion in denying defendants' motion to compel arbitration, the court first discussed the "competing principles" that framed the inquiry. "On the one hand," the *Brown* court observed, the FAA "was intended to reverse centuries of judicial hostility to arbitration agreements by placing arbitration agreements upon the same footing as other contracts." *Id.* (citing *McMahon*, 482 U.S. at 225-26). On the other hand, the Bankruptcy Code "offers a counter imperative" given that "[t]he very purpose of bankruptcy is to modify the rights of debtors and creditors." *Id.* Indeed, as the Court further observed, in contrast to the decentralizing impact of arbitration, "one of the core goals of bankruptcy is to centralize all disputes concerning the property of the debtor's estate." *Id.* at 595 (citing *Shugrue v. Airline Pilots Ass'n Int'l*, 922 F.2d 984, 989 (2d Cir. 1990) and *Societe Nationale Algerienne Pour La Recherche, La Production, Le Transport, La Transformation et La Commercialisation des Hydrocarbures v. Distrigas Corp*, 80 B.R. 606, 610 (D. Mass. 1987)).

Characterizing this as a potential "conflict of polar extremes," the *Brown* court went on to observe that different courts have used different analyses leading to different results in applying the *McMahon* test. *Id*. at 595-599 (citations omitted). Seeking to harmonize the recent case law or alternatively to determine the most appropriate approach, the *Brown* court then proceeded to review three different approaches taken in three recent appellate decisions.

*Brown* first considered the Fourth Circuit's analysis in *In re White Mountain Mining Co., L.L.G.*, 403 F.3d 164 (4th Cir. 2005), where the underlying conflict concerned core claims seeking to determine whether pre-petition cash advances were debt or equity. In that case, the Fourth Circuit applied the *McMahon* framework and found an inherent conflict between the Bankruptcy Code's intent to "centralize disputes about a debtor's assets and legal obligations" and the FAA's policy favoring arbitration. *Brown*, 354 B.R. at 596-97 (citing *In re White Mountain*, 403 F.3d at 169). The court affirmed the rulings of the lower court declining to compel arbitration. As *Brown* explained the Fourth Circuit's holding by its recognition that

> "the very purpose of bankruptcy is to modify the rights of debtors and creditors," and that "Congress intended to centralize disputes about a debtor's assets and legal obligations in the bankruptcy courts." Contrasting this with arbitration, the [Fourth Circuit] reasoned that "permitting an arbitrator to decide a core issue" would frustrate the goal of bankruptcy to centralize decision-making.

*Brown*, 354 B.R. at 596 (quoting *White Mountain*, 403 F.3d at 169-170).

*Brown* next considered the Third Circuit's decision in *Mintze v. American Gen. Fin. Servs. (In re Mintze)*, 434 F.3d 222 (3d Cir. 2006).  In *Mintze* – a case, like *Brown*, that involved "core" federal TILA claims but no claims created under the Bankruptcy Code – the court declined to rely on the distinction between core and non-core claims. Instead, the Third Circuit found that "nonenforcement of an otherwise applicable arbitration provision turns on the underlying nature of the proceedings, i.e., whether the proceeding derives exclusively from the

provisions of the Bankruptcy Code and, if so, whether the arbitration proceeding would conflict with the purposes of the Code." *Brown*, 354 B.R. at 597 (quoting *Mintze*, 434 F.3d at 231). Because the claims at issue in *Mintze* were exclusively TILA based claims, the court did not find any conflict between the FAA and the "statutory rights" at issue in that case, i.e., between the purposes of the FAA and the purposes of TILA. In sum, "because the 'statutory claims' raised by the debtor arose from TILA rather than any statutory right created by the Bankruptcy Code, there could be no inherent conflict between the Bankruptcy Code and the FAA." *Brown*, 354 B.R. at 599 (citing *Mintze*, 434 F.3d at 231).

Finally, *Brown* reviewed the Second Circuit's decision in *MBNA America Bank N.A. v. Hill*, 436 F.3d 104 (2d Cir. 2006), which involved a debtor's filing of a putative class action based upon certain events that occurred during her bankruptcy proceeding. *Brown*, 354 B.R. at 597-598. There, the Second Circuit agreed that "bankruptcy courts are more likely to have discretion to refuse to compel arbitration of core bankruptcy matters" because they "implicate more pressing bankruptcy concerns," but nonetheless declined to establish a "bright line" rule that core bankruptcy matters will always confer such discretion. Instead, the court required "a particularized inquiry into the nature of the claim and the facts of the specific bankruptcy." *Brown*, 354 B.R. at 598 (citing *Hill*, 436 F.3d at 108). Turning to the specific facts in *Hill*, including the fact that administration of the debtor's estate was complete and that the claim was brought as a putative class action that sharply diminished any direct connection to the estate at issue, *Hill* held that the claims should be arbitrated. *Hill*, 436 F.3d at 109.

The *Brown* court then attempted to reconcile the disparate results obtained through application of the *McMahon* analysis and found that the "divergent outcomes" could be explained by "a misperception of the nature of arbitration agreements and the function of the

FAA in enforcing such agreements." *Brown*, 354 B.R. at 600. Noting that arbitration agreements are comparable to "contractual choice-of-forum provisions" or, alternatively, "a specialized kind of forum selection clause," *Brown* went on to find that *Mintze* and *Hill* "undermine[] the well-settled intent of the FAA to place arbitration agreements on the same footing as other contracts and elevate[] arbitration agreements over and above other analogous forum selection agreements" *Brown*, 354 B.R. at 601. Instead, as *Brown* further explained, "forum selection clauses in core contract proceedings are not uniformly enforceable because such enforcement would undermine the goal of centralizing bankruptcy proceedings." *Id.* at 602 (citing *N. Parent, Inc. v. Cotter & Co (In re Parent, Inc.)*, 221 B.R. 609, 622 (Bankr. D. Mass. 1998) (collecting cases)). *See also Prima Paint Corp. v. Floyd & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.l2 (1967) (purpose of FAA is "to make arbitration agreements as enforceable as other contracts, *but not more so*") (emphasis added).

Ultimately, the *Brown* court resolved its inquiry by holding that the approach adopted by the Fourth Circuit in *White Mountain* "best applies the [*McMahon*] framework," and that "a bankruptcy court retains discretion to decide whether and when to compel arbitration if the at-issue proceeding" is core." *Id.* at 602-03. Therefore, even though the core claim at issue in *Brown* was predicated on the debtor's statutory rights under TILA rather than on a trustee's statutory rights under the Bankruptcy Code (such as rights to bring fraudulent conveyance claims under the Bankruptcy Code), *Brown* upheld the decision of the bankruptcy judge on the grounds that "compelling in this case would be inconsistent with the purpose of the bankruptcy laws to centralize disputes about a debtor's legal obligations so that reorganization can proceed efficiently."

The comprehensive analysis in *Brown* confirms that where, as here, there are only core

claims which derive directly from the Bankruptcy Code that effectively seek to adjust the rights of creditors and where the bankruptcy process is in its infancy and still ongoing, this Court has more than ample discretion to find an inherent and direct conflict in this case between the FAA's interest in arbitration and the Bankruptcy Code's interest in adjusting the rights of the bankruptcy estate's creditors under the Bankruptcy Code and in centralizing all such disputes into one forum sufficient to warrant retention of jurisdiction by the Court in this case.

Accordingly, this Court should use its discretion and deny BDO's motion to compel arbitration of the fraudulent transfer claim in this case.

### C. The Defendant's request for stay of this proceeding pending arbitration of the State Court Action should also be denied.

BDO's argument for a stay of this proceeding falls on a number of fronts. First, BDO's argument is premised on the entry of an order compelling arbitration in the State Court Action – an order which has not, and may never, come to pass. Although a motion to compel arbitration has been filed in the State Court Action – and notwithstanding BDO's optimism with respect to the disposition of that motion – *whether* the State Court will rule in BDO's favor and *when* such a ruling will be issued, remains to be seen. The Trustee should not be made to wait on a day that may never come.

Second, BDO's argument that a stay is warranted because "the outcome of [this proceeding] will depend on the arbitrator's decision [in the State Court Action]" is completely erroneous. Notably, courts generally stay proceedings of non-arbitrable claims when it is feasible to proceed with the litigation and allow the arbitration and the lawsuit to each proceed in its normal course. *See, e.g., Klay v. All Defendants*, 389 F.3d 1191, 1204 (11th Cir. 2004). Crucial to this determination is "whether the outcome of the non-arbitrable claims will depend upon the arbitrator's decisions." *Id.* Here, the Trustee's ability to prove "reasonable equivalent

value" for purposes of the constructive fraudulent transfer claim is not dependent on whether an arbitrator determines that BDO is liable for professional negligence. (This is especially true in light of the fact that the Trustee will ultimately be entitled to discovery – an avenue of exploration typically not permitted in an arbitration proceeding.)

Further, even assuming there is a meaningful correlation between a the Trustee's ability to prove BDO's failure to provide "reasonably equivalent value" and an arbitrator's finding of liability for "professional negligence", BDO has completely ignored the fact that the Trustee has also alleged actual fraudulent transfer claims in this case. The Trustee's ability to show that the Debtor intended to hinder or delay creditors in making payments to BDO will by no means be affected by an arbitrator's finding of whether BDO committed professional negligence.

Based on the foregoing, BDO's request for a stay of this proceeding pending the final resolution of any arbitration that may (or may not) be directed by the State Court, should be denied. *See* 11 U.S.C. § 105(a) ("court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of th[e] [Code]").

## IV.    Conclusion

As set forth above, this Court has exclusive jurisdiction over the fraudulent transfer claim at issue in this case as the claim is not derivative from the Debtor and therefore is not subject to arbitration under any scenario. Furthermore, this Court should deny BDO's request to stay this proceeding. The fraudulent transfer claim should be adjudicated on the merits without delay by this Court. Moreover, if the parties are compelled to arbitrate in the State Court Action, it is that proceeding that should be stayed pending the conclusion of a trial in this case. Accordingly, the Trustee respectfully requests the entry of an Order denying the Motion in its entirety.

Respectfully submitted this 14th day October, 2010.

**I hereby certify that I am admitted to the Bar of the United States District Court for the Southern District of FL and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).**

GENOVESE JOBLOVE & BATTISTA, P.A.
*Special Counsel for the Trustee*
100 S.E. Second Street, 44th Floor
Miami, FL 33131
Tel. (305) 349-2300
Fax. (305) 349-2310

By: /s/ David Cimo
   David C. Cimo
   Fla. Bar. No. 775400


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via e-mail and U.S. Mail on the below-named addressees this 14th day of October, 2010.

John B. Hutton, Esq.
Email: huttonj@gtlaw.com
D. Porpoise Evans, Esq.
Email: evansp@gtlaw.com
Greenberg Traurig, P.A.
1221 Brickell Avenue
Miami, Florida 33131
Tel. 305-579-0500


   /s/ David C. Cimo
      David C. Cimo

**ORDERED in the Southern District of Florida on November 01, 2010.**

**Laurel M. Isicoff, Judge**
**United States Bankruptcy Court**

---

### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF FLORIDA
(MIAMI DIVISION)
www.flsb.uscourts.gov

In re:                                                          Chapter 7

CARDIAC MANAGEMENT SYSTEMS, INC.                Case No. 08-19029-BKC-LMI
                                                               (Jointly Administered)
                         Debtor.
_____/

KENNETH A. WELT, Chapter 7 Trustee
of the jointly administered estates of the
Debtor, Cardiac Management Systems,
Inc. and its affiliated debtors,

                         Plaintiff,

v.                                                              Adv. Pro. No. 10-03060-LMI

BDO SEIDMAN, LLP, n/k/a BDO USA, LLP,
a New York limited liability partnership,

                         Defendant.
_____/

### ORDER GRANTING BDO USA, LLP'S MOTION TO COMPEL
### <u>ARBITRATION AND TO STAY DISCOVERY</u>

THIS CAUSE came before the Court on October 18, 2010, at 3:00 p.m., on BDO USA, LLP's Motion to Compel Arbitration and to Stay Discovery, Or Alternatively, to Stay [D.E. 14] (the "Motion"). The Court having heard argument of counsel, being duly advised in the premises, and for the reasons stated on the record, it is hereby ordered and adjudged:

1.      The Motion is granted.

2.      The parties shall participate in arbitration pursuant to the terms of the Engagement Agreements (as defined in the Motion).

3.      This adversary proceeding is stayed, pending the conclusion of the arbitration. If the arbitrators decline to address any of the legal claims in this adversary proceeding, the parties may thereafter proceed with the litigation of any remaining issues in this Court, and any factual or legal issues determined by the arbitrators shall have preclusive effect, by application of res judicata and collateral estoppel.

###

Submitted by and copies to be furnished to:

John B. Hutton, Esq.
GREENBERG TRAURIG, P.A.
Attorneys for BDO Seidman, LLP n/k/a
BDO USA, LLP
1221 Brickell Avenue
Miami, Florida 33131
huttonj@gtlaw.com
Fax: (305) 579-0717

[Attorney Hutton is hereby directed to serve a conformed copy of this Order immediately upon receipt of same on all interested parties and to file a certificate of service with the Court.]

*NY 240,679,055v2 10-21-10*

2

Page 1

1                    UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF FLORIDA
2

                     Judge Laurel M. Isicoff
3

4    IN RE:

5    CARDIAC MANAGEMENT SYSTEMS,   CASE NO: 08-19029-BKC-LMI
             Debtor.
6    _____ /

7    KENNETH A. WELT,             CASE NO: 10-3060-BKC-LMI
             Plaintiff,

8    vs
     BDO SEIDMAN, LLP,

9            Defendant.
     _____ /

10

11           MOTION TO COMPEL ARBITRATION AND TO STAY
             DISCOVERY, OR IN THE ALTERNATIVE MOTION TO
12           STAY (14)

13
                          OCTOBER 18, 2010

14

15

16           The above-entitled cause came on for hearing

17   before the HONORABLE LAUREL M. ISICOFF, one of the

18   judges in the UNITED STATES BANKRUPTCY COURT, in and

19   for the SOUTHERN DISTRICT OF FLORIDA AT LARGE, at 51

20   SW 1st Avenue, Miami, Dade County, Florida, commencing

21   at or about 3:00 p.m., on October 18th, 2010, and the

22   following proceedings were had:

23

24                   Reported by: Carmen E. De La Cruz

25

Page 2

```
 1              APPEARANCES:

 2         GENOVESE JOBLOVE & BATTISTA, P.A., by

           DAVID C. CIMO, Esquire

 3         On behalf of Kenneth A. Welt, Plaintiff.

 4

           GREENBERG TRAURIG, by

 5         JOHN B. HUTTON, Esquire

           On behalf of BDO Seidman, LLP, Defendant.

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

```
 1              THE COURT:  Okay.  Cardiac.  Welt versus
 2   BDO Seidman.  I will take appearances starting, I
 3   guess, with Mr. Hutton since he's up at the podium.
 4              MR. HUTTON:  Thank you, Your Honor.
 5   John Hutton on behalf of Defendant, BDO.
 6              MR. CIMO:  Your Honor, David Cimo from
 7   Genovese Joblove & Battista on behalf of the
 8   Plaintiff, Chapter 7 Trustee, Kenneth Welt.
 9              THE COURT:  Okay.  All right.  So I have
10   reviewed the complaint, I have reviewed the motion to
11   compel arbitration, I have reviewed the plaintiff's
12   response and I have reviewed various and sundry cases
13   that were cited by the parties in their papers.
14              So, Mr. Hutton, since this is your motion
15   I'll ask you if there's anything you'd like to add or
16   repeat or highlight or pound into my head in case I
17   didn't understand it from your motion before I start
18   asking you the questions that I have?
19              MR. HUTTON:  Certainly, Your Honor.  We
20   believe that the issue before the Court is whether
21   this lawsuit by the Trustee, asserting that BDO failed
22   to conduct audits in accordance with general accepted
23   -- generally accepted accounting standards in the
24   United States as a representative that it would do in
25   the engagement letters is subject to arbitration as
```

Page 4

1    provided in those engagement letters.

2          We believe this is essentially a breach of

3    contract and professional negligence claim that is

4    cast as a fraudulent transfer claim, by alleging that

5    because BDO failed to conduct a proper audit, the

6    $215,000 in fees that it was paid over four years was

7    a fraudulent transfer.  In other words, because it was

8    a bad audit or there were bad audits over the four

9    year period, that the debtor did not, Cardiac

10   Management Services, did not receive reasonably

11   equivalent value.

12         The -- we would point out to the Court and

13   I want to highlight that the arbitration clause in the

14   litigation -- in the engagement letters before the

15   Court is very broad and provides that any claims

16   relating to BDO's audits are required to be resolved

17   in arbitration.  It's the arbitration provision that

18   the trustee admits in his response on Page 5 is very

19   broad.  And although we believe the trustee has

20   attempted to draft around the arbitration agreement by

21   attaching a fraudulent transfer label to his

22   allegations, the -- we believe the trustee's equitably

23   estopped from objecting to arbitration because his

24   claims are based upon the auditing services BDO

25   provided pursuant to those very same engagement

Page 5

1    agreements, including whether BDO conducted audits

2    that failed to meet professional standards, and

3    whether the trustee is entitled to a refund of the

4    fees paid as a result.

5                    Your Honor, we point out that the

6    equitable estoppel argument is not even addressed by

7    the trustee in the response, but it is a doctrine that

8    applies here both under recent Supreme Court authority

9    and under Eleventh Circuit authority.  And we think

10   the doctrine does require these claims be arbitrated.

11                   THE COURT:  Okay.

12                   MR. HUTTON:  I wanted to highlight some of

13   the procedural history of this case because I think

14   it's also important here.  As alleged in the

15   complaint, CMS filed bankruptcy Chapter 11 on June

16   30th, of 2008.

17                   THE COURT:  Uh-huh.

18                   MR. HUTTON:  That's about two years and

19   four months ago.

20                   THE COURT:  Uh-huh.

21                   MR. HUTTON:  On October 20th, of 2008

22   Cardiac sold substantially all of its assets pursuant

23   to a Section 363 sale, that's almost two years ago to

24   the day.

25                   THE COURT:  Uh-huh.

1          MR. HUTTON:  And on November 13th, of 2008

2    the case was converted to Chapter 7, and Welt was

3    appointed as trustee just under two years ago.  So

4    this case is certainly not in its infancy as suggested

5    by the trustee, and all of the assets were sold two

6    years ago.  And then about a year and a half after

7    Welt was appointed, on May 13th Welt sued BDO in State

8    Court and we've attached a copy of that amended

9    complaint as I think it's Exhibit 2, to our motion.

10          THE COURT:  Uh-huh.

11          MR. HUTTON:  And I wanted to focus on that

12   because the allegations in that amended complaint in

13   the State Court are virtually identical to the factual

14   allegations made in the adversary complaint in this

15   Court to support the fraudulent transfer theories.

16   That is, in particular, the allegations that are

17   contained in the State Court pleading, the heart of

18   the pleading, in Paragraphs 39 to 46(j), that those

19   are the allegations pursuant to which the trustee

20   alleges in the State Court that BDO alleges what the

21   alleged duties of BDO were under the engagement

22   agreements and what omissions were allegedly committed

23   by BDO.

24          On June 2nd of 2010, BDO moved to compel

25   arbitration in State Court and that is scheduled to be

1   heard by the State Court on November 1st.

2             THE COURT:  Uh-huh.

3             MR. HUTTON:  After commencing the State

4   Court action on May 13th, and by the way, the State

5   Court action based upon those same allegations that

6   are asserted here --

7             THE COURT:  Uh-huh.

8             MR. HUTTON:  -- a failure to comply with

9   GAAS, based upon the same allegations the trustee

10  asserts in the State Court theories of professional

11  negligence and aiding and abetting a breach of

12  fiduciary duty by the officers of CMS, and the trustee

13  seeks $6 million in damages, including the $215,000 in

14  fees that it seeks in this adversary complaint in this

15  Court, and that's in Paragraph 65 of the amended

16  complaint in the State Court.  And the -- and after

17  commencing that State Court action back on May 13th of

18  this year, 11 days later the trustee commenced the

19  adversary complaint in this Court on May 24th, of

20  2010.

21            As I noted, the main allegations that

22  support the State Court action are repeated verbatim

23  in this adversary proceeding.  If Your Honor compares

24  Paragraphs 39 to 46(j) in the State Court complaint

25  with Paragraphs 30 to 37(j) in the adversary

1    complaint, you'll see that they're identical.

2              And again, the trustee alleges that BDO

3    was retained to conduct audits for CMS, that BDO

4    represented in engagement letters that it would

5    conduct audits in accordance with generally accepted

6    accounting standards and that BDO's audits did not

7    comply with those professional standards.

8              Another interesting procedural step I

9    wanted to highlight is that as part of the adversary

10   complaint that was filed in this Court, the trustee

11   asserted a jury trial demand.  And the very same day

12   that the adversary complaint was filed, the trustee

13   moved to withdraw the reference based on jury trial

14   demand and the trustee noted in that motion to

15   withdraw reference that he was not consenting to a

16   jury trial in the Bankruptcy Court.

17             And, in fact, if you look at the motion to

18   withdraw reference that was filed here, the trustee

19   actually, I think, mistakenly mischaracterizes the

20   claims that are asserted in this case as professional

21   negligence and aiding and abetting.  He recognized it

22   as a mistake, but I think it does highlight the fact

23   that there is substantial overlap and a substantial

24   identity of the factual allegations that are made so

25   it was easy for the trustee to make that mistake.  And

 1    we do think that at its heart, the claims in this

 2    adversary proceeding are in the nature of breach of

 3    contract and fraudulent -- and professional negligence

 4    claims.

 5            Of course, the District Court shortly

 6    thereafter remanded back to this Court for pretrial

 7    proceedings as is customary.

 8            THE COURT:  Uh-huh.

 9            MR. HUTTON:  But the point here is that

10    this case will not be tried in this Court in any

11    event.

12            THE COURT:  Uh-huh.

13            MR. HUTTON:  And I think that's relevant

14    when we get later to the McMahon factors and the

15    Electric Machinery factors.  Insofar as one of the

16    purposes or the goals of the Bankruptcy Code is

17    consolidation of proceedings in one forum.  This case

18    is not going to be tried in the Bankruptcy Court in

19    any event.

20            THE COURT:  Well, we're just a unit of the

21    District Court, Mr. Hutton.  So, it's just venue not

22    jurisdiction; right?

23            MR. HUTTON:  No, but it is -- I think when

24    the cases talk about consolidation in one forum, they

25    talk about the specialized expertise that the

Page 10

```
 1    Bankruptcy Court has to deal with bankruptcy issues on
 2    an everyday basis.
 3              THE COURT:  Who is your judge?
 4              MR. HUTTON:  Pardon?
 5              THE COURT:  Who is the judge in the
 6    District Court?
 7              MR. HUTTON:  In this case that decided and
 8    remanded, it was Cecilia Altonaga.
 9              THE COURT:  I see she closed the case.
10              MR. HUTTON:  Yes, she closed it.
11              THE COURT:  Uh-huh.
12              MR. HUTTON:  I don't know that if
13    ultimately if this Court doesn't send this case to
14    arbitration and keeps the case whether it goes
15    ultimately to her or some other judge.
16              THE COURT:  Right.
17              MR. HUTTON:  I don't know.
18              THE COURT:  Well, I'll give you a hint.
19    If it does go back to her, she says that unless you
20    stand before her and say we're ready to pick the
21    trial, she sends it back to Bankruptcy Court.  So,
22    don't have any pretrial motions left.
23              Okay.  So you -- but let me ask you
24    something, in terms of the focus of the proper
25    exercise by the Bankruptcy Court, the proper deference
```

```
 1   of the Court to the FAA --

 2           MR. HUTTON:  Uh-huh.

 3           THE COURT:  -- does it matter whether the

 4   bankruptcy jurisdiction is being exercised by the

 5   District Court or the Bankruptcy Court?  Should it

 6   make a difference?  If the focus is on the tension

 7   between the Bankruptcy Code and the FAA, should it

 8   make a difference which judge is hearing the case?

 9           MR. HUTTON:  I think insofar -- again,

10   this goes to the trustee's argument about there being

11   an inherent conflict between sending this case to

12   arbitration and goals and purposes of the Bankruptcy

13   Code.

14           THE COURT:  Right, but I'm saying if the

15   goals and the purposes of the Bankruptcy Code, are you

16   suggesting that the District Court is not as well

17   versed in the bankruptcy -- well, are you suggesting

18   that ostensibly the District Court is not as well

19   versed in the Bankruptcy Code or its ability to

20   enforce the purposes of the Bankruptcy Code as is the

21   Bankruptcy Court?

22           MR. HUTTON:  No.  What I'm suggesting,

23   Your Honor, is I think when the cases focus on -- and

24   quite candidly, I've not seen a case expressly address

25   the issue to withdraw of reference or District Court
```

1  familiarity.  Usually as I've seen it focuses on the

2  familiarity of the Bankruptcy Court with bankruptcy

3  issues.

4          THE COURT:  Right, but the focus is not

5  the familiarity of the Court.  The focus is the

6  purpose of the Bankruptcy Code and whether that

7  purpose is being realized through the Bankruptcy

8  Court, the District Court or the Circuit Court.  We

9  focus on the purposes, not the Court itself; correct?

10         MR. HUTTON:  Well, I think the Court -- in

11  my view, the Court does matter in the fact that this

12  is not going to be heard and consolidated in the

13  Bankruptcy Court.  That's just one factor, but I think

14  insofar as --

15         THE COURT:  But there are really only two

16  factors that the Eleventh Circuit tells us to look at;

17  isn't it?

18         MR. HUTTON:  Well, I think there's a

19  number of considerations just -- you know, I'll jump

20  ahead to that argument, but I think there are a number

21  of considerations that the Court looks at to determine

22  whether there is an inherent conflict and that may be

23  whether there's an issue that pertains to a plan issue

24  that is important to resolve right away in the

25  Bankruptcy Court.

Page 13

```
 1            THE COURT:  Uh-huh.
 2            MR. HUTTON:  There is that $10 million
 3  issue that was in, I think, the Fourth Circuit case
 4  that is cited by the trustee.  It was important in
 5  that case in White Mountain, it's a Fourth Circuit
 6  case, it's important in that case to determine whether
 7  a $10 million advance could be treated as debtor
 8  equity because whether it would, was treated as one or
 9  the other, impacted the ability of the debtor to
10  formulate a plan.
11            THE COURT:  Uh-huh.
12            MR. HUTTON:  So I think that was a factor.
13  It's one of the, you know, one of the few -- I think
14  that by looking at instances like that where the Court
15  decided that there was an inherent conflict, it
16  highlights why in this case it is not.
17            Also, the case cited by both sides,
18  National Gibson --
19            THE COURT:  Uh-huh.
20            MR. HUTTON:  -- is another example where
21  the Court did find inherent conflict and it did so
22  because what the Court was asked to do in that case
23  was to construe its own orders, in terms of whether
24  the confirmation order and 524 prevented the party in
25  that case from collecting pre-petition debts.
```

Page 14

```
 1              THE COURT:  Uh-huh.
 2              MR. HUTTON:  And I think there are two --
 3    if there were no state law issues involved, the Court
 4    was being asked strictly to enforce its own order,
 5    interpret the Bankruptcy Code, I think that's another
 6    example, but here -- and there's another example,
 7    Gandy, from the Fifth Circuit where there are issues
 8    of extraterritorial jurisdiction and there was a need
 9    to perhaps enforce jurisdiction over assets
10    transferred to a foreign country.
11              THE COURT:  Uh-huh.
12              MR. HUTTON:  That's another example.  None
13    of these circumstances are present here.  What you
14    have is a case, and that's why I gave you some of the
15    background.
16              THE COURT:  Uh-huh.
17              MR. HUTTON:  This is a case more than two
18    and a half years after it was filed, more than two
19    years after all the assets were sold, the issues in
20    this, if you look at all the allegations, the factual
21    issues that the Court's going to be asked to address,
22    or the arbitrator's going to be asked to address, are
23    not bankruptcy issues.
24              THE COURT:  It's a collection issue.
25    Okay.  I understand that argument.
```

```
 1              MR. HUTTON:  So we don't think there is
 2   any conflict whatsoever, much less an inherent
 3   conflict because they're really and truly the issues
 4   that are being addressed here and in the State Court
 5   which is also subject to a motion to compel
 6   arbitration that's going to be heard on November 1st,
 7   are really issues, not everyday issues the Court --
 8   this Court necessarily deals with, but issues of
 9   accounting standards obligations, under Generally
10   Accepted Accounting Standards, what those -- how those
11   obligations apply in this case, whether those
12   obligations were met and so on.
13              THE COURT:  Well, what about Mr. Cimo's
14   argument, at least indirectly by citation of cases
15   that the trustee isn't even bound by the arbitration
16   provisions because this is a right that exists outside
17   of the agreement, and therefore, the arbitration
18   provisions, putting aside for a minute the missing two
19   years, the arbitration agreement wouldn't apply?
20              MR. HUTTON:  Well, if -- is Your Honor
21   referring to the cases that talk about fraudulent
22   transfer actions as not debtor --
23              THE COURT:  No, let's forget about the
24   cases relied on.  What I want to know is what is your
25   position on the trustee's argument that because the
```

 1    cause of action that's being pursued is a bankruptcy

 2    specific cause of action, I believe the trustee cites

 3    among other cases the HR Certified case, but because

 4    the cause of action is outside the contract, it's a

 5    bankruptcy cause of action, that the trustee is not a

 6    party to the -- for purposes of this lawsuit, is not a

 7    party to that engagement letter, and therefore, the

 8    arbitration provision doesn't even apply?  So we never

 9    get to the standard of when the Court should or should

10    not defer to the arbitration provision.  So what is

11    your response to that argument?

12              MR. HUTTON:  Well, the response, Your

13    Honor, and this is where we've invoked the equitable

14    estoppel argument --

15              THE COURT:  Uh-huh.

16              MR. HUTTON:  -- because we think that, you

17    know, yes, the trustee in his capacity here nominally

18    asserting a fraudulent transfer claim is not standing

19    in the shoes of the debtor, ostensibly is standing in

20    the shoes of the creditors who would have had the

21    right under state law to assert a fraudulent transfer

22    claim.

23              THE COURT:  Uh-huh.

24              MR. HUTTON:  And they cite the Third

25    Circuit opinion, Hayes, and our response to that and

1    what those cases have not considered and what the

2    trustee doesn't address here is the equitable estoppel

3    argument, and I think that's an important --

4            THE COURT:  That you shouldn't be able to

5    rely on the contract and then step outside the

6    contract in terms of getting the relief.

7            MR. HUTTON:  Yes, Your Honor, that's

8    correct.  And the lead case that we cite for that is

9    Andersen versus Carlisle, which is a 2009 Supreme

10   Court case.  And that was an action with investors and

11   a tax scheme sued a management firm, a law firm, an

12   accounting firm and related individuals alleging

13   fraud, negligence and other claims after the IRS said

14   that the tax scheme that they had set up was an

15   illegal tax shelter.  And the defendants, all of them,

16   the management firm, the accounting firm, the law firm

17   invoked an arbitration clause that is -- was only in

18   the investment management agreement with the

19   management firm.

20           The Sixth Circuit said categorically that

21   non-signatories are not entitled to the benefits of an

22   arbitration agreement, but the Supreme Court reversed

23   and said that that's not correct, that non-signatories

24   can invoke an arbitration clause where relevant state

25   law permits.  And there's a number of grounds that the

```
 1   Supreme Court indicated exist under relevant state law
 2   for non-signatories to assert the benefits under
 3   contract which include equitable estoppel, and the
 4   Supreme Court said that because traditional principles
 5   of state law allow a contract to be enforced by and
 6   against non-parties to the contract through
 7   assumption, piercing the corporate veil, alter ego,
 8   incorporation by reference, third party beneficiary
 9   theories, waiver and estoppel, the Sixth Circuit's
10   holding that non-parties to a contract are
11   categorically barred from Section 3 of the FAA relief
12   was error.  In fact --
13              THE COURT:  Isn't that just what Judge Ray
14   said in Certified, was that because the parties
15   seeking arbitration did not show, that the trustee was
16   bound under any of those state law theories that
17   arbitration was not applicable?  And in Certified
18   wasn't the party relying on the same issues?  In other
19   words, there was a contract seeking fraudulent
20   conveyance based on malpractice.
21              MR. HUTTON:  Your Honor, I'm candidly not
22   familiar with Judge Ray's opinion in Certified.
23              THE COURT:  Uh-huh.
24              MR. HUTTON:  I would note that there
25   are --
```

 1            THE COURT:  Maybe I'm giving the wrong

 2    name.  No, Certified.  That's right.  Uh-huh.  Okay.

 3    Go ahead.

 4            MR. HUTTON:  I would note that even before

 5    the Supreme Court opinion, contrary to the Sixth

 6    Circuit, there are a number of Eleventh Circuit

 7    opinions that recognize equitable estoppel, including

 8    McBro Planning and Development from 1984.

 9            THE COURT:  Uh-huh.

10            MR. HUTTON:  And Blinko versus Greentree

11    Servicing.  In fact, Blinko is interesting.  It's a

12    recent 2005 opinion, because neither party was

13    actually a party to the arbitration agreement.  They

14    were husband and wife borrowers that asserted RESPA

15    claims against a successor servicer that actually

16    bought the rights to the note and mortgage out of the

17    Canseco bankruptcy.

18            THE COURT:  Uh-huh.

19            MR. HUTTON:  The servicer revoked the

20    arbitration clause and the note, which the husband

21    signed but the wife did not.  And the husband and wife

22    argued that servicing is a separate function and does

23    not arise out of the note.  And also that because the

24    wife never signed the note, that she was not bound by

25    the arbitration provision that was contained only in

Page 20

```
 1    note, it was not in the mortgage.

 2              The Eleventh Circuit held two things:

 3    Number One, that the arbitration clause was broad

 4    enough to encompass the RESPA claims at issue because

 5    the servicing function arises out of holding the note

 6    and the obligations, the statutory obligations that go

 7    along with that.

 8              And, secondly, that it was enforceable

 9    versus the wife, even though the wife was not a

10    signatory, because she was equitably estopped from

11    claiming the benefits on the note and it's such that

12    she would also be bound by the burdens of that note

13    which do include arbitration.

14              So, we think that the Equitable Estoppel

15    Doctrine is one that's well-founded -- not only

16    required to be recognized under the recent 2009

17    Supreme Court decision in Andersen versus Carlisle,

18    but is also one that's well-founded in Eleventh

19    Circuit case law.  And also, because the Supreme Court

20    refers to state law, the BDOC versus B-case is also

21    relevant, and that's the situation where a former

22    partner bought a claim against the BDO partnership

23    seeking retirement benefits.

24              And although the partner didn't sign the

25    agreement he relied upon the agreement establishing
```

1    his claims and he signed previous agreements that had

2    the same arbitration language, the Court held that the

3    claims were subject to arbitration under the Doctrine

4    of Equitable Estoppel.

5             THE COURT:  Uh-huh.

6             MR. HUTTON:  And here, Your Honor, what

7    we're asserting is that when the trustee is asserting

8    claims against BDO and does so based upon the duties

9    and obligations that it had to perform the audits in

10    accordance with Generally Accepted Accounting

11    Standards in the United States, as it agreed it would

12    do on the engagement letters --

13             THE COURT:  Uh-huh.

14             MR. HUTTON:  -- and alleges that it failed

15    to perform to those standards, that the trustee is

16    equitably estopped from denying or refusing to

17    arbitrate as contained in those same agreements.

18             THE COURT:  Okay.  Well -- okay.  So

19    you're differentiating if the cause of action arose

20    separate from the agreement.  Let's say a BDO partner

21    committed a separate crime or a separate torte for

22    which the debtor had a cause of action.

23             MR. HUTTON:  I think --

24             THE COURT:  You would differentiate it,

25    because then you're not looking to the contract.

1          MR. HUTTON:  I mean, I think that is a

2  separate issue, that's not the point I was making now,

3  but I think that is another issue.

4          THE COURT:  Uh-huh.

5          MR. HUTTON:  Because when you look at --

6  for example, they cite Hayes and Company --

7          THE COURT:  Uh-huh.

8          MR. HUTTON:  -- the Third Circuit opinion,

9  which did not, you know, by the way consider equitable

10 estoppel, the issue wasn't raised, it wasn't argued.

11 It was decided ten years before the Supreme Court

12 decision in Andersen versus Carlisle --

13         THE COURT:  Uh-huh.

14         MR. HUTTON:  -- and the issue just wasn't

15 presented, but even if it was, if it had been raised,

16 I'm not sure if it would have applied in that case

17 because it dealt with a brokerage agreement with

18 Merrill Lynch the debtor had and the customer

19 agreement had an arbitration clause in it.

20         THE COURT:  Uh-huh.

21         MR. HUTTON:  The trustee alleged certain

22 security law violations for churning an account and

23 fraudulent transfers relating to that churning.  The

24 claims in the case were based upon the representations

25 that were made by -- supposedly by Merrill Lynch to

1   the debtor customer, you know, in terms of types of

2   investments that would be made --

3             THE COURT:  Right.

4             MR. HUTTON:  -- and so on, not based upon

5   expressing any duties or obligations under the

6   customer agreement.  In fact, one of the things that

7   the debtor tried to do during the case was to assume

8   the customer agreement, but the Court said, no, we're

9   not going to do that.  That's not executory.  There

10   are no obligations under our agreement and the

11   arbitration clause is enough --

12             THE COURT:  Right.

13             MR. HUTTON:  -- alone, was enough to make

14   it executory.

15             THE COURT:  Uh-huh.

16             MR. HUTTON:  So the Court did, in that

17   case, order arbitration of all claims other than 544,

18   but again, the Court did not consider equitable

19   estoppel and it's not clear that it would have applied

20   because the claims are not based upon representations

21   made in the customer agreement.  It was based upon

22   separate verbal representations that were made

23   concerning the type of investments that were being

24   made to the brokerage firms' clients in that case, you

25   know, in terms of the accounts.

1          THE COURT:  Uh-huh.  Okay.  I'm going to

2    stop you.  One more question and then you need to sit

3    down because it's already been a half hour.

4          Mr. Cimo states that you do not -- you

5    failed to include the October 4th through September

6    5th and the October 7th through September 8th

7    agreement.  So, does that mean that there were none in

8    existence?

9          MR. HUTTON:  Not at all, Your Honor.  And

10   let me address and clarify that for you.  What we have

11   attached to the complaint and to the State Court

12   complaint that's attached to the motion to compel

13   arbitration is, first of all, a letter -- an

14   engagement letter dated March 18th, 2008 that pertains

15   to the audit done as of September 30th as to the audit

16   for the year ending September 30th, 2007.

17         THE COURT:  Right.

18         MR. HUTTON:  And there was after that,

19   Your Honor will recall this case as I mentioned, filed

20   on June 30th, of 2008, so I don't think there was a

21   postpetition letter for the year ending December 30th,

22   2008.

23         THE COURT:  Okay.  So you're saying --

24         MR. HUTTON:  There is a --

25         THE COURT:  -- there is a letter for the

Page 25

 1    first period, but not for the second; is that what

 2    you're saying?

 3            MR. HUTTON:  Well, what I'm saying is that

 4    there are letters that we attached for the audit years

 5    ending 2007, 2006 and 2004.

 6            THE COURT:  Uh-huh.

 7            MR. HUTTON:  The only audit year for which

 8    we did not attach an engagement letter was for the

 9    audit year ending September 30th, 2005.

10            THE COURT:  Okay.  And the reason was why?

11            MR. HUTTON:  The reason, obviously after

12    we saw the response and we went back and checked and

13    we spoke with the -- my colleague spoke with the

14    engagement partner at BDO today, we were told that

15    there is a letter, I have a draft of it.  They're

16    trying to locate the original.  It is in their

17    ordinary and customary practice to do it, and you

18    know, they believe they would not have done an audit

19    without having an engagement letter.  It's our intent

20    to -- I have the draft, it was dated December 14th,

21    2005.  It's out intent to supplement the record with

22    the original.  I don't know if it's the trustee's

23    contention that there was none or that, you know,

24    simply, you know, that we failed to attach it.

25            THE COURT:  Okay.  Well, that's an open

1    issue then.  Okay.  Thank you, Mr. Hutton.

2              All right.  Mr. Cimo, anything you want to

3    highlight before you address the issues raised by

4    Mr. Hutton and I ask the questions that I have?

5              MR. CIMO:  Yes, Judge, very briefly.  It

6    did take a half hour because he had to explain away

7    the fact what's very simple, which is, this is an

8    action under 544 and 548 of the Bankruptcy Code.

9    These claims did not exist until the petition was

10   filed.

11             For Mr. Hutton to argue that equitable

12   estoppel applies when these claims could only be filed

13   in Bankruptcy Court, is beyond absurdity.  These are

14   not state law claims.  726 is only applied under the

15   Florida Fraudulent Transfer Statute vis-a-vis 544.

16   When you go to my complaint, this is an action

17   asserting rights under 544 and 548.  544 allows us to

18   go back four years, 548 allows us to go back two

19   years.

20             Moreover, I assure you if we sought

21   arbitration and didn't file these in front of the

22   Bankruptcy Court, they would be seeking to dismiss

23   them as the arbitration panel not having any

24   jurisdiction to be deciding claims under Section 544,

25   548 of Bankruptcy Code.  So we filed this lawsuit the

Page 27

1    only place where we could file it.  We couldn't file

2    it in  State Court.  We couldn't file it in the

3    arbitration Court.  We could only file it here.  And

4    the rational for this is aptly explained and not

5    reversed by a Supreme Court case in our response

6    papers and the Third Circuit case that we cited, which

7    if you turn to Page --

8                    THE COURT:  Are you talking about Hayes?

9                    MR. CIMO:  -- 6 of 14 of our brief, this

10   is the rational of the Third Circuit in Hayes versus

11   Merrill Lynch, quote, "Such claims are not derivative

12   to the bankrupt.  They are creditor claims of the

13   Bankruptcy Code, that the Bankruptcy Code authorizes

14   the trustee to assert on their behalf.  The Supreme

15   Court has made it clear that it is the parties to an

16   arbitration agreement who are bound by it, and whose

17   intentions must be carried out.  Thus, there is no

18   justification for binding creditors to an arbitration

19   clause with respect to claims that are not derivative

20   from one who is a party to it."  It follows, "That the

21   trustee cannot be required to arbitrate its Section

22   544(b) claims and that the District Court was not

23   obligated to stay them pending arbitration."

24                    He's trying to basically stick a square

25   peg in a round hole.  We don't think equitable

```
 1   estoppel could ever apply under these circumstances,

 2   and we've cited other cases that clearly state for the

 3   proposition -- again, we don't think these have all

 4   been modified by the Supreme Court opinion, that

 5   fraudulent transfer claims are core claims.  That

 6   they're creatures of statute.  This is on Page 7 of 14

 7   of my brief; that are solely for the benefit of

 8   creditors of the debtor.  And as such, are not

 9   arbitratable.  Part of preferential transfer claims

10   are not arbitratable.  National Gypsum, core

11   declaratory judgment claim is not arbitratable.  And

12   then Mintze, extent, validity and priority of liens is

13   not arbitratable.

14              If you take away these core claims from

15   the Bankruptcy Court, non-bankruptcy judges or

16   non-District Court judges sitting in bankruptcy are

17   going to be deciding core issues that Congress has

18   clearly delineated can only be decided by the

19   Bankruptcy Court.

20              So, we don't think there's a lot of

21   argument here on what the cases say.  We agree with

22   you that the trustee is not a party to the agreement

23   and we believe that under the core analysis and the

24   fact that these claims only existed when the

25   bankruptcy case was filed, we don't understand how
```

1  equitable doctrines can apply and take away

2  jurisdiction that only exists before this Court by

3  virtue of a doctrine which is equitable in nature and

4  cannot apply to statutory claims under the Federal

5  Bankruptcy Code.

6        THE COURT:  All right.  Well, I'm confused

7  now, Mr. Cimo, and I didn't state that the trustee was

8  or was not a party.  I asked Mr. Hutton to answer the

9  question as to that.

10        In the Electric Machinery case, which is

11  an Eleventh Circuit case, as you know, the

12  Whiting-Turner versus Electric Machinery, which is a

13  2007 case, the Eleventh Circuit addressed the issue of

14  whether and under what circumstances a Bankruptcy

15  Court must defer to the Federal Arbitration Act.

16        MR. CIMO:  Yes.

17        THE COURT:  And the first issue that the

18  Court had to decide, although the Court found to the

19  contrary, was whether or not the litigation for which

20  the arbitration right had been asserted was core.  And

21  the Court in that case defined core, let's see, I

22  can't find the exact quote but essentially it's a

23  cause of action that only exist in bank -- oh, here we

24  go.  It's Toledo citing its own decision, stated, if

25  the proceeding involves a right created by the federal

Page 30

```
 1    bankruptcy law it is a core proceeding.  Okay.
 2              MR. CIMO:  Yes.
 3              THE COURT:  So, your argument about 544
 4    and 548 that it's a core proceeding is consistent with
 5    what the Eleventh Circuit in the Whiting-Turner case
 6    says is a core proceeding.
 7              MR. CIMO:  Correct.
 8              THE COURT:  Okay.  So then we look at,
 9    again, in the same opinion -- oh, God, it's so hard to
10    read this.  This is why I like the old-fashioned way.
11    I think it's Page 797 or 796.  The Court, in looking
12    at Judge Williamson's decision states the following in
13    looking at this core issue, again.  It says, however,
14    whether or not the Bankruptcy Court has jurisdiction,
15    even exclusive jurisdiction, over a matter is a
16    separate question from whether enforcing a valid
17    arbitration agreement would pose an inherent conflict
18    with the underlying purposes of the Bankruptcy Code.
19    And then the Court goes on to establish a test.
20              The Court says, one, that you have to
21    distinguish between core and non-core.  That's the
22    first thing the Eleventh Circuit says.  And then the
23    Court says that with respect to non-core, that
24    generally, the Bankruptcy Courts do not have
25    discretion to decline to enforce an arbitration
```

 1   agreement relating to a non-core proceeding.

 2            Then the Eleventh Circuit goes on to say,

 3   and here's the second part of the test, however, even

 4   if a proceeding is determined to be a core proceeding,

 5   the Bankruptcy Court must still analyze whether

 6   enforcing a valid arbitration agreement would

 7   inherently conflict with the underlying purposes of

 8   the Bankruptcy Code.

 9            So, I understand your argument and with

10   all sincere, respect and admiration for Judge Ray, I

11   read Whiting-Turner as bypassing this issue of a core

12   proceeding being one that is not derivative of an

13   agreement, that that does not seem to be the test to

14   the Eleventh Circuit.  And I'm not saying what I would

15   do in the absence of that language, but it seems to me

16   that the Eleventh -- I mean, it seems very clear to me

17   that the Eleventh Circuit bypasses that completely and

18   says, that is not the analysis.  It's not core or

19   non-core.

20            MR. CIMO:  Absolutely.

21            THE COURT:  I mean, that's not what

22   decides whether the arbitration agreement is binding.

23   So, it would seem to me that for purposes of the

24   Eleventh Circuit and the Whiting-Turner decision, what

25   I would have to look at in terms of determining

Page 32

```
 1    derivative, in other words, does it relate to the
 2    agreement, putting aside the equitable estoppel
 3    argument, okay, is -- does the cause of action flow
 4    from the contract rights.  And that, to me, is the
 5    decision as to whether it's subject to the arbitration
 6    clause.  So that's -- so my first question to you,
 7    Mr. Cimo, is, I've read your complaint and the way I
 8    read the complaint is that it is based on the
 9    negligent performance, or the gross misperformance, by
10    BDO of its obligations under the agreements.  That is
11    the reason why a reasonably equivalent value was not
12    delivered.
13              MR. CIMO:  It's based in part on that.
14              THE COURT:  Right.  So my question is,
15    because I know you mentioned the actual fraud.  Okay.
16    So, one, I need to know where in the complaint are
17    there allegations that do not have any relationship to
18    the engagement reflected -- the engagement of BDO
19    pursuant to the engagement letters, putting aside by
20    the way for a minute that there might be gaps, and I
21    will tell you now, that if there was no valid
22    engagement letter with an arbitration provision that
23    year is a different situation.  And then we talk about
24    staying non-arbitrable provisions.  So, show me -- I
25    have the complaint here in front of me, Mr. Cimo, if
```

Page 33

1    you give me a moment.

2             MR. CIMO:  Yes, more than happy to.

3             THE COURT:  And, I'm sorry gentlemen, but

4    you're just going to have to get comfortable and put

5    your feet up, or go find a coffee place.  We'll be

6    done eventually.

7             MR. CIMO:  On Page 5.

8             THE COURT:  Okay.  So on Page 5.

9             MR. CIMO:  Of the complaint.

10            THE COURT:  Of the complaint.

11            MR. CIMO:  We articulate management's,

12   acts and omissions.

13            THE COURT:  Okay.  What paragraph, I'm

14   sorry?

15            MR. CIMO:  This is the actual Section B.

16   I'm reading the title of the section.

17            THE COURT:  Okay.  Yes, I see it.

18            MR. CIMO:  We incorporate a separate

19   section into the complaint, after the history and

20   business operations of the debtor.

21            THE COURT:  Right.

22            MR. CIMO:  And it has a B, Capital B,

23   called Management's acts, omissions and breaches of

24   fiduciary duty, and intent to hinder or delay

25   creditors.

```
1              THE COURT:  Right.

2              MR. CIMO:  And then set forth what

3   management did.

4              THE COURT:  Uh-huh.

5              MR. CIMO:  So, the alternative basis for

6   relief has nothing to do with the engagement letter,

7   but has everything to do with aiding and abetting the

8   conduct of the debtor's principals in breaching their

9   fiduciary duties.  And there's a separate claim in

10  here for actual intent to hinder or delay.  And the

11  fact that what the acts and omissions that BDO engaged

12  in assisted those principals in aiding them in breach

13  of their duties.  And we believe those exist apart

14  from whatever agreement this entity had with the

15  debtor estate.

16              We also submit to you that this is one of

17  those claims that didn't exist until ultimately the

18  bankruptcy was filed, and that, although it is true

19  that you have to look at it under the Eleventh Circuit

20  case whether it arises or relates out of the

21  agreement, these actual intent allegations of the bad

22  conduct of the debtors is well outside professional

23  malpractice, and rises to the separate tort of aiding

24  and abetting breach of fiduciary duty, potentially

25  conspiracy to aid and abet breach of fiduciary duty
```

```
 1   is clearly outside of the four corners of an

 2   arbitration provision.

 3           THE COURT:  Does that cause of action

 4   exist in Florida?

 5           MR. CIMO:  Aiding and abetting does exist

 6   in Florida.

 7           THE COURT:  And the breach of fiduciary

 8   duty?

 9           MR. CIMO:  Absolutely.  Aiding and

10   abetting, breach of fiduciary duty does exist under

11   Florida law, but we believe though that because we

12   could not file this 548 action anywhere else, we don't

13   believe the Eleventh Circuit addressed this issue of,

14   what if we file this before  the arbitrators.  I

15   submit to you they would have moved to dismiss and

16   said the arbitrators have no jurisdiction to hear a

17   548 claim or a 544 claim which is not a shoe-stepping

18   claim --

19           THE COURT:  Uh-huh.

20           MR. CIMO:  -- but a claim that only exists

21   when the petition is filed, and once the petition is

22   filed, then you have to weigh those new rights that

23   come into existence with the rights that derive under

24   these contracts that have these arbitration

25   provisions.
```

Page 36

```
 1            THE COURT:  Well, I think what the
 2   Eleventh Circuit says I have to do is whether
 3   enforcing the agreement would inherently conflict with
 4   the underlying purposes of the Bankruptcy Code.
 5            MR. CIMO:  And we think the answer is
 6   yes, because the underlying rationale and thrust of
 7   544 and 548 is to have one forum decide who is
 8   disgorging fraudulent transfers, and if we start
 9   allowing arbitrators to decide who disgorges
10   fraudulent transfers, then we could have creditors
11   outside of bankruptcy filing their own fraudulent
12   transfer actions saying that they want to become the
13   estate representative to avoid and recover fraudulent
14   transfers.
15            THE COURT:  But then doesn't that tie into
16   a conflict with the Hayes decision in that only the
17   trustee can bring those actions and not a creditor?
18            MR. CIMO:  I was in a case called Swirn
19   before Judge Cristol where Judge Cristol did rule that
20   only the trustee as the representative of the estate
21   can do so, but there is countervailing law which the
22   Eleventh Circuit hasn't ruled on yet --
23            THE COURT:  Uh-huh.
24            MR. CIMO:  -- that says until that
25   judgment gets entered to avoid a fraudulent
```

Page 37

1    transfer --

2              THE COURT:  Uh-huh.

3              MR. CIMO:  -- any creditor can file a

4    motion or a complaint to avoid a fraudulent transfer.

5    Imagine what a horrible result that would be.

6              THE COURT:  Well, let's just hope the

7    Supreme Court doesn't get ahold of it.

8              All right.  So, my understanding,

9    Mr. Cimo, is your argument is that with respect to the

10   aiding and abetting, while the aiding and abetting

11   might have been made possible by the fact that BDO was

12   under contract with Cardiac, that that cause of action

13   is not derived from the agreement whether -- so, it's

14   not an arbitratable provision?

15             MR. CIMO:  Well, I think the arbitration

16   provision -- I have to answer your question directly.

17             THE COURT:  Uh-huh.

18             MR. CIMO:  The arbitration provision is so

19   broad that if somebody had a hangnail and they stubbed

20   it on a door at the debtor's premises and it had

21   something to do with BDO, they would argue that that's

22   arbitratable.  That's how broad it is.

23             THE COURT:  Uh-huh.

24             MR. CIMO:  But I will tell you that when

25   you asked the question to me of the type of conduct

Page 38

1    that's in conflict with the Bankruptcy Code, there's

2    nothing more in conflict with the Bankruptcy Code than

3    the right of a fiduciary, whether it be a

4    debtor-in-possession or a trustee, to recover and

5    disgorge monies from a fraudulent transferee, nothing

6    more sacred under the Bankruptcy Code than that.

7               And if we're going to go to this equitable

8    estoppel, this judicial common law concept to override

9    a statutory provision, we've just enacted a new in

10   pari delicto concept that's going to apply to trustees

11   on arbitration provisions where even though you have a

12   statutory claim that you can only bring in Bankruptcy

13   Court, let's create a judicial doctrine to stop you

14   from litigating it in the one forum where you could

15   file it, and we respectfully submit because this claim

16   could only be filed before the Bankruptcy Court, there

17   can't be any rule that says this has to be

18   arbitratable, and to try to argue common law or the

19   Eleventh Circuit standard to say that this has to

20   weigh in favor of what the provision says, completely

21   belies and undermines the statutory provisions that

22   permit the trustee, as the sole representative of the

23   estate, to avoid and recover fraudulent transfers.

24               THE COURT:  Well, what about the fact that

25   your action in State Court for the $6 million

Page 39

```
 1    encompasses the return of the fees?
 2              MR. CIMO:  We don't dispute that, but at
 3    the end of the day, that's a disgorgement action under
 4    common law and that may ultimately not be decided by
 5    the State Court or the arbitrators.  They may very
 6    well say, that's more appropriately done in a
 7    bankruptcy proceeding, but we're not going to not
 8    assert a disgorgement claim --
 9              THE COURT:  Uh-huh.
10              MR. CIMO:  -- just because we had a right
11    to do so under the Bankruptcy Code.  We don't believe
12    asking for that relief is adequate to make the estate
13    whole in the event it is determined that that
14    disgorgement claim for whatever reason should not be
15    permitted, whether we don't meet the elements under
16    state law, et cetera.
17              The fact remains, when a fiduciary asserts
18    a statutory claim that only he or she can assert --
19              THE COURT:  Uh-huh.
20              MR. CIMO:  -- far be it from someone to
21    argue that because we have similar relief in a State
22    Court that we can't go forward, we think that totally
23    undermines the purpose of 548 and 544.
24              THE COURT:  Okay.  Well, let's put aside
25    the breach of fiduciary duty or the aiding and
```

Page 40

```
 1    abetting the breach of fiduciary duty for a moment.

 2    I'm going to assume, number one, that that cause of

 3    claim under whatever name you call it has not been

 4    alleged in the complaint in the State Court.

 5              MR. CIMO:  There is a claim for aiding and

 6    abetting in the State Court.

 7              THE COURT:  Okay.  So you asked for aiding

 8    and abetting in State Court.

 9              MR. CIMO:  Yes.

10              THE COURT:  Okay.  And --

11              MR. CIMO:  By the way, that's my

12    recollection.  I don't have the State Court complaint

13    in front of me.  If it's attached, I believe when I

14    drafted that complaint we added a count for aiding and

15    abetting.

16              MR. HUTTON:  Your Honor, I can represent

17    to the Court it is part of the -- it's Count 2 in the

18    State Court.

19              THE COURT:  Okay.  All right.  So you have

20    an aiding and abetting count and then you've asked for

21    -- so, these are not causes of action, you might call

22    them something different, but they're not claims that

23    you could not have made in the State Court action,

24    which I understand the Court hasn't ruled on that

25    arbitration provision yet.
```

Page 41

1          MR. CIMO:  When you say these claims, you

2    mean the ones that are in front of you today?

3          THE COURT:  I'm saying the facts giving

4    rise to the claim, not the title that you put --

5          MR. CIMO:  We fully concede that the facts

6    that we've asserted in the State Court are the same

7    facts -- virtually identically the same facts that

8    we've alleged here.  We're not contesting that there's

9    any difference, but we are saying is that under the

10   actual intent prong --

11         THE COURT:  Uh-huh.

12         MR. CIMO:  -- which we don't have in State

13   Court, there's a different set of criteria that are

14   employed that are unique and that which require of you

15   going outside of the four corners of the arbitration

16   provision.

17         THE COURT:  Okay.  Now, if the State Court

18   or the arbitrators of the State Court action

19   determined that BDO was not negligent or grossly

20   negligent or whatever, would you still have a claim

21   for aiding and abetting breach of fiduciary duty?

22         MR. CIMO:  Possibly.  I've never seen

23   that, but it's very possible that they can determine

24   that they've met the standard of care and yet acted in

25   a manner that aided and abetted separate conduct of

Page 42

1  the principals which resulted in aiding and abetting

2  liability.  It's unlikely, but there's a possibility

3  that they could still aid and abet and still discharge

4  their duties under the code that governs that

5  profession.

6         THE COURT:  So, you have no obligation to

7  intervene when a man is being murdered, but even if

8  you do nothing wrong, you could be found liable for

9  aiding and abetting --

10        MR. CIMO:  I don't think it works that

11 way.  I think you have to look at every act and

12 omission on a case by case basis, and an expert may

13 say that X was not a violation of the rules of

14 professional conduct, but B -- but conversely it did

15 aid and abet because of knowledge and substantial

16 assistance, and this substantial assistance may have

17 been something more than issuing an audit opinion.

18        The point is, it's unlikely that that will

19 happen, but it could happen.  There could be a

20 scenario where the jury comes out and says, not

21 professional negligence, but there seemed to be aiding

22 and abetting a breach of fiduciary duty.

23        THE COURT:  Okay.  Well, let me ask about

24 this, you have a count for actual intent to defraud.

25        MR. CIMO:  No, we don't use the word

Page 43

```
 1    defraud.
 2                THE COURT:  I'm sorry.
 3                MR. CIMO:  We use intent to hinder or
 4    delay.
 5                THE COURT:  Intent to hinder or delay
 6    creditors.  Okay.  And the basis for your allegations
 7    of the actual intent is?
 8                MR. CIMO:  Badges of fraud analysis.
 9                THE COURT:  Well, I'm just trying to find
10    that, and that goes to the breach of fiduciary duty
11    claims?  In other words, your badges of fraud are --
12                MR. CIMO:  Paragraph 45.
13                THE COURT:  25 not 45.
14                MR. CIMO:  Paragraph 45.
15                THE COURT:  Oh, Paragraph 45.  Okay.
16    Well, it says the debtor made the 2004 to 2008
17    transfers with the actual intent to hinder or delay
18    creditors.  I'm just trying to understand how paying a
19    professional, no matter how poorly they allegedly
20    performed, would translate into an actual intent to
21    hinder or delay creditors.
22                MR. CIMO:  That's a fair question.  It's a
23    case that I lost in Model Imperial case, a bank
24    provided value, lots of value to Model Imperial, and
25    the Court said the value you provided you don't get
```

Page 44

```
 1    credit for because you're not a good faith transferee.

 2              THE COURT:  Yeah, but I know the facts of

 3    that case pretty well, Mr. Cimo.

 4              MR. CIMO:  Every case has a different --

 5              THE COURT:  Right.  What I am saying is

 6    that in that case the Court found that there was

 7    actual knowledge by the debtor and the bank with

 8    respect to loan provisions that didn't allow the loan

 9    to be made.

10              MR. CIMO:  The Court found that Hamilton

11    Bank was on inquiry notice that there was something

12    about the transactions which would be a fraudulent

13    transfer.

14              THE COURT:  Okay.

15              MR. CIMO:  And it's an inquiry notice

16    standard.  It's not the trustee's burden to establish

17    a lack of good faith.  It's the transferee's burden to

18    establish that they were in good faith, and when a

19    professional does more than just either fall below the

20    standard of care or have knowledge of specific issues

21    which would render the transfer avoidable, we believe

22    that that case law in the Model decision regarding

23    good faith could be applicable to professionals

24    equally as it is to a bank or any other creditor

25    dealing with the debtor.
```

```
 1            THE COURT:  But what I'm trying to
 2   understand is that you're suggesting that the debtor
 3   paid a professional that didn't deserve to be paid and
 4   that's a grounds for actual intent to hinder or delay
 5   creditors?
 6            MR. CIMO:  No, we're claiming that in
 7   order to determine whether the transfers were made
 8   with actual intent, they needed to get clean audited
 9   opinions from their accountants, and to the extent the
10   accountants worked with management, in this
11   particular case the allegation is the receivables were
12   overstated, that these receivables were overstated and
13   banks loaned on those receivables thinking the
14   receivables were worth more than they really were,
15   created a scenario where the debtor was not acting
16   appropriately.  He was acting with actual intent to
17   hinder or delay certain creditors.
18            And when you do a badges of fraud
19   analysis, whether there's lack of insolvency, not
20   paying its debt as they became due, insufficient value
21   because there were allegations that the auditing
22   services were less than stellar, it raises factual
23   issues whether these transfers were made with actual
24   intent to hinder or delay.  We're not making any
25   allegation that there was any intent to defraud.
```

1           THE COURT:  Okay.  Let me ask you one

2   other question and then I'm going to ask Mr. Hutton

3   for a brief response.

4           Why shouldn't I continue the hearing on

5   this, in other words, wait and see what the State

6   Court does, I mean, what is gained if the State Court

7   either denies or grants the motion to arbitrate,  why

8   shouldn't this matter, whether I grant the motion to

9   arbitrate or not, be stayed pending resolution of

10  those other issues, so that you're not litigating in

11  two courts the exact same factual issues?

12          MR. CIMO:  Well, when you get into issues

13  of judicial economy, et cetera, and whether or not

14  this action should be stayed, we respectfully believe

15  that those issues are not ripe for a determination

16  right now until we see what happens not only on the

17  arbitration motion in State Court, but whether any

18  appeal which comes out of that may be resolved because

19  one party may not like what happens from that and that

20  may be an appealable order.

21          We just don't think that justice should be

22  delayed while that process is going forward and until

23  there's more information about where these cases are

24  going, we have a right, we believe, to go forward on

25  this action and if we win on this case, it could very

1   well be it could bring about a quicker resolution of

2   the State Court case because we're going to try issues

3   in this case that are no doubt related to what's

4   happening in the State Court, but the fact remains, if

5   we could have filed these in State Court, we could

6   have very well, but we couldn't.  So, because that's

7   the case, why should we be delayed in prosecuting our

8   claim if we have a right to prosecute these claims.

9          In any event like Mr. Hutton stated, this

10   will be heard by the Article 3 judge sitting in

11   bankruptcy, not by you because of the jury trial

12   demand, but at the end of the day the trustee has a

13   right to try to disgorge those transfers.  And for all

14   I know, they might write a check to us, if you deny

15   the stay motion, for that $200,000 and change mooting

16   out this entire complaint, meaning all that will be

17   left is the State Court case.  I will tell you, we

18   will do everything we can to coordinate discovery in

19   regard to both cases.  It's not our intention -- I'm

20   on a contingency.

21          THE COURT:  Uh-huh.

22          MR. CIMO:  It's not my intention to take

23   four or five depositions of the same person.  We want

24   to do everything we can to promote judicial economy.

25   We just don't believe being stopped in our tracks to

Page 48

```
 1   disgorge a fraudulent transfer should be employed at

 2   this early stage of the proceeding, and this adversary

 3   is still at its early stages, although I do concede

 4   the underlying bankruptcy case has been around for a

 5   little bit of a while.

 6                 THE COURT:  Okay.  Thank you.

 7                 MR. CIMO:   I also wanted to add that --

 8                 THE COURT:  Yes, sir.

 9                 MR. CIMO:  -- we don't think dismissal is

10   appropriate under any circumstances because our

11   statute would have expired.  So if you are going to do

12   anything in terms of granting relief, we don't want

13   the case dismissed.  If you going to allow us to

14   arbitrate, we just want that arbitration.

15                 If that's what your decision is, we want

16   that stature to be deemly complied with if we're the

17   ones that have to file the arbitration proceeding.  We

18   don't want to be punished because at the end of the

19   day this is one of those claims where we filed within

20   the two years --

21                 THE COURT:  Right.

22                 MR. CIMO:  -- and it will not be timely if

23   we're required to dismiss this and file a separate

24   arbitration proceeding.

25                 THE COURT:  Well, I don't think that they
```

Page 49

```
 1   asked for a dismissal.
 2              MR. CIMO:  Some cases permit it, I just
 3   want to point that we, you know --
 4              THE COURT:  No, that wouldn't happen.
 5              MR. CIMO:  Thank you, Judge.
 6              THE COURT:  All right.  Mr. Hutton,
 7   anything that you want to respond to?
 8              (Thereupon, The Court reporter changed her
 9   paper and a discussion was held off the record.)
10              THE COURT:  All right.  So, are you ready?
11              Court REPORTER:  Yes, Your Honor.
12              THE COURT:  So, Mr. Hutton, any brief
13   response?
14              MR. HUTTON:  Yes, Your Honor.  And I'm
15   glad Your Honor raised or asked about the actual fraud
16   issue because --
17              THE COURT:  Well, but Mr. Cimo said there
18   is no request for actual fraud, it's intent to hinder
19   or delay.
20              MR. HUTTON:  Intent to hinder or delay.
21              THE COURT:  Okay.  But that's different.
22              MR. HUTTON:  Actual intent, I should say.
23   Because we, too, saw the, you know, one sentence
24   allegation in Paragraph 45, but nothing else that we
25   could find that related to that, certainly no express
```

 1    badges of fraud alleged anywhere in the complaint, and

 2    so I sort of scratched my head in terms of, you know,

 3    where that came from other than another attempt to

 4    avoid arbitration of these claims.

 5              Then, I think, Mr. Cimo tried to tie it in

 6    with the aiding and abetting management issue, and so

 7    I went back and looked at those allegations of the

 8    complaint, while he was speaking, and it turns out

 9    that those two mirror allegations that are in the

10    State Court, because in State Court and Mr. Cimo said,

11    well, these claims can only be brought here.  That's

12    not so.  They were, the aiding and abetting claim was

13    brought in State Court.  In fact, I think that's where

14    they're seeking a ruling, because they're not just

15    seeking to recover the fees paid, they're seeking

16    damages in excess of $6 million.

17              But if you compare the allegations that

18    are made in this complaint, in Paragraphs 23 through

19    28(g), they are verbatim the same as the allegations

20    that support the aiding and abetting claim in the

21    State Court, in the amended complaint it's Paragraphs

22    28 and 32 through 38(g).  But I think there's a

23    disconnect between saying that BDO aided and abetted

24    management's breaches of fiduciary duty and saying

25    that by paying fees to BDO there is some actual intent

1   to hinder delay or defraud.  I think there's a

2   disconnect there and I don't think these

3   allegations --

4            THE COURT:  Hinder or delay, no defraud.

5            MR. HUTTON:  I think there's a disconnect

6   between saying, well, BDO somehow aided and abetted

7   management's breaches of duty.

8            THE COURT:  By being incompetent?

9            MR. HUTTON:  By not catching certain acts

10  in terms of, you know, the statement of receivables or

11  what, you know, the things that are alleged here, in

12  saying, I think it's a separate issue, whether

13  payments that were made to BDO, the $215,000 that was

14  paid for auditors over four years was management or

15  the debtor, the intent to hinder or delay creditors by

16  making those payments.  I don't see how the allegation

17  they've made regarding the aiding and abetting count

18  which mirror those in State Court relate to the

19  payments of those transfers that are really the only

20  thing at issue in the adversary complaint.

21            THE COURT:  Okay.

22            MR. HUTTON:  So I think there's a

23  disconnect there.  The --

24            THE COURT:  Okay.  What about Mr. Cimo's

25  argument that equitable estoppel can't apply because

```
 1   his cause of action can't exist outside of Bankruptcy

 2   Court?

 3            MR. HUTTON:  Well, it actually does.  The

 4   -- this is 544. It -- they rely upon 726, and this

 5   action could have been brought by creditors outside of

 6   bankruptcy.  In fact, they allege that there are

 7   actual creditors that existed that could have brought

 8   the claim, that's a necessary element of the cause of

 9   action they're asserted.

10            THE COURT:  Uh-huh.

11            MR. HUTTON:  So it did exist.  I think the

12   issue is those creditors were nonsignatories to the

13   agreement.  Our answer to that is equitable estoppel

14   because they relied upon the agreement establishing

15   the claims.

16            THE COURT:  Okay.

17            MR. HUTTON:  And, you know, to the extent

18   that Hayes said, that Mr. Cimo said, the parties to

19   the  arbitration agreement are bound, well, we would

20   submit that in Andersen vs Carlisle the Supreme Court

21   held otherwise and said that, it's not necessary just

22   the parties to the arbitration agreement, and the

23   Supreme Court -- as we referenced, there is Eleventh

24   Circuit authority, McBro and the other cases we've

25   cited, that recognized that even in situations where
```

Page 53

```
 1   neither party is a party to the arbitration agreement

 2   equitable estoppel principles can apply and --

 3               THE COURT:  Okay.

 4               MR. HUTTON:  -- and require the

 5   application of the arbitration provision, and we think

 6   that's certainly the case here.

 7               THE COURT:  Okay.  Thank you.

 8               MR. HUTTON:  One last thing?

 9               THE COURT:  Very briefly.

10               MR. HUTTON:  Very very brief.

11               THE COURT:  Because now I'm running an

12   hour behind schedule.

13               MR. HUTTON:  There was a comment or a

14   concern about discovery in arbitration.  Assuming,

15   and I'm not the expert in arbitration, but I conferred

16   with some of my colleagues who do it, and I am told

17   this would be a complex arbitration.  I have a copy of

18   the arbitration rules if Your Honor would like to see

19   them.

20               THE COURT:  Please no.

21               MR. HUTTON:  Where claims are in excess of

22   a million, there is discovery and discovery typically

23   is allowed in arbitration.  So, if there's any concern

24   about not being able to get discovery in an

25   arbitration proceeding, that should not be cause for
```

 1    concern.

 2                  And the second thing I want to mention is

 3    that BDO has already produced its work papers to the

 4    trustee.  The Kluger firm served a Rule 2004 request

 5    back in  February of 2009 and I understand that BDO

 6    produced all its work papers in response to that 2004

 7    subpoena, so -- and I can assure Your Honor discovery

 8    of something we'd want in the arbitration as well.

 9                  THE COURT:  Okay.  All right.  Is this

10    binding arbitration?

11                  MR. CIMO:  Yes.

12                  THE COURT:  Okay.  So, it will have

13    collateral estoppel effect?

14                  MR. HUTTON:  Yes, Your Honor.

15                  MR. CIMO:  Yes, Judge.  We believe it

16    will.

17                  THE COURT:  Okay.  All right.  I'm going

18    to grant the motion to stay -- well, no.  Let me back

19    up.  I'm going to grant the motion to compel

20    arbitration subject to the following:  If the

21    arbitrators determine that they do not want to

22    adjudicate these issues and merely the facts, okay,

23    then we will come back here at such time as the

24    arbitration is completed, continue with this

25    litigation, but with whatever collateral estoppel

1  effect the ruling of the arbitrators or wherever you

2  litigate this, whatever impact those have.

3          And for the reasons, I don't want to

4  repeat myself too much, but as I said, my reading of

5  the Whiting-Turner versus Electric Machinery case in

6  my view compels me to do as I've described earlier,

7  which is in determining whether the matter is

8  arbitrable, whether it's core or noncore, I have to

9  look at the derivation of the causes of action rather

10  than the nature of the cause of action, because if the

11  -- as I said before, if the delineation is core versus

12  noncore, then Whiting-Turner just doesn't make sense.

13          And so, because of that and because of

14  that causes of action that are alleged in the

15  complaint all derive from the allegations of negligent

16  or gross performance of the engagement letters, those

17  would be subject to arbitration under the terms of the

18  letter, and notwithstanding that while I do appreciate

19  Mr. Cimo's argument that this would -- that granting

20  this motion would inherently conflict with the

21  underlying purposes of the Bankruptcy Code, in this

22  particular instance, and I'm not saying that this

23  would apply in every case in which there's a

24  fraudulent conveyance action or every case in which

25  there is well, 544, 548, I'm just saying in this

```
 1    particular case, the purposes of the Bankruptcy Code
 2    which are to achieve recovery by the trustee of assets
 3    that the trustee believes -- well, assets or the
 4    liquidation of claims that the trustee has the right
 5    to assert on behalf of creditors, that by granting the
 6    motion to arbitrate does not conflict with the
 7    underlying purposes of the Bankruptcy Code in this
 8    case, and I just want to make this very clear.  I
 9    believe that this decision has to be made on a case by
10    case basis, not on a cause of action by cause of
11    action basis.
12              And so, therefore, I am going to grant the
13    motion, but as I said before, I want to make very
14    clear that if the arbitrators decline to adjudicate
15    the issues rather than the facts relating to the
16    issues, we will come back here at the appropriate
17    time, and so I will grant a stay, not a dismissal, but
18    a stay of this litigation pending the conclusion of
19    the arbitration however it concludes.
20              MR. CIMO:  Judge, there is no arbitration
21    yet.  There's a motion to compel in the State Court.
22    I just wanted to clarify that for you.
23              THE COURT:  Right, so -- but I'm granting
24    the motion to compel in this case.  Now, we have do
25    have the issue of those two missing or one missing
```

Page 57

1    engagement letter.  There is case law, which, of

2    course, I cannot find right this second because I

3    forgot to write it down, that says that even when

4    there are nonarbitrable provisions, but they are

5    entwined with the arbitrable provisions, that the

6    Court can defer on those matters subject to

7    resolution, and it appears to me that if the State

8    Court grants the motion to compel and all of the

9    allegations are being resolved by the arbitrators,

10   that it's appropriate to compel arbitration.

11          On the other hand, if the State Court

12   determines that a portion of the complaint is not

13   going to be arbitrated, then my motion to stay -- my

14   granting of the motion to stay stands and we will wait

15   until the conclusion of the State Court proceedings

16   and again come back here at such time as is

17   appropriate to determine how the resolution of the

18   State Court action impacts the causes of action that

19   are here.

20          So, Mr. Hutton, I'm going to ask you to

21   prepare the order and share your draft with Mr. Cimo.

22   It can be as simple, if you gentlemen wish, as for the

23   reasons stated on the record and then just put what

24   we're going to do and I think that should be fine.

25          MR. HUTTON:  Thank you, Your Honor.  I

1    will do so.

2                MR. CIMO:  Thank you, Judge.

3                THE COURT:  All right.

4           (Thereupon, the hearing was concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 59

```
 1                          CERTIFICATION

 2

 3     STATE OF FLORIDA )

 4                      )

 5     COUNTY OF MIAMI-DADE)

 6

 7          I, Carmen E. De La Cruz, Shorthand Reporter

 8     and Notary Public in and for the State of Florida at

 9     Large, do hereby Certified that the foregoing

10     proceedings were taken before me at the date and place

11     as stated in the caption hereto on Page 1; that the

12     foregoing computer-aided transcription is a true

13     record of my stenographic notes taken at said

14     proceedings.

15

16

17               WITNESS my hand this 20th day of October,

18     2010.

19

20

21                         _____

22                         Carmen E. De La Cruz

23                         Court Reporter and Notary Public

24                         DD545111 Expiration Date 08/2011

25
```